IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALVERENE BUTLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CASE NO. 2:06-cv-00278-MEF-CSC |
| ALABAMA DEPARTMENT OF | ) | |
| TRANSPORTATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM BRIEF IN SUPPORT OF SUMMARY JUDGMENT

Defendants Alabama Department of Transportation, Joe McInnes, Mark T. Waits, and

Patrick Todd Jackson hereby file with this Court their Memorandum Brief in Support of

Summary Judgment.  Defendants file contemporaneously herewith their Motion for Summary

Support of Summary Judgment and their Evidentiary Materials in Support of Summary

Judgment.  As grounds, Defendants state as follows:

## FACTS

Plaintiff Alverene Butler was first employed as a Clerical Aide by the Alabama

Department of Transportation in January 1994.  (See Notice of Provisional Appointment, dated

June 23, 2994, a copy of which is attached hereto as "Exhibit E," at 2; Departmental

Appointment Notification, dated January 7, 1994, a copy of which is attached hereto as

"Exhibit G.")  Butler received a provisional appointment as an Engineering Assistant I effective

July 11, 1994.  (Exhibit E at 1.)  She was accorded permanent status as an Engineering Assistant

on March 27, 1999.  (See Notice of Permanent Status, dated March 27, 1999, a copy of which is

attached hereto as "Exhibit F.")

From 1994 until August 6, 2004, Butler worked under five different supervisors.  (See Revised Grievance Hearing Procedure, dated August 6, 2004, Docket No. 876, a copy of which is attached hereto as "Exhibit P," at 2.)  From April 2000 until February 2003, Butler worked under the supervision of James Horace.  (See Exhibit P at 2.)

During the time Ms. Butler was supervised by Horace, she complained about him to the Assistant District Engineer on November 20, 2001; to the Assistant District Engineer and the District Engineer, Defendant Mark Waits, on December 7, 2001; and to the Assistant District Engineer and Waits again on February 25, 2003.  (See Exhibit P at 2.)  On February 26, 2003, Butler filed a departmental grievance alleging sexual harassment.  (See Correspondence from L. Daniel Morris, Jr., to then-State Personnel Director Tommy Flowers, dated October 8, 2004, a copy of which is attached hereto as "Exhibit H"; see also Exhibit P.)

On August 6, 2004, a grievance hearing was conducted (Exhibit P).  The Hearing Officer found that, while the complaints indicated on-going problems between Horace and his subordinates, they fell short of constituting complaints of sexual harassment.  He noted:

> However, none of the documentation on these complaints evidences any allegation of sexual harassment.  Despite this, Ms. Butler testified she referred to sexual harassment complaints she had against Mr. Horace in the meeting of December 7, 2001, and she testified she further told others, not part of her upper management, of these complaints.  She admittedly did not file a grievance based upon any sexual harassment until the present one, and no one else claimed to have witnessed any such misconduct, at least before February 25, 2003.

(Exhibit P at 2.)

The Hearing Officer also addressed Ms. Butler's filing of an EEOC charge and the Department's actions in response thereto.  In August 2002, Butler filed an EEOC charge

claiming sexual harassment by Horace.  In November 2002, Butler received a "right-to-sue" letter from EEOC[1].  (See Exhibit P at 2.)

On February 25, 2003, a formal meeting was held with the employees supervised by Horace.  As a result of information gathered at that meeting, Horace was immediately removed as the supervisor of Butler and others.

An immediate investigation was begun concerning Horace's alleged misconduct.  On March 27, 2003, Defendant Mark Waits recommended that Horace be terminated.  Horace was then terminated on or about April 18, 2003.  (See Exhibit P at 3.)  In commenting on ALDOT's action, the Hearing Officer said, "This action was effective and it was quick."  (Exhibit P at 3.)

The Hearing Officer's September 8, 2004, Opinion noted, however, that ALDOT did "drop the ball" by allowing Mr. Horace to perform the Annual Employee Performance Appraisal for Ms. Butler after he had become aware of Ms. Butler's complaints against him.  (Exhibit P at 3.)

On October 8, 2004, ALDOT Assistant Director L. Daniel Morris, Jr., contacted the State Personnel Department regarding the evaluations Butler had received from Horace.  (Exhibit H.) Morris requested that Ms. Butler's evaluations for calendar years 2002 and 2003 be raised and that the revised scores be reflected in Butler's personnel file.  Morris also asked that, if the revised scores entitled Butler to a pay raise, that such raise be granted retroactive to the date that it would have been paid.  (Exhibit H at 2.)

The first page of Morris' letter indicates that the request was approved on October 25, 2004, by Jackie Graham, then-Assistant Director of the State Personnel Department. (Exhibit H.)

---

[1] Butler apparently elected not to act upon the right to sue letter received from the EEOC.

<u>The Reprimand of April 13, 2005</u>

On January 31, 2005, Butler was a passenger in a state vehicle that was involved in a traffic accident.  (See Alabama Uniform Traffic Accident Report, dated January 31, 2005, a copy of which is attached hereto as "Exhibit I"; Deposition of Karen Stacey, a copy of which is attached hereto as "Exhibit C," at 13-16.)  The state vehicle was driven by Karen B. Stacey, an employee of ALDOT.  The vehicle driven by Stacey was determined to be "the prime contributing unit." (Exhibit I at 1; Exhibit C at 37-39.)

According to Butler, at the time the two vehicles collided Stacey exclaimed, "Did you see that stupid motherfucking nigger hit me?  (Exhibit U at 1; Exhibit B, Deposition of Mark Waits, at 11; Exhibit C, Deposition of Karen Stacey, at 19.)

Stacey denied making such a statement.  (Exhibit C at 18.)  When interviewed, the employees of the crew that worked with Butler and Stacey stated that none of them had ever heard Stacey make such a slur.  (Exhibit T, Affidavit of Mark Waits, Attachment 1 at 4.)

Butler did not file a grievance concerning the purported statement or report said statement to her superiors.  (Exhibit U, Investigative Determination; Exhibit B, Deposition of Mark Waits, at 11.)

From the time of the traffic accident on January 31, 2005 until early April, Butler reported Stacey's purported statement to the black employees of the work crew.  (Exhibit T, Affidavit of Mark Waits, Attachment 1 at 4, 7, 19, 21 and 22.)  She told Kelvin Johnson about the statement approximately ten times.  Johnson asked her to stop talking about it but Butler persisted.  She reported the statement to Melvin Wynn four or five times and to Reeser Knight "several" times over the interim months.

During the time that Butler was talking to the black employees about Stacey, Butler was advising Stacey that some of the black employees were out to get Stacey.  (Exhibit T, Attachment 1, at 10; Exhibit C at 25-26; Exhibit W, Report of Workplace Violence.)[2]  Butler advised Stacey that James Feagin told Butler that if she (Butler) cared about Stacey she better watch Stacey's back or she would find Stacey "strung up out there."  (Exhibit T, Attachment 1, at 10.)  When Stacey mentioned that she was going to confront Feagin about his statement, Butler told her not to, that she (Butler) would "handle it."  (Exhibit C at 26.)

On March 16, 2005, Stacey talked to Feagin about what he had allegedly said to Butler about Stacey.  (Exhibit T, Attachment 1, at 10; Exhibit C at 26.)  Feagin denied making the statement (Exhibit T, Attachment 1, at 17.)  At that time Feagin told Stacey what Butler was telling the black crew members about Stacey.  (Exhibit T, Attachment 1, at 10.)

On the same day that Stacey talked to Feagin, she also told co-workers Taylor and Johnson that she had not made the statement.  Johnson advised Stacey that, "…it didn't sound like you, Karen." (Exhibit T, Attachment 1, page 11.)

Stacey reported Butler's comments to her supervisor, Project Engineer Todd Jackson (also a Defendant in this action).  (See Deposition of Patrick Todd Jackson, a copy of which is attached hereto as "Exhibit D," at 14.)  Stacey advised Jackson that Butler had apparently told other employees of the purported racial comments and that she (Stacey) wanted to get the matter cleared up.  (Exhibit D at 15.)

Jackson then approached Butler and asked about the racial epithets.  Butler reported that Stacey had used the epithet at the time of the traffic accident but she "had forgot it as soon as it happened."  (Exhibit D at 15.)  Jackson instructed Butler not to discuss the matter with anyone until he had a chance to discuss it with his supervisor, Mark Waits.  (Exhibit D at 16.)

[2] Butler subsequently admitted making the statement but said that it was made in a joking manner.  (Exhibit W at 2.)

Contrary to Jackson's instructions, Butler discussed the matter with several co-workers (Exhibit U; Exhibit B, Deposition of Mark Waits at 15-16; Exhibit T, Attachment 1, at 8.)  Butler admitted to Mark Waits that she had approached at least three employees contrary to Jackson's instructions.  (Exhibit T, Attachment 1, at 8.)  Co-workers Jesse Taylor and Kelvin Johnson acknowledged that Butler had discussed the matter with them on the morning of the April 11, 2005 confrontation.  (Exhibit T, Attachment 1, at 18-19.)

On the morning of April 11, 2005, Stacey, Butler, and other employees were on a job site.  (Exhibit C at 20.)  One of the employees, Jesse Taylor, made the comment that if Butler had something to say, that she should say it.  (Exhibit C at 20.).[3]  Stacey asked Butler if she had something to say.  Butler responded with the assertion that Stacey had made the racial slur at the time of the wreck, and Stacey denied it.  Other employees were involved in the conversation, and the progress of the job was affected.  (Exhibit C at 23-25.)

Stacey, who was the Chief Inspector and in charge of the job (Exhibit C at 240), called Defendant Jackson, the Project Engineer, and advised him that "things were getting out of hand." (Exhibit C at 24; Exhibit D at 34.)  Todd came to the site, gathered all the employees together, and let them know that they were expected to complete the work assigned.  (Exhibit D at 34.) Jackson did not ask for questions or comments at that time.  Jackson subsequently talked with the employees on the job site, other than Stacey and Butler, and issued Butler a reprimand. (Exhibit D at 25-28; Reprimand of April 13, 2005, a copy of which is attached hereto as "Exhibit Q.")

Butler filed a departmental grievance alleging that Stacey had made a racial slur on January 31, 2005, that there had been a confrontation on April 11, 2005, that she received a

---

[3] When subsequently asked by Waits why he (Taylor) had said something to Stacey that morning, Taylor said that Butler had made it his business when she approached him that morning talking about it and that he was tired of hearing about it.  (Exhibit T, Attachment 1, at 18.)

reprimand as a result of the confrontation, and that she received an unfair performance appraisal score. (See Investigative Determination, Docket Number 954, a copy of which is attached hereto as "Exhibit U.")

Defendant Waits investigated Butler's grievance. (Affidavit of Mark Waits, attached hereto as "Exhibit T.") In conducting his investigation, Waits ascertained the individuals whom he would need to interview. He then typed up a list of questions for each individual. He interviewed the individuals asking them the questions that he had prepared and noted their responses. He returned to his office and typed up each individual's responses. Waits then met with the witnesses and asked them to review the responses he had prepared. Several of those interviewed signed and dated their responses. (See Exhibit T.)

The questions and responses attached to Waits' affidavit (Exhibit T, Attachment 1, at 10-25) reflect that Butler admitted discussing the matter with other employees after being told by Jackson not to. (Exhibit T, Attachment 1, at 15.) Employee James Feagin stated that he had never heard Stacey make any kind of racial slur, that Butler told him that Stacey had done so, that he also heard Butler telling other employees about the supposed epithet. (Exhibit T, Attachment 1, at 17.)

Employee Jesse Taylor said that other employees had told him about Butler's comments about Stacey. He told Butler that she needed to talk with Stacey about the matter and that he was tired of hearing about it. (Exhibit T, Attachment 1, at 18.) Taylor went on to note that Butler was hindering work. He didn't have a good relationship with Butler because "she was messy and keeps things going on" and "looking for something to get some dirt on you." Taylor also noted that Stacey was "okay to work with."

Kelvin Johnson was also interviewed by Waits (Exhibit T, Attachment 1, at 19.)  Johnson stated that Butler began telling him about the purported slur in January or February and brought it up "over ten times."  In spite of him telling Butler not to involve him, she kept bringing it up. On the morning in question, Butler approached three of the employees in the truck and began discussing the slur again.  At that time, Johnson noted, "Jesse said, 'Maybe you and Karen need to talk about it.' "  Johnson went on to state that Butler's actions were a hindrance and held up crew work.  (Exhibit T, Attachment 1, at 19.)

In his interview Johnson was asked a question about a hostile working environment.  His response was, "Hostile work environment with Rene (Butler), not with Karen."  Other employees interviewed gave information consistent with that listed above.  (Exhibit T.)

Based upon information received in his investigation, Waits found that Butler's actions justified her reprimand.  (Exhibit T, Attachment 1, at 3.)  After reviewing Waits' investigation and documentary evidence, the Department's EEO issued an Investigative Determination upholding the reprimand (Investigative Determination, Docket Number REY954, dated June 1, 2005, a copy of which is attached hereto as "Exhibit U.")

Butler appealed the determination but failed to appear for the grievance hearing. Accordingly her grievance was dismissed.  (Order of Dismissal, Docket Number 954, a copy of which is attached hereto as "Exhibit V.")

Butler's EEOC Charges indicate that Jackson gave her another reprimand at some time after the April 15, 2005, reprimand (See Exhibits AA and CC).

Approved and Disapproved Leave

On August 24, 2005, Mark Waits issued a memorandum to "All District Three Supervisors" regarding "Approved and Disapproved Leave."  (Exhibit X at 3.)  There had been

some confusion as to whether employees would be put on leave without pay if a leave slip was

disapproved.  (Exhibit B, Deposition of Mark Waits, at 23-28.)  There was an issue as to how to

treat a situation where a leave request was denied.  Some thought that the individual would still

use the leave, be paid for his time off, and that his use of that leave would be addressed on his

performance evaluation.  Others thought that, if the leave was disapproved, and the employee

was off for that period, the employee would be on leave without pay and would not be paid for

the number of hours that were disapproved.

Once it was determined that disapproved or disallowed leave would be treated as leave

without pay, the department had to go back and correct all leave and payroll records by issuing

supplemental payrolls.  An audit was conducted to ensure that records were corrected.

(Exhibit B at 25, 26).  As a result of this review, some employees leave balances were adjusted.

(Exhibit Z, Leave Accrual Corrections Form.)  Exhibit Z indicates that four people in the Sixth

Division had their leave hours adjusted.  These employees were Melvin Jackson, Alverene

Butler, Michael Bogan, and Kelvin A. Johnson.  The leave accrual form bears the following

notation:

> "Leave was disapproved by supervisors on above listed employees.
> They should have been charged LWOP.  Requests have been made
> to accounting to reduce their pay by number of hours shown; thus,
> their leave should be adjusted."

Citations for Abuse of Leave Procedures

On August 29, 2005, Todd Jackson instituted new leave policies for those under his

supervision.  (See New Project Leave Procedures, dated August 29, 2005, a copy of which is

attached as "Exhibit Y, at 1.")

On August 30, 2005, Jackson issued a letter of written counsel to Butler for excessive absences. (Exhibit Y at 2.) Jackson had also had occasion to give Stacey letters of written counsel for her use of leave. (Exhibit D at 12.)

On August 30, 2005, Jackson issued a letter of written counsel to Butler for her failure to follow call-in procedures. (Exhibit Y at 3.)

Consideration of Stacey for Promotion To Civil Engineer (CE)

During the late summer or early fall of 2005 Stacey interviewed for the position of Civil Engineer (the title was later changed to Transportation Technologist). She had previously submitted an application, taken the written test, and been placed on the register. She decided not to take the position due to her decision to retire (Exhibit C, Deposition of Karen Stacey, at pages 35-37).

Butler's Separation from Employment with ALDOT

On August 31, 2005, a representative from Retirement Systems of Alabama responded to a request for information from Butler. (See letter from Jacqueline J. Lohman to Alverene Butler, dated August 31, 2005, a copy of which is attached hereto as "Exhibit K.") Lohman advised Butler that disability benefits would only be paid, "…after our Medical Board certifies that such member is mentally or physically incapacitated for the further performance of duty and that such incapacity is likely to be permanent…."

On November 2, 2005, Butler submitted an Application for Retirement to the Employee's Retirement Systems of Alabama. (See Application for Retirement, dated November 2, 2005, a copy of which is attached hereto as "Exhibit L.") On the second page of her application Butler indicated that she was seeking "disability benefits from the Retirement Systems of Alabama."

(See Report of Disability, Part II: Applicant Authorization, dated September 20, 2005, a copy of which is attached hereto as "Exhibit M.")

In September of 2005, Butler's physician, Albert E. Lester, M.D., submitted a Report of Disability to the Retirement Systems of Alabama (See Report of Disability, Part I: Statement of Examining Physician, a copy of which is attached hereto as "Exhibit N.")  Dr. Lester, who indicated that he had treated Butler from April 20, 1985, to September 12, 2005, reported the following diagnoses as the cause of her disability:  "Chronic back pain, neck pain, abnormal MRI Lumbar Spine, chronic shoulder pain, HTN, and Fibromyalgia."  On the second page of the report when asked about records that clarify or support diagnosis, Lester noted, "Abnormal MRI of shoulder, Abnormal MRI of Lumbar Spine."

On November 1, 2005, the medical board of the Retirement Systems of Alabama certified that, because of the conditions reported by Dr. Lester, Butler was permanently physically or mentally incapacitated for the performance of duty and should be retired.  (See Report of the Medical Board, dated November 1, 2005, a copy of which is attached hereto as "Exhibit O.")

On November 8, 2005, Retirement Systems representative Lucy H. Holcombe advised Butler that her application for disability was approved.  Holcombe further advised Butler that her retirement would be effective January 1, 2006.  (See Letter from Lucy Holcombe to Alverene Butler, dated November 8, 2005, a copy of which is attached hereto as "Exhibit J.")

## ARGUMENT AND SUPPORTING AUTHORITY

### Summary Judgment Standard

Summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  For purposes of summary judgment, the district court resolves all reasonable doubts about the facts

in favor of the nonmoving party. *Warrior Tombigbee Transport Co., Inc. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir. 1983). The party opposing the motion for summary judgment, however, cannot rest on his pleadings to present an issue of fact, but rather must make a response to the motion by filing affidavits, depositions, or otherwise that illustrate material facts in the case necessitating trial. *Van T. Junkins & Assoc. v. U.S. Industries, Inc.,* 736 F.2d 656, 658 (11th Cir. 1984).

Summary judgment is appropriate if the non-moving party bears the onus of proving an element of his case and fails to produce evidence adequate to create a genuine question of fact regarding the existence of that element. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d. 265 (1986).

The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986). The moving party may produce evidence demonstrating the inability of the nonmoving party to prove his case at trial. *Celotex Corp. v. Catrett, supra*.

To survive summary judgment on a hostile work environment claim, the Plaintiff must produce enough evidence that a reasonable jury could find that his workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed. 295 (1993).

McInnes, Waits and Jackson Are Not Proper Defendants under Title VII

In addition to the Alabama Department of Transportation (ALDOT), the Plaintiff has named Joe McInnes, Mark Waits, and Patrick Todd Jackson as Defendants in this action. McInnes is named in his official capacity. Waits and Jackson are named in both their individual and official capacities.

Only ALDOT may be sued under Title VII. *Busby v. City of Orlando*, 931 F.2d. 764, 772 (11th Cir. 1991); *Smith v. Auburn University* 201 F.Supp.2d 1216 (M.D.Ala. 2002). McInnes, Waits, and Jackson are not proper defendants under Title VII.

The Eleventh Amendment Bars Plaintiffs 1983 Action against the Alabama Department of Transportation

In order to succeed on a 1983 claim, "a plaintiff must show that he or she was deprived of a federal right *by a person* acting under color of state law." *Griffin v. City of Opa Locka*, 261 F3d 1295, 1303 (11th Cir.2001) (emphasis added). According to *Will v. Mich. Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed. 2d 45 (1989), the State is not a "person" within the meaning of § 1983. The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.. The Eleventh Amendment bars suit against a State brought by the State's own citizens. *McLendon v. Ga. Dept. of Cnty. Health,* 261 F.3d 1252, 1256 (11th Cir.2001). Moreover, state agencies share the same Eleventh Amendment immunity as do states. See *Fouche v. Jekyll Island State Park Auth.,* 713 F.2d. 1518, 1520-23 (11th Cir. 1983). Therefore, the Eleventh Amendment bars a federal court from exercising jurisdiction over a lawsuit against a non-consenting state and its agencies. *Vt. Agency of Natural*

13

*Resources v. United States, ex. rel. Stevens,* 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836(2000).

Qualified Immunity

Defendants Waits and Jackson are sued both in their official and their individual capacities. With regard to any claim of retaliation asserted pursuant to the equal protection clause, these Defendants claim the defense of qualified immunity.

The right to be free from retaliation is clearly established as a *first amendment* right and as a *statutory* right under Title VII; but no clearly established right exists under the *equal protection* clause to be free from retaliation. *Ratliff v. Dekalb County, Ga*., 62 F.3d 338,340 (11th Cir. 1995); *Evans v. Alabama Department of Corrections,* 418 F.Supp2d 1271, 1283 (M.D. Ala. 2005); *Walton ex. rel. R.W. v. Montgomery County Board of Education,* 371 F.Supp 2d 1318, 1322 (M.D. Ala. 2005).

Accordingly, Waits and Jackson are entitled to the defense of qualified immunity with regard to the Plaintiff's claims under 42 U.S.C. § 1983.

Plaintiff's Retaliation Claims

Plaintiff contends that Defendants McInnes, Waits, and Jackson retaliated against her for two alleged acts on the part of the plaintiff. The first of these acts is described in paragraph 31 of Plaintiff's First Amended Complaint (Doc. No. 14 at 6) as her "having reported the misconduct of a white individual." As noted in the *Statement of Facts* section of this memorandum, Butler was a passenger in a state vehicle that was involved in a traffic accident. (See Exhibit I; Exhibit C" at 13-16.) The state vehicle was driven by Karen B. Stacey, an employee of ALDOT. The vehicle driven by Stacey was determined to be "the prime contributing unit." (Exhibit I at 1; Exhibit C at 37-39.) Butler contended that Stacey had made a racial slur at the time of the

accident.  Stacey denied making the racial comment.  (See Exhibit C at 19-20.)  Butler also asserted that Stacey had not properly reported the accident.

Secondly, Butler alleges that she was retaliated against for filing a sexual harassment complaint against a former supervisor.  (Plaintiff's First Amended Complaint (Doc. No. 14) at 6, ¶ 32.)

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove the following elements:  (1) she participated in an activity that Title VII protects; (2) she suffered an adverse employment action; and, (3) there is a causal connection between the participation in the protected activity and the adverse employment decision.  *Gupta v. Fla. Bd. Of Regents* 212 F3d 571,587 (11th Cir. 2000); *Farley v. Nationwide Mutual Ins*., 197 F.3d 1322, 1336 (11th Cir. 1999).  If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.  *Raney v. Vinson Guard Service*, 120 F.3d 1192 (11th Cir. 1997); *Hairston v. Gainesville Sun Publg. Co.,* 9 F.3d 913 (11th Cir. 1993).

If the defendant proffers legitimate reasons, the presumption of retaliation is rebutted and drops from the case.  At the summary judgment stage, "the burden then shifts back to the plaintiff to raise a genuine factual issue as to whether the defendant's proffered reason is a pretextual ruse to mask a retaliatory action.  *Hairston, supra*, at 921. The proffered "legitimate reason" is not pretextual unless the plaintiff shows both that the reason was false and that discrimination was the real reason.  *Brooks v. County Com'n of Jefferson County, Ala.,* 446 F.3d 1160, 1163 (11th Cir. 2006).  Conclusory allegations of discrimination, without more, are insufficient to raise an inference of pretext.  *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.* 97 F.3d 436, 444 (11th Cir. 1996).  When an employee has articulated several different reasons

for an employment action, a plaintiff must demonstrate that each of the proffered reasons is unworthy of credence in order to establish pretext. *Lewis v. Chattahoochee Valley Community College*, 136 F.Supp.2d 1232, 1239 (M.D. Ala. 2001).

In the case at bar, only one of Butler's actions constitutes a "protected activity" as required for the first element of a *prima facie* case. Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. 2000(e)-3(a). As with a discriminatory treatment claim, a plaintiff alleging a retaliation claim under Title VII must begin by establishing a *prima facie* case. The plaintiff must first show that he engaged in a protected activity. *Coutu v. Martin County Board of County Com'rs.*, 47 F.3d 1068 (11th Cir. 1995). The Plaintiff's reporting of the alleged racial comment of Karen Stacey does not rise to the level of a "protected activity" as required for proof of a *prima facie* case.

In 1978 the Ninth Circuit considered the question of whether the expression of opposition to a single comment by one co-worker in the presence of another can constitute opposition to an unlawful employment practice as a matter of law. *Silver v. KCA, Inc.*, 586 F.2d. 138 (9th Cir.1978). In *Silver*, the plaintiff objected to a racially derogatory comment uttered by a co-worker, demanded and received an apology from the co-worker, and subsequently was fired. In finding that the plaintiff had failed to establish a *prima facie* case of retaliatory discharge under Title VII, the Ninth Circuit opined that the opposition of an employee to a co-worker's own individual act of discrimination "does not fall within the protection of Title VII." *Silver,* 586 F.2d at 142.

The Eleventh Circuit adopted the Ninth Circuit's rationale in *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956 (11th Cir. 1997). The facts set forth in *Little* at 958 are strikingly similar to those in the case at bar. In *Little*, the plaintiff worked in the Test department. A co-worker approached him and stated, "Nobody runs this team but a bunch of niggers and I'm going to get rid of them." Although Little apparently informed a number of co-workers about the racially derogatory remark, he did not report the remark to either a supervisor or manager until several months later. Little contended that, once he reported the remark to management, he was harassed continually. He alleged that he was under surveillance from supervisors, subjected to closer scrutiny and criticism, and given menial tasks to perform. He also contended that he was denied a promotion. In granting the employer's motion for summary judgment, the district court ruled that (1) one isolated comment by a co-worker does not constitute an unlawful employment practice; and, (2) the actions of which Little complained did not constitute "an adverse employment action within the meaning of Title VII."

The Eleventh Circuit affirmed the ruling of the district court. Writing for the panel, Judge Birch stated,

> "We agree with the Ninth Circuit's disposition of *Silver*, a case factually similar to the one at hand. As stated by the Court, 'by the terms of the statute…***not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful practice of an employer, not an act of discrimination by a private individual***."

*Little,* 103 F.3d 956 (emphasis added).

The above-cited case law renders obvious the conclusion that Butler's claim of retaliation may be analyzed only with reference to her opposition to the actions of her supervisor, James Horace.

As noted above, to prove retaliation a plaintiff must show that (1) she participated in an activity that Title VII protects; (2) she suffered an adverse employment action; and, (3) there is a causal connection between the participation in the protected activity and the adverse employment action. *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571 (11th Cir. 2000).

With regard to her EEOC charge against Horace and the filing of her departmental grievance, Plaintiff meets the first requirement of the *prima facie* case. Obviously, the filing of an EEOC charge is a protected activity. The Eleventh Circuit has also held that internal proceedings, such as the Plaintiff's departmental grievance, are protected by Title VII. *EEOC v. Total System Services, Inc.,* 240 F.3d 899 (11th Cir. 2001).

Next, Plaintiff must show that she suffered an adverse employment action. The Eleventh Circuit has never adopted a bright line test for determining what treatment or event rises to the level of an "adverse employment action". *Davis v. Town of Lake Park, Florida,* 245 F.3d 1232 (11th Cir. 2001). But see *Doe v. DeKalb School District.*, 145 F.3d 1441, 1449(11th Cir 1998) (observing not every unkind act rises to the level of adverse employment actions).

In a recently released opinion the Supreme Court has addressed a disagreement among the Circuits as to what type of employer activity meets the definition of "adverse employment action". *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. ____, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The Court addressed the question as to how harmful an act of retaliatory discrimination must be to fall within the prohibition of Title VII. In answering this question Justice Breyer, speaking for the Court, concluded, at 2415:

> "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination."

The Court explained its use of the term material adversity because of the importance of separating significant from trivial harms.  Title VII, the Court noted, does not set forth a general civility code for the American workplace.

The Court acknowledged that, "judicial standards … must filter out complaints attacking the normal tribulations of the workplace, such as the sporadic use of abusive language, gender related jokes, and occasional teasing.  An employee's decision to report discriminatory behavior cannot immunize an employee from those petty slights or minor annoyances that often take place at work … personality conflicts that generate antipathy and snubbing by supervisors and co-workers are not actionable."

In light of the recent issuance of the *Burlington Northern* opinion, there is a paucity of published opinions in this Circuit to be used as authority in interpreting the new standard.  There are, however, a number of unpublished opinions referencing *Burlington Northern*, *supra*.  See, generally, *McAdams v. Harvey Slip Copy*, 2007 WL 106774 (C.A. 11(Ala.)); *Arnold v. Tuskegee University,* 2006 WL 3724152 (11th Cir. 2006); *Delong v. Best Buy,* 2006 WL 362697 (11th Cir. 2006); *James v. State of Alabama Dept. of Revenue,* 2006 WL 3070134 (11th Cir. 2006), *Beard v. 84 Lumber Company,* 2006 WL 2946883 (11th Cir. 2006);*DAR v. Associated Outdoor Club, Inc.*, 2006 WL 3006704 (11th Cir. 2006).  In the majority of these slip opinions, the panels, after acknowledging *Burlington Northern,* uphold grants of summary judgment based upon the plaintiff's failure to show the third element of a *prima facie* case of retaliation, a causal connection between the participation in the protected activity and the adverse employment action.

The case at bar is similar to those listed above.  Butler, regardless of the existence, or lack thereof, of an adverse employment action simply cannot show a causal connection between her charges of sexual harassment and subsequent employment actions.

In evaluating Butler's apparent claim of a causal connection one must review the timeline of pertinent events. Such a review would include the following dates:

1. August 2002-Plaintiff's EEOC charge asserting sexual harassment by supervisor James Horace.

2. February 26, 2003-Plaintiff's departmental grievance asserting sexual harassment by supervisor James Horace.

3. March 27, 2003—Waits recommendation that Horace be terminated.

4. April 18, 2003—Horace terminated by ALDOT.

5. September 18, 2004—Hearing Officer's Opinion re Butler's departmental grievance characterizes ALDOT's action as "effective and it was quick" but points out that ALDOT dropped the ball when it allowed Horace to complete Butler's performance appraisal.

6. October 8, 2004—ALDOT Assistant Director Morris contacts State Personnel Department regarding raising Butler's evaluations and granting retroactive pay raise.

7. October 25, 2004—Morris request approved.

8. April 13, 2005—Butler receives first of two written reprimands.

9. August 2005—Leave hours adjusted for Butler and three other employees.

10. August 30, 2005--Butler gets letter of written counsel for use of leave.

11. August 30, 2005--Butler gets letter of written counsel for failure to follow call-in procedures.

12. August 31, 2005—State begins processing of paperwork for Butler's disability

retirement.

13. Summer/fall 2005—Karen Stacey interviews for CE position.

14. November 1, 2005—Retirement Systems panel certifies Butler's incapacity for

performance of duty.

15. January 1, 2006—Butler receives disability retirement.

16. April 1, 2006—Karen Stacey retires.

Review of the timeline reveals that it was approximately 32 months from Butler's EEOC

charge against Horace to the first of her two written reprimands and 26 months from her

departmental grievance to the first of her two reprimands.  It was approximately 36 months from

her EEOC charge to the adjustment of leave hours for Butler and three other employees.  It was

also a period of some 36 months from the time of Butler's EEOC charge to Karen Stacey

interviewing for the job which Butler says should be offered to her.[4]

To establish the causal connection requirement of a *prima facie* case, a plaintiff must

show that the decision-makers were aware of the protected activity and that the protected activity

and the adverse employment action were not wholly unrelated.  *Gupta v. Florida Board of

Regents,* 212 F.3d 571, 590 (11th Cir. 2000); *Wideman v. Wal-Mart Stores, Inc*., 141 F.3d 1453,

1457 (11th Cir. 1998).

At a minimum, the plaintiff must show that the adverse action followed the protected

conduct.  *Griffin v. GTE Fla. Inc.,* 182 F.3d 1279, 1284 (11th Cir. 1999).  In other words, the

plaintiff must show a temporal link between the protected conduct and an adverse employment

action.  Our circuit has ruled that the temporal proximity must be very close.  *Hulbert v. St.*

---

[4] It should also be noted that during the first eight months of that period Butler's harasser was investigated and
terminated. Additionally Butler's evaluations were revised and a retroactive pay raise approved within five weeks of
ALDOT officials being apprised of the problem by a grievance officer.

*Mary's Health Care System*, 439 F.3d 1286, 1297(11th Cir. 2006). See *Sullivan v. Nat'l R.R. Passenger Corp.,* 170 F.3d 1056, 1060-61 (11th Cir. 1999) holding that no causal link existed between protected activity in February 1994 and adverse employment actions in late 1994 and early 1995. *See also Sierminski v. Transouth Fin. Corp*., 216 F.3d 945, 951(11th Cir. 2000) in which the Court held that a seven month time period between the protected activity and the adverse employment action is too indirect to satisfy the causal connection requirement. A district court in the Southern District of Alabama addressed the issue in *Breech v. Alabama Power Co*., 962 F.Supp. 1447, 1461(S.D. Ala. 1997). In *Breech*, the court ruled that a period of more than a year between the protected activity and the adverse employment action negated any claim of causal connection.

The Supreme Court has cited, with approval, decisions in which a period of three to four months between the protected activity and the adverse employment prevented the finding of a causal connection. *Clark County Sch. District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed. 2d 509 (2001) citing *Richmond v. ONEOK,* 120 F.3d. 205, 209(10th Cir. 1997) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75(7th Cir. 1992).

If there is a substantial delay between the protected expression and the alleged retaliatory conduct, then, in the absence of other evidence tending to show causation, the complaint fails as a matter of law. *Higdon v. Jackson*, 393 F.3d. 1211, 1220(11th Cir. 2004).

The period ranging from 26 to 36 months between Butler's protected activity and her litany of purported adverse employment actions is far in excess of the temporal link contemplated by the above mentioned case law. Her claim of retaliation must fail due to the inability of Butler to fulfill the third element of proving a *prima facie* case.

Additionally, Butler's claim against Jackson must fail due to a lack of proof that Jackson was aware of the protected activity at the time of his issuance of the written reprimand. *Gupta, supra.* The only evidence available indicates that Jackson was unaware of Butler's earlier EEOC charge at the time (at least 26 months later) that he issued the written reprimand.

Exhibit U submitted by Defendants is the Investigative Determination regarding Butler's grievance regarding her first reprimand which was received in April of 2005. At page 3 of that Determination, the investigating official observes, "Mr. Jackson was not aware of, nor involved, with any prior complaint filed by Ms. Butler."

Defendants would further assert that, even if Butler has met the requirements of a *prima facie* case of retaliation, Defendants have met their burden of articulating a legitimate non-discriminatory reason for each and every adverse action of which Plaintiff complains.

With regard to the reprimands and letters of written counsel, Defendants have clearly shown that these items were issued as a result of Butler's steadfast refusal to comply with supervisory instruction and departmental policy. Her refusal, on one occasion, resulted in a disruption of the workplace.

With regard to adjustment of leave hours, Defendants have shown that Butler and three other employees had their hours adjusted as a result of the Department's determination that disapproved leave would be treated as LWOP and the subsequent re-evaluation of leave records over a period of months. (Exhibit B, Deposition of Mark Waits, at 25, 26; Exhibit Z, Leave Accrual Form).

With regard to Butler's claim that she was not considered for promotion to the position of Civil Engineer, the Defendants direct the Court's attention to Defendants' Exhibit S, Affidavit of Steve Dukes. Dukes is the State Personnel Department employee that serves on a team that

manages the development of Employment Registers and the issuance and return of Certificates of Eligibles.  Candidates for employment/promotion are selected from the Certificate of Eligibles.

One of the records kept by the SPD is an "application history" which reflects job classifications for which an applicant applies and the action which was taken with regard to specific applications.  According to the evidence submitted via Dukes affidavit, Butler applied three times for Civil Engineer positions. On one occasion Butler's application was rejected due to the fact that she did not meet the minimum qualifications for the job.  The other two times, the application history reveals that Butler simply failed to appear for the examination.  Due to Butler's failure to complete the process she has never been placed on an employment register. Since she has never been on a register for Civil Engineer, her name could never have been certified to ALDOT as being eligible for the position.  As noted by Dukes, "It was impossible for ALDOT to promote Ms. Butler from her Engineering Assistant position to that of Civil Engineer."  (Exhibit S, Dukes Affidavit, at 4.)

Defendants are entitled to summary judgment as to Butler's claims of retaliation.

<u>Plaintiff's Disparate Treatment Claims</u>

Plaintiff's Complaint alleges that she was subjected to disparate treatment by Defendants Jackson and Waits. In deposition, Plaintiff identified Karen Stacey, a white ALDOT employee, as her comparator.  (Exhibit A, Deposition of Alverene Butler, at 14 and16).  She could not identify anyone else from whom she was treated differently.

Butler's claim must fail due to the lack of a proper comparator for purposes of showing disparate treatment.  In determining appropriate comparators, the legal standard for such relevant evidence is routinely addressed in Title VII actions through well settled case law.  For instance,

in *Holifield v. Reno,* 115 F.3d 1555, 1562(11th Cir. 1997), the Court held employees are "similarly situated" only when the comparator is "nearly identical" to the employee. Similarly situated employees are the only appropriate legal comparison because the law does not vest the Court with the authority to second-guess a reasonable employer's decisions. *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).

In the case at bar, it is undisputed that Karen Stacey held the title of Chief Inspector as opposed to Butler's working title of Inspector. (Exhibit C, at 30-32.) Stacey held the title of Chief Inspector from the time Jackson put Stacey and Butler back in the field until Stacey retired. (Exhibit C, at 30-32.) Jackson appointed Stacey to the Chief Inspector position because she showed initiative and an ability to get things done. He noted that when he gave Stacey something to do that it got done. (Exhibit T, Attachment 1, at 25.) Butler acknowledged that the duties of a Chief Inspector were largely "to delegate" and to supervise. (Exhibit A, 122-3.) A comparison, therefore, of duties, tasks performed, or work not done, is clearly improper.

Butler also compares herself to Stacey in alleging that the Defendants failed to promote her (Butler) to the position of Civil Engineer. Once again, Stacey is not a proper comparator. Stacey testified that she took the test for the Civil Engineer position and "got on the register". Unlike Stacey, Butler was not "on the register". Butler was once determined not to meet minimum qualifications and, on two other occasions, simply failed to appear for the test (Exhibit S, Affidavit of Steve Dukes) so that she could be placed on a register. Stacey was available for interviews. Butler was not available for consideration. As Dukes noted, it was "impossible" for the Department to even consider her (Butler) for a position. (Exhibit S, Affidavit of Steve Dukes.)

Even if, however, Butler could make out a *prima face* case of disparate treatment, her claim would still fail. The Defendants have set forth legitimate, non-discriminatory reasons for their actions. These reasons have been set forth in previous sections of this memorandum.

The facts as shown render obvious the conclusion that Plaintiff cannot even establish a *prima facie* of discrimination in promotion. In *Hawthorne v. Sears Termite and Pest Control,* 309 F.Supp 2d 1318 (M.D. Ala), the Middle District recognized the elements for a *prima facie* case as requiring that plaintiff show (1) he is a member of the protected class; (2) he applied for and was qualified for the promotion; (3) he was rejected in spite of his qualifications; and, (4) the position went to a person who was not a member of the protected class or the employer continued to attempt to fill the position after rejecting the employee's application.

In Butler's case she fails to meet elements two and three. In all three of her attempts to apply, she was either adjudged not qualified or she failed to complete the application process by taking the examination. The one time Butler's application was rejected it was rejected due to her lack of minimum qualifications and not in spite of her qualifications. (Exhibit S, Affidavit of Steve Dukes.)

Constructive Discharge

A constructive discharge occurs when a discriminatory employer imposes working conditions that are "so intolerable that a reasonable person in the employee's position would have been compelled to resign." *Fitz v. Pugmire Lincoln Mercury Inc.,* 348 F.3d 974, 977 (11th Cir. 2003), *Poole v. Country Club of Columbus, Inc.,* 129 F.3d. 551,553 (11th Cir. 1997).

In the case at bar, Plaintiff has failed to show that she was compelled to resign due to the actions of her employer. Instead, the undisputed evidence reflects that the Plaintiff applied for and accepted disability retirement after being certified by Retirement Systems of Alabama as

being, "permanently physically or mentally incapacitated for the performance of duty."

(Exhibits K-O.)

Defendants are entitled to summary judgment with regard to Plaintiff's claim of

constructive discharge.

<u>Conclusion</u>

For the reasons cited above, Defendants contend that they are entitled to an order

granting them summary judgment on each and every count of the Plaintiff's Complaint.

RESPECTFULLY SUBMITTED
TROY KING
ATTORNEY GENERAL

s/ Harry A. Lyles
Jim R. Ippolito, Jr. (IPP001)
Assistant Attorney General
Chief Counsel

Harry A. Lyles (LYL001)
R. Mitchell Alton, III (ALT003)
Assistant Attorneys General
Assistant Counsel

**ADDRESS OF COUNSEL:**
State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama  36110
Telephone:  (334) 242-6350
Facsimile:  (334) 264-4359
lylesh@dot.state.al.us

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ALVERENE BUTLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **CASE NO. 2:06-cv-00278-MEF-CSC** |
| **ALABAMA DEPARTMENT OF** | ) | |
| **TRANSPORTATION,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 29, 2007, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECT system, which will send notification to the following:

Mr. Jay Lewis, Esq.
Law Offices of Jay Lewis, L.L.C.
P.O. Box 5059
Montgomery, Alabama  36103-5059
ATTORNEY FOR PLAINTIFF

s/ Harry A. Lyles
Harry A. Lyles (LYL001)
Assistant Attorney General
Assistant Counsel

**ADDRESS OF COUNSEL:**

State of Alabama Department of Transportation
1409 Coliseum Boulevard
Montgomery, Alabama  36110
(334) 242-6350 (office)
(334) 264-4359 (facsimile)
lylesh@dot.state.al.us