# ALVERENE BUTLER

## v.

# ALABAMA DEPARTMENT OF TRANSPORTATION, et al.

# ALVERENE BUTLER

## January 5, 2007



DEFENDANT'S
EXHIBIT

A

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**

ALVERENE BUTLER - 1/5/2007

**1**

IN THE UNITED STATES DISTRICT CIRCUIT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALVERENE BUTLER,
    Plaintiff,
vs.        CASE NO. 2:06-CV-278-MEF
ALABAMA DEPARTMENT OF
TRANSPORTATION, et al.,
    Defendants.

———————————————
   *   *   *   *   *   *

DEPOSITION
OF
ALVERENE BUTLER,

taken pursuant to notice and stipulation on
behalf of the Plaintiff, and the ALABAMA
DEPARTMENT OF TRANSPORTATION, 1409 Coliseum
Boulevard, Room K-101, Montgomery, Alabama
36130-3050, before DAWN A. GOODMAN, Certified
Shorthand Reporter and Notary Public in and for
the State of Alabama at Large, on Friday,
January 5, 2007, commencing at 11:00 o'clock
a.m.

**2**

APPEARANCES

FOR THE PLAINTIFF:
    JAY LEWIS, Esquire
    847 South McDonough Street
    Suite 100
    P.O. Box 5059
    Montgomery, Alabama 36104

FOR THE DEFENDANTS:
    HARRY LYLES, Esquire
    Alabama Department of Transportation
    1409 Coliseum Boulevard
    Room K-101
    Montgomery, Alabama 36130-3050

    H. MITCHELL ALTON, III, Esquire
    Alabama Department of Transportation
    1409 Coliseum Boulevard
    Room K-101
    Montgomery, Alabama 36130-3050

**3**

ALSO PRESENT:
    Todd Jackson
    Mark Waits

**4**

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the Deposition of Alverene Butler is taken pursuant to notice and stipulation on behalf of the Defendant; that all formalities with respect to procedural requirements are waived; that said deposition may be taken before DAWN A. GOODMAN, Certified Shorthand Reporter and Notary Public in and for the State of Alabama at Large, without the formality of a commission; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Civil Rules of Procedure for the State of Alabama.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of the Deposition of Alverene Butler is hereby waived and that said

1 (Pages 1 to 4)

5

1  deposition may be introduced at the trial of
2  this case or used in any other manner by either
3  party hereto provided for by the Statute,
4  regardless of the waiving of the filing of
5  same.
6          It is further stipulated and agreed by
7  and between the parties hereto and the witness
8  that the signature of the witness to this
9  deposition is hereby waived.
10
11          *   *   *   *   *   *
12
13
14
15
16
17
18
19
20
21
22
23

7

1  5  Two-page letter, dated December      71
2     30, 2004, from L. Daniel Morris,
3     Jr., to The Honorable Terry Everett
4
5  6  Two-page letter, dated October      69
6     8, 2004, from L. Daniel Morris,
7     Jr., to Mr. Tommy Flowers
8
9  7  Omitted
10
11  8  Omitted
12
13  9  Nine-page document, dated      11
14     June 8, 2006, entitled First
15     Amended Complaint
16
17
18
19
20
21
22
23

6

1              I N D E X
2                        Page
3  Examination by Mr. Lyles          8
4  Examination by Mr. Lewis          124
5              I N D E X
6  For the Defendants:
7  No.                      Page
8  1  Omitted
9
10  2  Six-page document, dated      65
11     September 8, 2004, from
12     John T. Robertson, IV., Esquire,
13     entitled Hearing conducted
14     at Offices of ALDOT, Central
15     Office
16  3  Omitted
17
18  4  Two-page letter, dated April 13,      41
19     2005, from Patrick T. Jackson
20     to Ms. Alverene Butler, EA II/III
21
22
23

8

1              P R O C E E D I N G S
2  THE COURT REPORTER:  Did counsel
3     want the usual stipulations?
4  MR. LYLES  Yes, ma'am, please.
5  MR. LEWIS:  Yes.
6
7          (ALVERENE BUTLER, of lawful
8          age, having been duly sworn,
9          testified as follows:)
10
11          EXAMINATION
12
13  BY MR. LYLES:
14  Q.  (By Mr. Lyles) Okay.  For the record,
15      please state your full name.
16  A.  Alverene Dixon Butler.
17  Q.  All right.  Ms. Butler, one of the things
18      that we usually ask folks about in these
19      cases is, due to the location of the
20      court and the area from which they pick a
21      jury, we will ask for all of the
22      relatives in an over-several-county area.
23      I found it usually takes a lot of time.

ALVERENE BUTLER - 1/5/2007

**9**

1   What I would like to do, if it's all
2   right with your counsel, if you could
3   make me a list of folks you are related
4   to and give it to your lawyer and he will
5   forward it to me.
6   A.  Okay.
7        MR. LYLES:  We've already talked
8        about that.
9   Q.  (By Mr. Lyles)  Great.  Thank you, ma'am.
10       Now, Ms. Butler, one thing,
11  that I'm not as organized as your lawyer,
12  so I'm going to be kind of jumping around
13  from one subject to another, as I can
14  remember them.  What I am going to try
15  to do is, we are going to go through your
16  Complaint so I can understand exactly
17  what we are here about.  Then after that,
18  we will go back and talk about some of
19  the things that we've heard yesterday in
20  testimony.  Then I may get into some
21  other areas after that.
22       The first thing I want to do
23  is show you what I've marked as Exhibit

**10**

1   9.  And I want to make sure that that is
2   a copy of the Complaint that we are
3   about.  Take your time.  Just take a
4   moment to look through it.  Does that
5   appear to be what we are in the lawsuit
6   about?
7   A.  Okay.
8   Q.  Hold onto that.  We will chat about that
9   in just a moment.
10       Also, I've got two EEOC
11  charges here.  I want to make sure that
12  these are the ones that you filed.  I
13  will represent to you that they appear to
14  be an affidavit and so forth.  If you
15  want to take a look at them to make sure
16  they are on the same page.  I've got
17  different numbers.  Just glance at that
18  and tell me the number of that one, the
19  number is up here -- and that is indeed
20  your charge?
21  Q.  Okay.
22  A.  This is 05221.
23  Q.  Um-hum.

**11**

1   A.  That's fine.
2   Q.  All right.
3   A.  This is mine.  04383.
4   Q.  Okay.  That is also in your charge; is
5   that right?
6   A.  Yes.
7   Q.  All right.  Now, let's take a look at
8   your Amended Complaint.  And that's No. 9
9   that you have got there in front of you.
10       (The referred-to document was
11       marked for identification as
12       Defendants' Exhibit No. 9)
13  Q.  (By Mr. Lyles)  As I understand it, this
14  lawsuit was filed against the ALDOT
15  obviously and, then, three people.  Those
16  three people are Mark T. Waits, Patrick
17  T. Jackson, and Joe McInnis; is that
18  right?
19  A.  Correct.
20  Q.  And Mr. McInnis is sued in his official
21  capacity because he is like the head of
22  the Department, and he would have to
23  approve any relief.  Mr. Waits -- let me

**12**

1   ask you this:  Are these gentlemen seated
2   over to my left, is that Mr. Waits and
3   Mr. Jackson?
4   A.  Yes.
5   Q.  Okay.  And these two gentlemen, it's your
6   testimony as we sit here today, that Mr.
7   Waits is a racist?
8   A.  Yes.
9   Q.  And Mr. Jackson is also a racist?
10  A.  Yes.
11  Q.  Okay.  That they also retaliated against
12  you for some earlier filings or
13  complaints; is that right?
14  A.  Yes.
15  Q.  Okay.  If you will, let's look at Page 6
16  of your Complaint.  It says, "Plaintiff
17  was qualified for a promotion from EA to
18  CE on two separate occasions."  The first
19  thing I'm going to ask you, to make sure
20  I understand it, EA is Engineering
21  Assistant; is that right?
22  A.  Yes.  What number are you?
23  Q.  I'm sorry.  Paragraph 34.  You were an EA

3 (Pages 9 to 12)

ALVERENE BUTLER - 1/5/2007

13

```
 1        II/III; is that right?
 2   A.   Yes.
 3   Q.   Okay.  The CE is what?
 4   A.   The same -- it's a Civil Engineer.  Same
 5        thing as TT is now.
 6   Q.   Okay.  And your contention is that you
 7        were qualified to be promoted to a CE on
 8        two separate times but, for the racial
 9        animosity of these gentlemen, that you
10        did not get those jobs; is that right?
11   A.   Correct.
12   Q.   Now, how long have you been on the CE
13        register, to the best of your
14        knowledge?
15   A.   I'm not sure.
16   Q.   Okay.
17   A.   Approximately about four years.
18   Q.   Okay.  Do you recall how many
19        applications you submitted for that
20        position?  I know some jobs you have to
21        periodically resubmit.
22   A.   Right.  I'm not sure.
23   Q.   Okay.  But, to the best of your
```

14

```
 1        recollection as we sit here today, you
 2        have indeed submitted applications for
 3        CE?
 4   A.   Yes.
 5   Q.   Down in Paragraph 38, it says that you
 6        contend you were treated differently from
 7        a similarly situated member of a
 8        nonprotected group, a white female.  Do
 9        you see that?
10   A.   Yes.
11   Q.   Based on yesterday's testimony, I'm
12        assuming that is the lady Karen Stacey
13        that was deposed yesterday; is that
14        right?
15   A.   Yes.
16   Q.   Is there anybody else -- any other white
17        females that you say you were treated
18        differently than?
19   A.   No.
20   Q.   Okay.  Now, is it because you are a black
21        female, or because you are black, or
22        because you are a female?  Which of those
23        things?
```

15

```
 1   A.   Black.
 2   Q.   Okay.  Now, on Paragraph 37 through 49,
 3        you talk about you wanted to be promoted
 4        to a job in November 2005, and you
 5        applied for it.  Your application was
 6        rejected and the promotion went to a
 7        member of nonprotected group, white.
 8        "Alternatively, the promotion went to a
 9        person who has filed no complaints for
10        sexual harassment."
11            First, if you will, tell me
12        what job that was that was open in
13        November 2005.
14   A.   It was also a TT position.
15   Q.   TT, which used to be CE?
16   A.   Right.
17   Q.   Okay.  You applied for that job, felt
18        like you should have been -- and you
19        wanted that job; is that right?
20   A.   Yes.
21   Q.   Okay.  It says your application was
22        rejected.  Who rejected your
23        application?
```

16

```
 1   A.   I'm not sure.
 2   Q.   Okay.  Did you get a letter saying it was
 3        rejected?
 4   A.   No.
 5   Q.   How do you know it was rejected?
 6   A.   I wasn't even called for an interview.
 7   Q.   It says the promotion went to a member of
 8        a nonprotected group.  Who got that
 9        promotion?
10   A.   They called in Karen Stacey.
11   Q.   Karen Stacey.  They called her in.  Who
12        called her in?
13   A.   I'm not sure.
14   Q.   Okay.  Did she get that promotion?
15   A.   Yes, but she declined it.
16   Q.   Okay.  So it was offered to her?
17   A.   Yes.
18   Q.   All right.  It says, "The promotion went
19        to a person who filed no complaints of
20        sexual harassment."  You are talking
21        about Karen Stacey on that; is that
22        right?
23   A.   Yes.
```

ALVERENE BUTLER - 1/5/2007

---

**17**

1  Q. What you mean by that is, she may not
2     have ended up with that job, but if she
3     wanted it, she could have it; is that
4     right?
5  A. Yes.
6  Q. Okay. How did you know?
7  A. She personally told me.
8  Q. She told you. And when did that take
9     place?
10  A. November.
11  Q. November?
12  A. 2005.
13  Q. Okay. It goes on to say that you were
14     discharged from your job; working
15     conditions became so intolerable you
16     couldn't take it anymore. Is that
17     basically it?
18  A. Yes.
19  Q. Did Karen tell you who offered her that
20     position?
21  A. I don't recall.
22  Q. Okay. And as to whether or not she has
23     ever filed a complaint of sexual

---

**18**

1     harassment, did she tell you she never
2     had, or are you just assuming she never
3     had?
4  A. No. She has never told me.
5  Q. Okay. Now, your Prayer for Relief that
6     starts on Page 7 and goes over to Page 8,
7     that's basically, as I understand, you
8     are telling the court what you want the
9     court to do about this; is that right?
10  A. Yes.
11  Q. Okay. You want compensatory damages
12     against Mark Waits in the amount of
13     $500,000. Tell me how you came up with
14     that figure, please, ma'am.
15  A. From all of the stress, humiliation, the
16     pain and suffering.
17  Q. Okay.
18  A. All that I had endured.
19  Q. All right. Did somebody help you come up
20     with that number, or did you just decide
21     that's what that was worth?
22     MR. LEWIS: Object to any
23     questions that might invoke

---

**19**

1     the attorney-client
2     privilege.
3  Q. (By Mr. Lyles) Ms. Butler, I'm not asking
4     you to tell me about any conversations
5     between you and Mr. Lewis, okay? Because
6     that's protected.
7  A. Right.
8  Q. I'm not allowed to know about that.
9  A. Okay.
10  Q. Other than your lawyer helped you
11     determine that number?
12  A. No.
13  Q. And it also goes on down in Part (e) that
14     you want other relief; back pay, back
15     benefits, accrued leave, reinstatement or
16     what's called Crum pay, money instead of
17     reinstatement; is that right?
18  A. Exactly.
19  Q. And what type of position and so forth do
20     you want reinstated to?
21  A. I don't recall.
22  Q. Suppose the court says, "Okay.
23     Ms. Butler, you're right. Mr. Waits and

---

**20**

1     Mr. Jackson were racist. They
2     discriminated against you, and I'm going
3     to give you what you are asking for. I'm
4     going to reinstate you." What do you
5     want the court to reinstate you to? What
6     job with ALDOT do you want?
7  A. I'm not sure at this time.
8  Q. Okay. But you said you feel like you
9     could perform the duties -- or you didn't
10     say this but, I'm assuming, since you
11     used to be an EA, you could perform those
12     duties?
13  A. Yes.
14  Q. Or CE or TT, as it's called now?
15  A. Yes.
16  Q. Okay. It also goes on to say that you
17     want to be awarded attorney's fees, which
18     means, if you win, the court will decide
19     how much money your lawyer is entitled
20     to. And I'm sure it will be a large
21     amount.
22     MR. LEWIS: And well deserved.
23  Q. (By Mr. Lyles) How much have you paid him

---

5 (Pages 17 to 20)

ALVERENE BUTLER - 1/5/2007

---

21

1  thus far?
2  A.  I haven't paid him anything.
3  Q.  Okay. Is this like on a -- if you win,
4  he gets paid, kind of deal?
5  A.  Yes.
6  MR. LEWIS: For the record, I will
7  provide you with the
8  contentions of the
9  agreement.
10  Q.  (Mr. Lyles) That's fine. If I have
11  evaluate this thing, I want to be able to
12  give people numbers. Okay.
13  Ms. Butler, yesterday we
14  were in here and we talked, as you know,
15  to Ms. Stacey. And your lawyer did his
16  usual thorough job deposing Mr. Waits and
17  Mr. Jackson. And some topics came up
18  that I just want to make sure I
19  understood what they were. So I am going
20  to go back and ask you some things that
21  came up. The reason I am doing that is I
22  want to understand what you think
23  happened and what you think is driving

---

22

1  this lawsuit. Okay?
2  A.  Okay.
3  Q.  Now, Mr. Lewis asked Ms. Stacey if she
4  did manual labor on the job. I believe
5  she said, "yes." What is the
6  significance of that? Is it your
7  contention she didn't do manual labor or
8  that you did more manual labor?
9  A.  Yes.
10  Q.  I'm sorry. I asked you two things and
11  you said "yes." Which one?
12  A.  My contention is that not only did I not
13  do more manual labor, she didn't do
14  any.
15  Q.  Okay. She did no manual labor?
16  A.  No.
17  Q.  How much did you do?
18  A.  Whatever I needed to do. Quite a bit.
19  Q.  Okay. So part of what we are here about
20  is you had to perform duties different
21  from Ms. Stacey; is that right?
22  A.  Yes.
23  Q.  Give me an example of that please, ma'am.

---

23

1  A.  Making concrete cylinders.
2  Q.  Okay.
3  A.  Taking compactions.
4  Q.  All right. Let me stop you there. What
5  is "taking compactions"? What does that
6  mean?
7  A.  Taking compactions, that's checking soil.
8  If we are doing soil compactions,
9  running, taking densities on it.
10  Q.  Okay. Ms. Stacey didn't have to do that,
11  as far as you know?
12  A.  Mrs. Stacey didn't do that.
13  Q.  Okay. All right. Let me ask you about
14  that. I understand that you can testify
15  that there were times you worked together
16  and you didn't see her do it.
17  A.  Right.
18  Q.  But how you -- how do you know that she
19  never did it?
20  A.  Because that was at her own admission.
21  Q.  Okay.
22  A.  And that she had no intentions of doing
23  it.

---

24

1  Q.  Who did she make that mention to?
2  A.  To me.
3  Q.  When did she do that?
4  A.  When we were on the 31 job. That was
5  probably about October.
6  Q.  Okay. The 31 job; what is that?
7  A.  That's --
8  Q.  Highway 31?
9  A.  31, yes.
10  Q.  During that time she said she had no
11  intention of doing that?
12  A.  Right.
13  Q.  Okay. Ms. Stacey was asked if she
14  complained to Todd -- which I assume is
15  Mr. Jackson; is that right?
16  A.  Um-hum.
17  Q.  -- about hours worked and she said "no."
18  Do you contend that she did indeed do
19  that. That she complained to Todd about
20  hours that she worked?
21  MR. LEWIS: I object to the form.
22  And the reason I'm objecting
23  to it, for your benefit, is I

---

6 (Pages 21 to 24)

ALVERENE BUTLER - 1/5/2007

25

1  don't think she was objecting
2  to the hours that Ms. Stacey
3  worked. She was objecting to
4  the hours that Ms. Butler
5  worked.
6  Q. (By Mr. Lyles) Well, let me back up and
7     ask you that.
8  A. Okay.
9  Q. Is it your contention that there was some
10    difference between the hours you worked
11    or the hours that Ms. Stacey worked? Did
12    you work more hours than she did, or did
13    she complain about one of you not working
14    as many hours?
15 A. She didn't complain.
16 Q. Okay.
17 A. She just stated to Todd that I did not
18    work the hours.
19 Q. I see. You didn't work the hours that
20    you claimed you worked?
21 A. Exactly.
22 Q. When did that happen?
23 A. That happened on a few occasions.

26

1  Q. Tell me about those occasions.
2  A. I don't exactly remember the dates.
3  Q. Okay. Tell me as much as you can about
4     the occasions so I can kind of figure out
5     what was going on.
6  A. Myself, Reeser Knight, Calvin Johnson and
7     Melvin Wynn would normally be the last
8     ones to come in at the end of the day.
9     We would lock up, and we would record our
10    hours.
11 Q. Okay.
12 A. And that meant no one was at the office
13    when we came in.
14 Q. Okay.
15 A. We put down the hours we worked only to
16    learn the next day that they would have
17    been changed by Mr. Jackson. Ms. Stacey
18    would tell Mr. Jackson that we did not,
19    in fact, work the hours.
20 Q. Okay. How do you know that she told
21    Mr. Jackson?
22 A. I have seen her do it with the other
23    employees in my presence.

27

1  Q. All right. In your presence, she told
2     Mr. Jackson about other situations where
3     people didn't work?
4  A. Exactly.
5  Q. And from that, you are assuming that your
6     reduction in hours was due to her doing
7     the same thing to you?
8  A. Exactly.
9  Q. But you didn't personally see her do that
10    or hear her do that?
11 A. No.
12 Q. Okay. Now, you said you would come in
13    last. Your lawyer asked some questions
14    of Ms. Stacey about that, who generally
15    came in last.
16 A. Um-hum.
17 Q. Are you saying that the folks that you
18    rode with, or the crew you worked on,
19    were the last ones to come back to the
20    shop or to the base?
21 A. Right.
22 Q. Who would that be? Who would be in that
23    group that came in last?

28

1  A. Most times it was myself, Melvin Wynn,
2     Reeser Knight and sometimes Calvin
3     Johnson.
4  Q. Okay. Now, that was after you quit
5     riding with Ms. Stacey; is that right?
6  A. Exactly.
7  Q. When did you stop riding with Ms.
8     Stacey?
9  A. In January.
10 Q. January?
11 A. I'm not exactly sure about the exact
12    date, but I know it was right after the
13    accident.
14 Q. Okay. That was the car accident we
15    talked about yesterday?
16 A. Yes.
17 Q. Okay. And why did y'all quite riding
18    together?
19 A. I stopped riding with her.
20 Q. And why is that?
21 A. I chose not to be in her – I did not
22    want to be in her company unless I had
23    to.

7 (Pages 25 to 28)

ALVERENE BUTLER - 1/5/2007

29

1    Q.   Okay. Before that, y'all had been pretty
2         good friends; hadn't you?
3    A.   I was a friend to her. She was an
4         associate of mine.
5    Q.   You were a friend to her, but that was
6         not reciprocated; is that right?
7    A.   Exactly.
8    Q.   Did she on occasion buy your lunch
9         because you didn't have any money to buy
10        lunch?
11   A.   She bought my lunch whether I had money
12        or not.
13   Q.   Okay. She bought your lunch. Did she on
14        one occasion give you some money to buy
15        your children Christmas presents?
16   A.   No.
17   Q.   That didn't happen?
18   A.   No.
19   Q.   Are you sure?
20   A.   I'm sure.
21   Q.   If Ms. Stacey says she gave you several
22        $100 to buy Christmas for your children;
23        she is lying?

30

1    A.   Yes, she is.
2    Q.   During the time that y'all were riding
3         together and that you were a friend to
4         her, but she was not a friend to you, did
5         there come a time when there was a death
6         in your family? One of your relatives
7         died?
8    A.   That happened on a couple of occasions.
9    Q.   Okay. Did Ms. Stacey come to the
10        funerals of those people?
11   A.   Not to my knowledge.
12   Q.   Okay. Did she come to the house after
13        the funeral?
14   A.   Yes.
15   Q.   After the accident in January, did she
16        call your house on several occasions to
17        check on you?
18   A.   She may have called once or twice.
19   Q.   Okay. Now, the day of the accident she
20        was back in the examining room with you;
21        is that right?
22   A.   Yes.
23   Q.   Okay. Did you ask her to come back

31

1         there?
2    A.   No.
3    Q.   Okay. Had she taken you to the doctors
4         before when you needed to go to the
5         doctor?
6    A.   Yes.
7    Q.   In fact, wasn't she on some of the
8         doctor's records as being someone with
9         whom they could discuss your medical
10        condition?
11   A.   Not to my knowledge.
12   Q.   You never put her on there?
13   A.   No.
14   Q.   Okay. Did she often go back in the
15        doctor's office with you?
16   A.   Yes.
17   Q.   Now, there was some questions about
18        padding time sheets yesterday.
19   A.   Yes.
20   Q.   And I know you were here for part of the
21        deposition. Do you recall those
22        questions? Do you know what they were
23        about?

32

1    A.   I don't recall them specifically, no.
2    Q.   As you told me earlier, you feel like
3         there was times that you worked hours and
4         Ms. Stacey would go behind you and say,
5         no, she didn't work those hours?
6    A.   Yes.
7    Q.   Mr. Lewis asked some folks about leave
8         that was previously approved and then
9         disapproved later. Do you remember that
10        line of questions?
11   A.   Yes.
12   Q.   Tell me what you contend happened.
13   A.   Mr. Jackson held a meeting and came in
14        passed out to all of the employees a memo
15        from Mr. Waits stating that they were
16        going back to April 8th and checking
17        leave. I don't know. I don't remember
18        exactly the contents of the letter. But
19        it meant that they were going to go back
20        into your record, and leave that they
21        felt shouldn't have been approved, they
22        were going to go back and disapprove
23        it.

8 (Pages 29 to 32)

ALVERENE BUTLER - 1/5/2007

33

1  Q. Okay. And did you feel like that was
2     something they were out to get you?
3  A. Yes.
4  Q. Okay. Why did you feel that way?
5  A. Because they had started doing all sorts
6     of things of that nature.
7  Q. Do you know whether or not -- did they
8     ever actually take any leave from you?
9  A. Yes.
10 Q. And did they take it from any other
11    employees?
12 A. I don't have that knowledge.
13 Q. Okay. Do you know whether or not they
14    took any from Ms. Stacey?
15 A. I don't have that knowledge.
16 Q. Okay. Ms. Stacey at one point got a
17    letter about her leave also; did she
18    not?
19 A. I don't have that knowledge either.
20 Q. She didn't tell you about that?
21 A. No.
22 Q. Okay. Now, you heard -- never mind. Let
23    me ask you something else. There was a

34

1     name that came up yesterday, a Reeser
2     Knight. Do you remember who that is?
3  A. Yes.
4  Q. Okay. There was some questions about Ms.
5     Stacey talking to her about complaints
6     that she had on the job or problems she
7     had with Ms. Stacey. What are you
8     contending here that -- did Ms. Knight
9     have problems with Ms. Stacey also?
10 A. I think they had had some type of
11    conflict at one time.
12 Q. Okay. Did Ms. Stacey get into arguments
13    with folks a lot at work?
14 A. Yes.
15 Q. Tell me about that.
16 A. Pretty much if she didn't have her way,
17    or whatever, she would periodically go
18    off on co-workers, threaten to have them
19    removed.
20 Q. Okay. Threaten to have them removed?
21 A. Yes.
22 Q. What does that mean?
23 A. She would make the statement, she will

35

1     have them out of there. I guess
2     transferred out.
3  Q. Was there co-workers that wasn't doing
4     their job or just people she didn't like
5     or what?
6  A. No. My opinion was she did it because
7     she knew she could.
8  Q. Okay. Does Reeser Knight still work for
9     the Department?
10 A. No.
11 Q. How come: Do you know?
12 A. She said she couldn't handle the stress.
13    She left.
14 Q. Okay. We talked earlier about different
15    duties and so forth. I have got a mark
16    here next to "compaction." Compaction
17    and slump test. What is that?
18 A. That's where you're actually testing the
19    strength of the concrete.
20 Q. Okay. All right. Now, as I understood
21    yesterday, there was some talk about a
22    reprimand you got; was there not? Did
23    you get a reprimand from Mr. Jackson over

36

1     here?
2  A. I got a couple of them.
3  Q. Tell me about each one, please, ma'am.
4     What was the first one you remember ever
5     getting from Mr. Jackson?
6  A. The first one was about the altercation
7     that took place on the job site.
8  Q. Was that the one we talked about
9     yesterday with Ms. Stacey?
10 A. Yes.
11 Q. That was the first one. That was
12    sometime in April of 2005; is that right?
13 A. Yes.
14 Q. And some things happened after that?
15 A. Yes.
16 Q. Tell me about them.
17 A. About approximately maybe 14 days later,
18    Mr. Jackson came, called me over to his
19    truck and Mr. Wynn and Ms. Knight. He
20    talked to me first and Mr. Wynn and told
21    us to go over to Mr. Waits' office and
22    that the young lady had some paperwork
23    waiting for me to pick up.

9 (Pages 33 to 36)

ALVERENE BUTLER - 1/5/2007

37

1   Q.  Okay.
2   A.  And that once we picked that paperwork
3       up, we were to go back to our office.
4       And Mr. Wynn, he turned around and he
5       told Mr. Wynn where he wanted us to take
6       us, because Mr. Wynn was driving. Then I
7       went over and I explained it to Ms.
8       Knight and we left. The next day he came
9       out to the site, wrote me a letter of
10      reprimand and told me that I did not
11      follow his order. And I told him that I
12      did follow his orders.
13  Q.  Okay.
14  A.  He said he instructed me to go in his
15      mailbox and retrieve some paperwork. And
16      I told him, "You did not tell me that."
17      And at that point he started hollering
18      and told me to shut up.
19  Q.  Who did that?
20  A.  Mr. Jackson.
21  Q.  Okay. You feel like it was based on your
22      race?
23  A.  Yes.

38

1   Q.  Or was that part of the retaliation?
2   A.  That was both.
3   Q.  Okay. All right.
4   A.  So I, in fact, shut up. Then he started
5       in on Ms. Knight because she told him,
6       "You didn't tell me anything."
7   Q.  Um-hum.
8   A.  "You had Rene to tell me." He in turn
9       went off on her.
10  Q.  And "went off," you mean lost his
11      temper?
12  A.  Yes.
13  Q.  When he did that, what would he do?
14  A.  Put his finger in your face, cuss you
15      out.
16  Q.  "Cuss you out." What words would he
17      use?
18  A.  It all depended.
19  Q.  Damn, hell, cuss words? When you say
20      cuss you out, you are talking literally
21      he would curse at you?
22  A.  Yes.
23  Q.  Okay. I don't need to know each word.

39

1       I'm trying to distinguish between raising
2       his voice and actually cursing at you.
3       And you're saying that he would curse at
4       you?
5   A.  Yes.
6   Q.  Okay. When you came to work for
7       Mr. Jackson, or got to know him, didn't
8       you tell him that you knew he wasn't a
9       racist?
10  A.  Ask me that question again.
11  Q.  Didn't you tell Mr. Jackson you knew he
12      wasn't a racist?
13  A.  No.
14  Q.  Didn't you tell some of the black
15      employees they didn't have to worry about
16      Mr. Jackson because you knew he wasn't a
17      racist?
18  A.  No. My exact words were that I did not
19      feel that he was from what I had seen of
20      him. I had never worked with him
21      before.
22  Q.  But you did at some point tell folks that
23      you didn't feel he was a racist?

40

1   A.  Right.
2   Q.  You told him that; is that right?
3   A.  I don't recall.
4   Q.  But later you changed your mind and
5       decided he was?
6   A.  From his actions, yes.
7   Q.  Which particular actions caused you one
8       day to say, well, he is a racist after
9       all?
10  A.  After the incident with another employee.
11      I think it may have been Peter Smith.
12      And he and Ms. Stacey were in a
13      conversation after Mr. Jackson had gotten
14      off the phone with Mr. Waits. And I saw
15      them more or less trying to plot to get
16      Mr. Smith out.
17  Q.  Tell me about that. You saw them
18      plotting. Tell me what you mean by that.
19  A.  They made the statement about that he
20      needed one more letter against him and
21      that Mark could get rid of him.
22  Q.  Mark being --
23  A.  Mr. Waits.

10 (Pages 37 to 40)

ALVERENE BUTLER - 1/5/2007

41

1  Q.  -- to your understanding, Mr. Waits?
2  A.  Yes.
3  Q.  Okay. And at this point in time,
4      Mr. Smith does not work for ALDOT; does
5      he?
6  A.  No.
7  Q.  He was terminated; wasn't he?
8  A.  Yes.
9  Q.  Do you know whether or not he went to a
10     personnel hearing?
11  A.  I'm not sure.
12  Q.  Do you know what he was terminated for?
13  A.  I'm not sure.
14  Q.  Let me show you -- I think this is the
15     right document. This is what I think we
16     were talking about yesterday, a letter of
17     reprimand. Is that what happened after
18     the confrontation at the job site?
19  A.  This is the reprimand that I received,
20     yes.
21     (The referred-to document was
22     marked for identification as
23     Defendants' Exhibit No. 4)

42

1  Q.  It says you were reprimanded for
2     distracting on the job and for
3     disruptive conduct; is that right?
4  A.  Inattention to job. Anything distracting
5     on the job. Disruptive conduct of any
6     sort.
7  Q.  All right. Let me back up a little bit.
8     I understood from yesterday's testimony
9     that Mr. Jackson told you not to discuss
10     this matter with people on the job site;
11     is that right?
12  A.  No. He did not.
13  Q.  Never told you that?
14  A.  No.
15  Q.  When he said that yesterday, he was
16     either lying or he was mistaken?
17  A.  He was lying.
18  Q.  How do you know he was lying and not just
19     mistaken?
20  A.  Mr. Jackson knows what he said to me.
21  Q.  Okay. He is just flat-out lying?
22  A.  He was too firm about the fact of saying
23     that he said it to me.

43

1  Q.  All right. Did you discuss what Ms.
2     Stacey allegedly said with the other
3     employees?
4  A.  I went out the next morning. We were all
5     getting ready to go out to the job. And
6     I asked -- I had already asked two other
7     employees.
8  Q.  Which ones did you ask?
9  A.  I had asked the two that rode with me,
10     which would have been Ms. Knight and Mr.
11     Wynn.
12  Q.  Okay.
13  A.  Had either of them told Ms. Stacey that I
14     had said that she had made these
15     comments.
16  Q.  Um-hum.
17  A.  They both had responded, "no."
18  Q.  Okay.
19  A.  So the following morning I had asked
20     Mr. Johnson, Mr. Feagin and Mr. Taylor.
21  Q.  Wait one second. I'm sorry. I can't
22     write as fast as a lot of people.
23     Mr. Johnson, Mr. Feagin?

44

1  A.  Yes.
2  Q.  And who else?
3  A.  Mr. Taylor.
4  Q.  T-E?
5  A.  T-A-Y-L-O-R.
6  Q.  Mr. Taylor. I'm sorry. All right. So
7     the next morning you asked those
8     people?
9  A.  Yes.
10  Q.  What did they say?
11  A.  One of them just simply said, "No." That
12     was Mr. Johnson. Mr. Taylor said, "You
13     know, I don't even talk to her."
14     Mr. Feagin said that she had come to him
15     and asked had he heard that.
16  Q.  You heard the testimony yesterday. Did
17     any of them tell you that you just needed
18     to talk to Ms. Stacey?
19  A.  Oh, Mr. Taylor told me that morning, "Why
20     don't you confront her about it?"
21  Q.  Okay.
22  A.  And I told him that wouldn't be
23     necessary.

11 (Pages 41 to 44)

---

45

1  Q. Okay. So you heard -- I'm assuming you
2     heard Ms. Stacey yesterday talk about
3     when she came to the site, somebody said,
4     "Rene has something she wants to say to
5     you." Do you remember words to that
6     effect?
7  A. Um-hum.
8  Q. Did that happen?
9  A. I don't know. I wasn't even near them.
10 Q. All you know is that she came over to the
11    truck where you were?
12 A. I was not at the truck.
13 Q. Where were you?
14 A. I was standing. I had walked off. My
15    daughter had called with a situation. So
16    I had walked away from everybody pretty
17    much almost to the edge of the curb.
18 Q. Okay. So Ms Stacey came up and
19    confronted you?
20 A. Yes.
21 Q. Whether somebody told her to do that; you
22    don't know. You just knew she showed up
23    where you were with your cell phone?

---

46

1  A. Right.
2  Q. What did she say to you?
3  A. She said, "You need to stop going around
4     here telling these lies on me."
5  Q. Um-hum.
6  A. And at that point I had turned around,
7     because she had reached for me on my
8     shoulder. I asked her, I said, "What did
9     you say?" She said, "You need to stop
10    going around telling these lies on me."
11    So at this point my daughter on the phone
12    is asking me, "What's going on?" I am
13    telling her, "I don't know. I'll call
14    you back." By then the other co-workers
15    had began to gather around.
16 Q. Okay. So let me see if I understand what
17    you are telling me. And if I
18    misunderstand you, tell me. But there is
19    not a question of whether or not you said
20    something to these people about what
21    happened or asked them what she said;
22    right?
23 A. If she said, yes.

---

47

1  Q. Okay. Where you differ is that you say
2     that Mr. Jackson had never told you not
3     to do that?
4  A. Exactly.
5  Q. All right. Now, Ms. Stacey said
6     yesterday about one of the employees --
7     about you telling her that one of the
8     employees was telling her, "You better
9     look out for her," that one of the
10    employees was going to string her up. Do
11    you remember that testimony?
12 A. Yes.
13 Q. Did that happen?
14 A. Yes.
15 Q. You told her that the employee said
16    that?
17 A. Yes.
18 Q. Did he say it?
19 A. Yes.
20 Q. All right. Now, have you ever told Mr.
21    Waits over here that the employee didn't
22    really say that, that you were just
23    kidding with Ms. Stacey?

---

48

1  A. Did I tell Mr. Waits what?
2  Q. That that employee did not say those
3     things. That you were just kidding with
4     Ms. Stacey.
5  A. Mr. Waits and I never talked about
6     that.
7  Q. Your answer would be "no" then?
8  A. Yes.
9  Q. You never admitted to Mr. Waits that you
10    had indeed told Karen that, but that the
11    employee didn't say those things?
12 A. No.
13 Q. Let me ask you one more thing about this
14    rebuttal now. If I understand -- not
15    rebuttal -- I'm sorry -- reprimand. If I
16    understand what you are telling me, there
17    is no question that the discussion
18    between you and these employees went on;
19    your issue is that Mr. Jackson wrote you
20    up for disobeying an order that he never
21    gave you; is that right?
22 A. Yes.
23 Q. Now, are you saying that at the wreck

---

12 (Pages 45 to 48)

ALVERENE BUTLER - 1/5/2007

49

1  that Ms. Stacey did indeed use the
2  language we heard yesterday?
3  A.  Yes.
4  Q.  Did you later tell Mr. Jackson that you
5  just didn't think about it anymore.  That
6  you forgot about it?
7  A.  I tried to tell Mr. Jackson the date of
8  the accident at the hospital.
9  Q.  Right.  I thought I understood
10  Mr. Jackson to say yesterday that when
11  this came up later that he mentioned it
12  to you, and you said, "Well, I forgot it
13  as soon as it happened."
14  A.  No, that never happened.
15  Q.  Okay.
16  A.  Mr. Jackson's exact words were, did that
17  upset me.
18  Q.  Okay.  What did you tell him?
19  A.  I asked him what did he think.
20  Q.  Okay.  Did you use the term "nigger"
21  sometimes?
22  A.  Not at work, no.
23  Q.  Now, Ms. Stacey had met members of your

50

1  family; had she not?
2  A.  Yes.
3  Q.  In fact, you introduced her to your
4  daddy; is that right?
5  A.  Yes.
6  Q.  Did you tell your daddy that you wanted
7  him to tell Ms. Stacey that she wasn't
8  your house nigger?
9  A.  Yes.
10  Q.  You have used that phrase in front of Ms.
11  Stacey?
12  A.  Yes.
13  Q.  Okay.  Did you tell other employees to
14  tell her that you were not her house
15  nigger?
16  A.  No.
17  Q.  If she says you did, she is just
18  mistaken?
19  A.  I wouldn't have said that word.  I don't
20  recall.
21  Q.  All right.  Now, speaking of your daddy.
22  Your daddy -- if I understand correctly,
23  Mr. Dixon is a minister?

51

1  A.  Yes.
2  Q.  He used to be a radio personality?
3  A.  Yes.
4  Q.  He has some kind of mission now that he
5  operates; is that right?
6  A.  Yes.
7  Q.  Did Ms. Stacey's husband ever work at
8  that mission or contribute to that
9  mission; to your knowledge?
10  A.  Yes.
11  Q.  Was that before the falling out about the
12  wreck?
13  A.  That was after my father had helped them
14  get a $400,000 loan for the company.
15  Q.  Your dad helped them do that?
16  A.  Yes.
17  Q.  How did he help them do that?
18  A.  He set them up an appointment with
19  someone that he knew that was a friend of
20  his to help get the paperwork started and
21  talk them through it.
22  Q.  And that was another example of you
23  trying to be friends with Ms. Stacey or

52

1  trying to help her or earlier that you
2  tried to be a friend and she wasn't one
3  to you?
4  A.  Right.
5  Q.  All right.  What kind of things would he
6  do at your father's mission?
7  A.  He went out and cut some doors.
8  Q.  Okay.  All right.  Did he do some kind of
9  contracting work or something?
10  A.  He is a concrete company.
11  Q.  Okay.  Now, let's talk about that wreck
12  we have all heard so much about.  I'm
13  trying to keep this from being any longer
14  than it has to be.  Basically, there is a
15  wreck on Southern Boulevard?
16  A.  Um-hum.
17  Q.  You were riding with Ms. Stacey?
18  A.  Um-hum.
19  Q.  What happened was, another car pulled
20  out, and she hit the car broadside or hit
21  it in the side?
22  A.  The car pulled out of Entec.
23  Q.  Okay.

13 (Pages 49 to 52)

ALVERENE BUTLER - 1/5/2007

53

1  A.  And she was trying to pull into Taco
2      Bell, which is next door to Entec.
3  Q.  Um-hum.
4  A.  And when the car pulled out, she
5      attempted to turn once. And I told her
6      to hold up. And she thought she had
7      enough time to make it. Because once she
8      got ready to take off, the car that was
9      already traveling wasn't sure if she was
10     going to hit him. So this car also
11     paused.
12 Q.  Okay.
13 A.  And when he saw that she went on and
14     stopped, he resumed driving. My
15     assumption is that she felt that at that
16     moment when she saw him pause that he was
17     going to go on and stop and let her
18     across. So she shot for it.
19 Q.  Okay. And there was not that much damage
20     to either vehicle; was there?
21 A.  I don't know what the damage was to his
22     vehicle.
23 Q.  Do you know whether or not the damage to

54

1      the Department's vehicle was less than
2      $200?
3  A.  I'm not sure.
4  Q.  I think Ms. Stacey said yesterday that
5      the air bags never deployed. Is that
6      true, as far as you know?
7  A.  No, they didn't.
8  Q.  From there, you went to the hospital?
9  A.  Yes.
10 Q.  Did Ms. Stacey take you?
11 A.  No.
12 Q.  Who took you to the hospital?
13 A.  Mr. Jackson had Mr. Wynn to take me.
14 Q.  Okay. Now, I understood yesterday -- or
15     questions were about whether Ms. Stacey
16     had lied to the police officer about what
17     happened. Do you remember those
18     questions?
19 A.  No.
20 Q.  Well, are you saying here today that she
21     did lie or she falsified a report?
22 A.  I'm saying I don't know what she said
23     with the police because they were in the

55

1      police vehicle. I'm saying what she told
2      me that she was going to tell Todd.
3  Q.  Okay. You've looked at this accident
4      report before; have you not?
5  A.  No.
6  Q.  You didn't go down to the city and get a
7      copy of it?
8  A.  Yes.
9  Q.  Okay. So you got a copy of it. Did you
10     look at it when you got it?
11 A.  I just put it in my file.
12 Q.  Okay.
13 A.  What I mainly got it for, I wanted the
14     people's name off of there.
15 Q.  You called them after that?
16 A.  Yes.
17 Q.  But the report itself does indeed say
18     that Ms. Stacey was at fault; does it
19     not?
20 A.  I'm not sure.
21 Q.  Okay. So she tried to lie to the
22     policeman and it didn't work; did it?
23         MR. LEWIS: Object to the form.

56

1  Q.  (Mr. Lyles) You can answer.
2  A.  I don't know.
3  Q.  Okay. You're saying she -- and we've
4      heard the phrase that you say that she
5      used yesterday. When he got out -- when
6      Mr. Smiley got out to direct traffic that
7      she says disparaging things about him
8      getting hit or acting stupid or something
9      along those lines; is that right?
10 A.  (Witness nods head)
11 Q.  Did Mr. Smiley hear her say either of
12     those things?
13         MR. LEWIS: Object to the form.
14 Q.  (By Mr. Lyles) Did he indicate to you
15     that he had heard her say those things?
16 A.  No.
17 Q.  Now, when you got to the hospital,
18     somehow Ms. Stacey ended up back in the
19     examining room with you; did she not?
20 A.  Yes.
21 Q.  How did that happen?
22 A.  I don't know.
23 Q.  Okay. This other gentleman took you?

14 (Pages 53 to 56)

ALVERENE BUTLER - 1/5/2007

57

1   A.  Yes.
2   Q.  Then all of a sudden, Ms. Stacey was
3       there?
4   A.  Yes.
5   Q.  Do you have any idea how she got there or
6       why she got there?
7   A.  No.
8   Q.  Did the doctor come in and talk to both
9       of you while she was present?
10  A.  The doctor was already talking to me when
11      she came in.
12  Q.  Did he ask her also what happened also?
13. A.  No.  He was talking to me.
14  Q.  Did she tell him what happened?
15  A.  She tried to tell him her version of what
16      happened.
17  Q.  Okay.  At some point, did you say
18      something to the effect of, "Jesus knows
19      the truth."  And Ms. Stacey said, "That's
20      right.  He does."
21  A.  Probably.  I'm not sure.  I don't
22      recall.
23  Q.  Okay.  How did what she was telling the

58

1       doctor differ from what you were trying
2       to tell the doctor?
3   A.  Before she told the doctor when the
4       doctor was asking me where I hurting at,
5       I was in a conversation with him trying
6       to tell him.  And she just butt in and
7       said, "Well, it couldn't be because we
8       weren't hit that hard.  We were actually
9       sitting still when the man hit us."
10  Q.  Okay.  What did the doctor say?
11  A.  He didn't say anything.
12  Q.  Okay.  What happened next?
13  A.  The doctor went on and finished.  And
14      when I made that statement about when she
15      said that we were actually sitting still
16      when he hit us, I turned to her and told
17      her, "You need to quit telling that lie."
18      I said, "First of all, he did not hit us.
19      We, in fact, hit him."
20  Q.  Okay.
21  A.  And when I made that statement, she
22      stormed out of the room.
23  Q.  All right.  And that doctor gave you some

59

1       medication and told you to rest for a
2       couple of days?
3   A.  Yes.
4   Q.  And you went to your own doctor after
5       that or went to the workmens' comp
6       doctor?
7   A.  Yes.
8   Q.  And they basically gave you some more
9       medication and said to rest for a couple
10      of days?
11  A.  Yes.
12  Q.  Did you file a claim with the Risk
13      Management folks or with workmens'
14      comp?
15  A.  I don't recall.
16  Q.  Okay.  You don't recall whether of not
17      she filed a claim with CTIF (sic) and
18      were told that you were on your lunch
19      hour so you couldn't get any relief for
20      what happened?
21  A.  I don't think I filed anything.  But I do
22      remember them sending me a letter to that
23      effect.

60

1   Q.  Okay.  All right.  Mr. Jackson was asked
2       a couple of questions about whether or
3       not he had advised you to watch yourself
4       and also to take Ms. Knight aside and
5       tell her to watch herself.
6   A.  Um-hum.
7   Q.  Did that happen?
8   A.  Yes.
9   Q.  Tell me about that.
10  A.  When I --
11          MR. LEWIS:  Object to form.  Which
12      one?
13  Q.  (By Mr. Lyles) Both.
14  A.  Those were at two different times.
15  Q.  Okay.  Tell me about --
16  A.  Mr. Jackson also stated yesterday we
17      started at the same time with him.  We
18      did not.
19  Q.  Okay.
20  A.  When I came to Mr. Jackson, and he took
21      me in his office talking to me and
22      telling me his rules.
23  Q.  This is when you first came?

15 (Pages 57 to 60)

61

1   A.  To Mr. Jackson.
2   Q.  This was at the point that you didn't
3       think he was a racist?
4   A.  Exactly.
5   Q.  Okay. Tell me what he said to you.
6   A.  He said -- he went on to tell me what his
7       policies were and that he would give me
8       something typed up to that effect.
9   Q.  Let me stop you there. Did he eventually
10      do that?
11  A.  Yes.
12  Q.  He gave you a packet of information, and
13      you signed something showing that you got
14      that packet?
15  A.  Right.
16  Q.  Go ahead.
17  A.  He went on to the tell me that I needed
18      to watch myself. Be careful what I was
19      doing because Mark was gunning for me.
20      "And, you know Mark, when he is gunning
21      for someone, he gets his man."
22  Q.  Okay. When he said, "You know Mark,
23      when he is gunning for somebody, he gets

62

1       his man"?
2   A.  Yes.
3   Q.  Did you indeed know Mark?
4   A.  Yes.
5   Q.  Is that what you understood?
6   A.  Yes.
7   Q.  Why did you think that?
8   A.  Because my exact words to him were, "I
9       know."
10  Q.  Okay. But how did you know that?
11  A.  From previous situations.
12  Q.  Such as?
13  A.  Such as the first one of the cases that I
14      had charges that I had filed.
15      Specifically, the sexual harassment
16      charge.
17  Q.  That was against Mr. Horace?
18  A.  Yes.
19  Q.  Okay.
20  A.  Where I had repeatedly reported it to Mr.
21      Waits and his assistant and everybody
22      else who would listen. Got no results
23      there. So I ended up having to go for

63

1       outside help. And he had also --
2   Q.  Let me stop you. You went for outside
3       help. What do you mean?
4   A.  I went to -- after I met with Mr. Joe
5       McInnes, and at that time Troy King was
6       Governor Riley's top legal advisor, then
7       I ended up going back to write the
8       governor and ended up writing my
9       congressman.
10  Q.  Okay. I was going to ask you: You wrote
11      a congressman also; is that right?
12  A.  Yes. I wrote to Representative Mr. Alvin
13      Holmes. Mr. Holmes called the Division
14      Office and requested an investigation.
15  Q.  Okay. Was there an investigation?
16  A.  Yes.
17  Q.  Okay. Now, in the past there had been a
18      grievance hearing about some of your
19      allegations against Mr. Horace; was there
20      not?
21  A.  Yes.
22  Q.  And the Hearing Officer was
23      Mr. Robertson. Do you recall that?

64

1   A.  I don't recall.
2   Q.  Okay. Mr. Mellon represented ALDOT. Do
3       you remember that?
4   A.  Not by name.
5   Q.  Okay. You had Mr. Atha from Wiggins,
6       Childs Law Firm?
7   A.  Yes.
8   Q.  That was one of your complaints, was it
9       not, in your letter to the congressman
10      that the Wiggins Law Firm didn't do a
11      good job in representing you?
12  A.  Exactly.
13  Q.  Okay. Wasn't one of the findings of the
14      Hearing Officer that your initial
15      complaints were -- it was a while before
16      you actually got to filing a grievance
17      about sexual harassment?
18  A.  I don't understand the question.
19  Q.  Didn't the Hearing Officer find that for
20      a while that your complaints weren't
21      clear. It was at a later time that you
22      alleged sexual harassment. And once it
23      became obvious to the Department, they

16 (Pages 61 to 64)

ALVERENE BUTLER - 1/5/2007

65

1    acted on it. It became obvious to them
2    in the fall of 2002?
3         MR. LEWIS: Object to the form.
4         (The referred-to document was
5         marked for identification as
6         Defendants' Exhibit No. 2)
7    Q. (By Mr. Lyles) Let me show you this.
8    Have you seen this? Did your lawyer show
9    it to you?
10   A. No, I got -- they sent me a copy, I
11   believe.
12   Q. In here it also finds there was a mistake
13   that Mr. Horace should not have evaluated
14   you; is that right?
15   A. Yes.
16   Q. Mr. Waits -- I think from the Hearing
17   Officer was, Mr. Waits that said he
18   didn't know anything about sexual
19   harassment until February of 2003; is
20   that right?
21   A. That's what Mr. Waits said, yes.
22   Q. Okay. All right. Now, so you said Mr.
23   Waits gets his man and so forth. Are you

66

1    saying that the things that have happened
2    to you were a result of your filing a
3    complaint of Mr. Horace?
4    A. Against the State. He was also mentioned
5    in that complaint because he did nothing
6    about it.
7    Q. Okay.
8    A. As well as the first complaint that I had
9    against Mr. Smiley. His name was also on
10   those papers.
11   Q. Okay. And you are saying that throughout
12   these series of events Mr. Waits just
13   didn't do anything?
14   A. Exactly.
15   Q. Yet, Mr. Waits was the one who
16   investigated Mr. Horace; was he not?
17   A. No.
18   Q. Are you sure about that?
19   A. No.
20   Q. Who did?
21   A. That came about through the Division
22   Engineer at that time when we had a
23   meeting.

67

1    Q. All right. And you talked about your
2    complaints. Let me see. In '96, you
3    filed a grievance about working
4    conditions; in '98, you filed a grievance
5    about conflict of co-workers; 2003, there
6    was harassment. Which I assume is Mr.
7    Horace; is that right?
8    A. Um-hum.
9    Q. Then in '05, complaint with co-workers
10   and so forth. How many EEOC charges did
11   you file?
12   A. I'm not sure. And I'm not sure -- I
13   don't know what the other one is. The
14   first one that you said, conflict with
15   co-workers.
16   Q. Okay. Conflict with co-workers would be
17   2002. You worked for -- let me see. You
18   worked for Mr. Kelly?
19   A. I'm not sure what year, but I did work
20   for Mr. Kelly.
21   Q. You said you wanted a complete
22   investigation into the wrongdoings that
23   Robert Smiley reported about you?

68

1    A. Yes.
2    Q. Okay. You want to be reimbursed for
3    doctor's visits and so on and so forth;
4    is that right?
5    A. Yes.
6    Q. How many EEOC charges have you filed
7    against with the Department?
8    A. I'm not sure about the number.
9    Q. Prior to Mr. Todd, another supervisor who
10   you felt did not evaluate you properly;
11   is that right?
12   A. Mr. Horace.
13   Q. Other than Mr. Horace? Wasn't there one
14   before him where you refused to sign your
15   evaluation?
16   A. That may have been one that Mr. Smiley
17   had done after the conflict.
18   Q. After which conflict?
19   A. After the conflict of the EEO charge, and
20   I went to the Division Engineer about
21   that. And he, in fact, didn't think that
22   Mr. Smiley should be doing that
23   particular appraisal.

17 (Pages 65 to 68)

69

1  Q.  Okay. After your grievance hearing about
2      your evaluation, the Department went back
3      and changed evaluations and tried to make
4      that right; did they not?
5  A.  Um-hum.
6  Q.  Okay. Have you ever seen this letter? I
7      have marked it as Exhibit 6. It looks
8      like a letter from Dan Morris to Tommy
9      Flowers asking that your evaluations be
10     adjusted.
11             (The referred-to document was
12             marked for identification as
13             Defendants' Exhibit No. 6)
14 Q.  (By Mr. Lyles) And it says, "Approved:
15     Jackie Graham 10-25-04." Do you know who
16     Ms. Graham is?
17 A.  Wait a minute. I'm trying to see where
18     you are here.
19 Q.  Okay. You see on the front where it
20     says, "Approved: Jackie Graham"?
21 A.  Okay.
22 Q.  Okay. On the second page it talks about
23     your evaluation and that they wanted to

70

1      adjust your evaluations?
2  A.  Um-hum.
3  Q.  Okay. So once that came to light, the
4      Department tried to do something about
5      it; didn't it?
6  A.  Um-hum.
7  Q.  Okay.
8          MR. LEWIS: You have to say "yes"
9          or "no."
10 A.  Yes.
11 Q.  (By Mr. Lyles) Of course, Mr. Morris
12     wrote that letter to the Personnel
13     Director and tried to get it straightened
14     out; is that right?
15 A.  (Witness nods head)
16         MR. LEWIS: Object to form.
17 Q.  (By Mr. Lyles) Does that letter appear to
18     be from Dan Morris?
19 A.  Yes.
20 Q.  And have you ever seen the letter that
21     Mr. Morris wrote Congressman Terry
22     Everett?
23 A.  I would have to see it.

71

1  Q.  Okay.
2  A.  I don't recall.
3  Q.  Okay. This letter purports they provided
4      Mr. Everett a copy of the hearing record,
5      their efforts to straighten it out with
6      State Personnel. And they informed him
7      that they couldn't do anything about your
8      dissatisfaction with the Wiggins Law
9      Firm?
10 A.  Um-hum.
11 Q.  Now, with regards to Mr. Horace, your
12     allegations against him were that you
13     were sexually harassed by Mr. Horace?
14 A.  Um-hum.
15         MR. LEWIS: You have to say "yes."
16 A.  Yes.
17         (The referred-to document was
18         marked for identification as
19         Defendants' Exhibit No. 5)
20 Q.  (By Mr. Lyles) I remember a bunch of
21     records I've looked at that there was
22     also some contentions that there were
23     improper things said in the office that

72

1      shouldn't have been. There was a lot of
2      joking and carrying on that shouldn't
3      have gone on in mixed company. Was that
4      part of your complaint? Things were said
5      to the women that shouldn't have been
6      said to them?
7  A.  Things were said to me that shouldn't
8      have been.
9  Q.  Okay. There was something about an
10     incubus and a succubus or something like
11     that. Do you remember any of that?
12 A.  I don't remember.
13 Q.  Do you know what any those words mean?
14 A.  Yes.
15 Q.  What do they mean?
16 A.  Incubus -- one of them means it's an evil
17     spirit that has sexual intercourse with
18     you while you sleep. One of them means a
19     female spirit that has sexual intercourse
20     with you while you sleep. I don't recall
21     which is which.
22 Q.  Did you ever tell the folks that you had
23     dreams about those entities?

18 (Pages 69 to 72)

|  | 73 |
|---|---|

A. No.
Q. Do you remember discussions about that in the office?
A. Not in that office, no.
Q. In some office?
A. Someone gave us -- another employee gave us the definition of the words.
Q. Now, let's go back to what you said about Mr. Waits and Mr. Horace. Your contention is that Mr. Waits didn't do anything about your allegations about Mr. Horace; is that right?
A. Yes.
Q. Why do you think that was?
A. Other than he didn't care?
Q. Well, if that's the reason, tell me that. You feel like he didn't care?
A. And because I was black.
Q. And why do you think that?
A. Because I honestly felt that he wouldn't have let a white female suffer like I did for as long as I did.
Q. And why did you feel that?

|  | 74 |
|---|---|

A. Just from his personality, what I have observed of him.
Q. Tell me what, in his personality, made you feel like he wouldn't let a white female go through that?
A. He didn't seem to care for Blacks very well.
Q. Give me some examples of that.
A. There was a young man that worked for him who had a white wife, who Mr. Waits seemed to have had a problem with that situation.
Q. Who was the young man?
A. I can't recall his name at this time.
Q. What happened that you feel like Mr. Waits had a problem with that?
A. They got ready to get a divorce or separation. And the wife had been going through some abuse with the husband. And it got back to the gentleman that Mr. Waits had made the statement that, "That's what the woman had gotten. That's what he got from marrying an N."

|  | 75 |
|---|---|

Q. Somebody told you that?
A. Yes. The young man himself.
Q. You don't remember his name?
A. No. I think it may have been something like Emmett or something. I'm not sure.
Q. Okay. What other reasons do you think that Mr. Waits didn't like black people?
A. Also because Karen Stacey had said that that was one of the reasons that they had fallen out, because she noticed how he was taking his position using it against Blacks.
Q. Okay.
A. And that his father would have turned over in his grave if he had known that Mr. Waits had gotten to this extent.
Q. You said, "They had fallen out?" Who had fallen out? Ms. Stacey?
A. Yes.
Q. And Mr. Waits?
A. Yes.

|  | 76 |
|---|---|

Q. Were they on bad terms?
A. I would assume so for her to make the statement.
Q. Did she say, "That's where we fell out"?
A. Says she stopped speaking to him. So apparently they had fallen out at that point.
Q. Yesterday your lawyer asked if Mr. Jackson and Mr. Waits had any relationship with Ms. Stacey. Do you contend that they did or there was some kind of favoritism because of some kind of personal relationship?
A. When I came to the Department, rumor had it that Mr. Waits and Ms. Stacey had an ongoing relationship.
Q. What do you mean?
A. That they were having a relationship, an affair.
Q. Rumor had it. Who was spreading the rumors?
A. Everybody.

19 (Pages 73 to 76)

ALVERENE BUTLER - 1/5/2007

77

1   Q.  Everybody. Everybody you talked to in
2       the entire Department told you --
3   A.  Everywhere you went.
4   Q.  Tell me one person that told you that.
5   A.  She was the first person to tell me
6       herself, Karen.
7   Q.  Karen said, "Guess what? I am having an
8       affair with Mark Waits."
9   A.  She said that's what was being spread
10      about her.
11  Q.  Did she say it was true?
12  A.  No, she did not.
13  Q.  Who else besides Karen told you about
14      it?
15  A.  There were two women that worked in the
16      Division Office at the time.
17  Q.  Who were they?
18  A.  One name was Pat. And I don't remember
19      the black lady's name that worked
20      there.
21  Q.  What did they say?
22  A.  They said that she and Mark were having
23      an affair.

78

1   Q.  How did they know that?
2   A.  They worked with her.
3   Q.  How did they know that from working with
4       her? Did they say she told them?
5   A.  I don't know. I didn't entertain it.
6   Q.  As far as you know, that was just
7       something somebody made up and was
8       talking about?
9   A.  Exactly.
10  Q.  Okay. You don't know whether it's true
11      or not?
12  A.  No.
13  Q.  You are not trying to say that, based on
14      that relationship, that Ms. Stacey got
15      any kind of favoritism or anything?
16  A.  I based it on whatever relationship they
17      had.
18  Q.  Okay. Did -- okay. We kind of got off
19      track, which is my fault. I am bad about
20      that. I asked you the two-part question
21      that your lawyer pointed out to me. The
22      second part was about you being told to
23      take Ms. Knight aside and told her to

79

1       watch herself?
2   A.  Yes.
3   Q.  Who told you to do that?
4   A.  Mr. Jackson.
5   Q.  What did he say?
6   A.  He told me to pull Reeser to the side and
7       let her know, because Mark was after
8       her.
9   Q.  Okay. When did that happen?
10  A.  That happened about the second day she
11      had arrived.
12  Q.  Okay. How long had you been there at the
13      point?
14  A.  I'm not sure. Maybe -- I'm not sure.
15  Q.  Okay. What did you think when he told
16      you that?
17  A.  What did I think about --
18  Q.  Did you think it was true? Did you think
19      it was weird he was telling you that?
20      Did you think there is something to worry
21      about? Did you think he was nuts? What
22      did you think?
23  A.  What I thought, I thought it was a

80

1       fact.
2   Q.  Why did you think that?
3   A.  Because I knew what I was experiencing
4       from Mr. Waits, him telling people that I
5       was a troublemaker.
6   Q.  Who did he tell?
7   A.  People in his office. He had made that
8       statement to females in his office.
9   Q.  Do you hear him say it?
10  A.  No, I didn't.
11  Q.  Who told you he said it?
12  A.  One of the women that worked in the
13      office with me.
14  Q.  Who was that?
15  A.  I don't know. I don't recall her name.
16  Q.  She came up and said, "Mark Waits said
17      you are a troublemaker"?
18  A.  No. She came up -- I spoke to her. She
19      said, "Hey, troublemaker."
20  Q.  Okay.
21  A.  I said, "Troublemaker." She said, "Yes."
22      I said, "Where did you get that from?"
23      She says, "Well, Mark says you are." I

ALVERENE BUTLER - 1/5/2007

81

1    said, "Why would he say that?" She said,
2    "I don't know."
3    Q.  Now, the day that Mr. Jackson warned you
4        to watch yourself, when was that?
5    A.  That was when he had the conversation
6        with me right when I started working with
7        him.
8    Q.  Did you know him before you started
9        working there?
10   A.  Mr. Jackson?
11   Q.  Um-hum.
12   A.  I had seen him. I didn't know him
13       personally.
14   Q.  He was telling you to watch out because
15       his boss was after you?
16   A.  Yes.
17   Q.  Did it kind of strike you as strange that
18       before he even knew you or knew he could
19       trust you from the first day on your job,
20       something like that?
21   A.  It wasn't the first day on the job. And,
22       no, it did not strike me as strange.
23   Q.  Why?

82

1    A.  Because he knew at that time that Ms.
2        Stacey and I were supposed to have been
3        friends.
4    Q.  Okay. But I mean, you would agree with
5        me that if Mr. Jackson said that, what
6        you said about Mr. Waits and Mr. Waits
7        found out about that, and he wouldn't be
8        real happy about it; would he?
9    A.  I don't think he would.
10   Q.  Yet, you think Mr. Jackson risked his job
11       to come tell you that and he hardly knew
12       you?
13          MR. LEWIS: Object to the form.
14   Q.  (By Mr. Lyles) You can answer.
15   A.  I don't think Mr. Jackson thought it
16       would ever come up again since he
17       considered himself doing me a favor by
18       telling me.
19   Q.  This was before you began thinking he was
20       a racist; is that right?
21   A.  I began thinking that he wasn't a racist
22       by seeing him in the mornings. We would
23       end up crossing each other's path, and he

83

1    seemed to have always been kind and
2    polite. I didn't know him.
3    Q.  You later learned that that just wasn't
4        the real Mr. Jackson; is that right?
5    A.  Exactly.
6    Q.  After all, he was a racist and a
7        sexist?
8          MR. LEWIS: Object to the form.
9    Q.  (By Mr. Lyles) Go ahead and answer,
10       please, ma'am.
11   A.  He is.
12   Q.  How did you and Karen come to drive
13       together and spend so much time
14       together?
15   A.  Actually, it got started because of the
16       rumors that had been put out about she
17       and Mark. And pretty much she started
18       sticking to herself, staying to herself
19       after that. And she said that whatever
20       office she went in, there was always talk
21       about her. And she was just staying
22       alone. So I had met her when I first
23       started working for the State. And when

84

1    I ended up coming out there to
2    Mr. Jackson's office -- actually, when I
3    came to the office where Mr. Jackson was,
4    I wasn't immediately under his
5    supervision.
6    Q.  Okay.
7    A.  I was under another Project Engineer's
8        supervision that shared that same office.
9        And because of the fact that I seemed to
10       have been the only one who she could talk
11       to, and the only one who gave her the
12       benefit of the doubt about this so-called
13       affair, this is how she and I ended up
14       spending time together.
15   Q.  Okay. She would sometimes bring you to
16       work?
17   A.  Excuse me.
18   Q.  Sometimes she would give you a ride to
19       work?
20   A.  Yes.
21   Q.  And you would go to lunch together?
22   A.  Yes.
23   Q.  She would buy lunch sometimes?

21 (Pages 81 to 84)

ALVERENE BUTLER - 1/5/2007

85

| | |
|---|---|
| 1 | A. Yes. I bought hers sometimes. |
| 2 | Q. She bought you breakfast sometimes? |
| 3 | A. Yes. |
| 4 | Q. Bought your cigarettes? |
| 5 | A. Um-hum. |
| 6 | Q. Okay. Do you have a driver's license? |
| 7 | A. Yes. |
| 8 | Q. She just gave you a ride to work just to |
| 9 | help you out or just to be nice? |
| 10 | A. It all depends. It might have been |
| 11 | something wrong with my car one day or |
| 12 | whatever. |
| 13 | Q. All right. Jay, we have going for a |
| 14 | little over an hour. Do you mind if we |
| 15 | take a break about 15 minutes? |
| 16 | MR. LEWIS: Sure. |
| 17 | (Short recess) |
| 18 | Q. (By Mr. Lyles) As you know, this is a |
| 19 | continuation of the deposition we started |
| 20 | this morning. You have been placed under |
| 21 | oath and so forth. We are just going on |
| 22 | with that. |
| 23 | There was some questions |

86

| | |
|---|---|
| 1 | about Ms. Stacey, Mr. Waits, Mr. Jackson |
| 2 | and Mr. Estes riding somewhere together |
| 3 | and Ms. Stacey being encouraged to come |
| 4 | up with something on you. Do you |
| 5 | remember that? |
| 6 | A. Yes. |
| 7 | Q. What are you saying happened? |
| 8 | A. This is what Ms. Stacey told me in |
| 9 | November. |
| 10 | Q. Okay. Tell me what she told you? |
| 11 | A. She and I ended up having to arrive back |
| 12 | together to the office. She had and I |
| 13 | had not been riding together. I rode |
| 14 | with her. Came back to the office. Once |
| 15 | we got into the office -- because I |
| 16 | always remain professional and civil to |
| 17 | her. |
| 18 | Q. Um-hum. |
| 19 | A. I went on back in the back to make a |
| 20 | call. She stood there waiting. After I |
| 21 | got off the phone, she asked me could she |
| 22 | talk to me. I told her, "Yes." She told |
| 23 | me that she just wanted to apologize for |

87

| | |
|---|---|
| 1 | everything that had happened, that she |
| 2 | missed my friendship and wanted to tell |
| 3 | me that she didn't think things would go |
| 4 | that far. She said -- she apologized and |
| 5 | said she was sorry and that Mr. Estes, |
| 6 | Mr. Waits were the two initiators. And |
| 7 | that Mr. Jackson, he was also present. |
| 8 | And that they came and got her on the job |
| 9 | site and rode with her. They rode her |
| 10 | through the job site and they were trying |
| 11 | to get her to gather some information |
| 12 | together to come up to build a case up |
| 13 | against me. She said that she stated to |
| 14 | them that she would have no part of |
| 15 | that. |
| 16 | Q. Okay. When did y'all have this |
| 17 | conversation? |
| 18 | A. That was in November. |
| 19 | Q. November of '05? |
| 20 | A. Yes. |
| 21 | Q. Okay. Your information about this |
| 22 | conversation comes from Ms. Stacey; is |
| 23 | that what you are saying? |

88

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. When she apologized to you, did you tell |
| 3 | her you accepted her apology? |
| 4 | A. Yes. |
| 5 | Q. How much later was this that she left the |
| 6 | Department? |
| 7 | A. I'm not sure. |
| 8 | Q. Okay. When you left the Department, did |
| 9 | you tell Ms. Stacey not to be offended by |
| 10 | anything that happened after you left? |
| 11 | A. Ask the question again. |
| 12 | Q. When you left the Department, did you |
| 13 | have a conversation with Ms. Stacey |
| 14 | wherein you told her not to be offended |
| 15 | by anything that happened or that you |
| 16 | brought up after she left -- after you |
| 17 | left the Department? |
| 18 | A. No. |
| 19 | Q. It didn't happen? |
| 20 | A. No. |
| 21 | Q. If she says it did, is she mistaken about |
| 22 | that too? |
| 23 | A. She lied about that. |

22 (Pages 85 to 88)

ALVERENE BUTLER - 1/5/2007

89

Q. She lied about that. There is some
questions about points being taken off
your evaluation because you failed an ACI
test.
A. Yes.
Q. Tell me about that.
A. The only thing I know about that is that
is supposed to have been Mr. Waits' rule.
That if you did not pass it, that points
were supposed to be taken off. And it
was coming up on my expiration of my ACI
that I had to take that again. And I
passed part, and I didn't pass the other
part.
Q. Okay.
A. And I had -- also, I had written the lady
who held the class, where we had a class
on appraisals who had told us that the
supervisors were not supposed to be able
to take off points on your appraisals --
Q. Okay.
A. -- if we did not pass because those
classes were court-appointed. So I had

90

e-mailed her. At any rate, apparently --
Q. What was that lady's name; do you
remember?
A. No, but I have it on record.
Q. You have it on record. What do you mean
by "you have it on record"?
A. I have it in a file at the house.
Q. Let me ask you about that file. Do you
have some like notes or diaries, tape
recordings, anything like that about the
things that you contend happened at
ALDOT?
A. I may have some notes.
Q. You said you had a file. Ms. Butler, you
either got them or you don't. Do you
have any such documents?
A. What I meant by that, I may have turned
it over to my attorney.
Q. Did your lawyer tell you that your notice
for today asked that you bring those
things with you?
A. No. What I have, my attorney has. The
only thing that I have personally may be

91

little scribblings from which I typed
from.
Q. Okay.
    MR. LYLES: Jay, and you and I can
        talk about that later.
    MR. LEWIS: Okay.
Q. (By Mr. Lyles) Did you have any
recordings? Did you record any telephone
conversations?
A. No.
Q. Did you keep a diary?
A. No.
Q. Did you keep notes?
A. Yes.
Q. What kind of notes?
A. Just things that happened daily.
Q. What did you write them on?
A. Whatever I had at that time.
Q. You kept like scraps of paper?
A. Yes.
Q. What would you do with those scraps of
paper?
A. I would take it and write into a

92

tablet.
Q. Where is the tablet right now?
A. I don't know. I typed it up. I didn't
have any use for it.
Q. Are you saying you threw it away?
A. It may be at the house somewhere.
Q. Will you look for that and turn it over
to your lawyer?
A. Yes.
Q. When you typed it, did you do it on a
word processor? Computer?
A. Yes.
Q. Okay. Did you make a disk or anything
like that?
A. No.
Q. What did you do with what you typed up?
A. My attorney has it.
Q. Okay. What does that form come in? Is
it like a document where you printed it
out? Is it on a floppy disk?
A. It's where I printed it out.
    MR. LEWIS: Harry, let me stop
        right there and say, there

23 (Pages 89 to 92)

ALVERENE BUTLER - 1/5/2007

93

```
1        are some documents that I
2        have that were done by
3        Ms. Butler. They were done
4        in the course of the
5        attorney-client relationship
6        for the purposes of informing
7        me.
8           MR. LYLES:  I understand that.
9           You and I will work it out,
10          even though I'm sure you know
11          I'm entitled to every bit of
12          it.  But we will work it
13          out.
14          MR. LEWIS:  I don't think so.
15   Q.  (By Mr. Lyles)  We will work it out.  Did
16       you ever record any conversations?  Like
17       would you be talking to somebody and have
18       a tape recorder with you?
19   A.  I did at one time, yes.
20   Q.  What did you do with those recordings?
21   A.  They got misplaced.
22   Q.  Do you know where they are?
23   A.  They got misplaced.
```

94

```
1    Q.  I understand that.
2    A.  No.
3    Q.  Are you going to look for them between
4        now and the time we try this case?
5    A.  Yes.
6    Q.  When you find them, would you agree to
7        give them to your lawyer and let him
8        decide whether I am entitled to see them?
9    A.  Yes.
10   Q.  Or hear them?
11   A.  Yes.
12   Q.  Any other kind of records that you might
13       have kept, any files that you have got,
14       copies of documents you have made or
15       anything like that?
16   A.  Payroll of such.
17   Q.  Of your own?
18   A.  Yes.
19   Q.  But not for any other employees?
20   A.  No.
21   Q.  Let me ask you that, as long as we are
22       talking about that.  Ms. Stacey was asked
23       some questions about looking at your file
```

95

```
1        in August of 2005 and going through it.
2    A.  Um-hum.
3    Q.  Are you saying that she did do that?
4    A.  I don't recall what that was in reference
5        to.
6    Q.  August 30th, 2005, she was asked if she
7        went through your personnel file?
8    A.  I don't recall what it was in reference
9        to.  Apparently Jay was looking at some
10       of the paperwork.
11   Q.  As we sit here today about the
12       allegations you are making, there is not
13       an incident that you know about?
14   A.  Not right off.
15   Q.  Okay.  All right.  Let me ask you about
16       one thing that bothers me about this
17       thing about the accident and so forth.
18       You told me what Ms. Stacey yelled.
19   A.  Um-hum.
20   Q.  She made some other remarks about the
21       gentleman when he was trying to direct
22       the traffic.  Who did you tell about
23       that?
```

96

```
1    A.  The only person that I told was Melvin
2        Wynn.
3    Q.  Why didn't you tell Mr. Jackson?
4    A.  I tried to tell Mr. Jackson.
5    Q.  Did you fill out any kind of report on
6        that?
7    A.  No.
8    Q.  Did you file any kind of grievance or any
9        kind of complaint?
10   A.  No.
11   Q.  Did it offend you?
12   A.  Yes.
13   Q.  With all due respect, when you feel like
14       you have been slighted, you don't
15       hesitate to file a grievance or a
16       complaint.  I think you agree with me on
17       that.
18   A.  Yes, I would.
19   Q.  I still don't understand why you didn't
20       file something about that incident until
21       over -- when you got a reprimand.  That
22       was months later.
23   A.  Mr. Jackson asked me did I want to file a
```

24 (Pages 93 to 96)

97

```
     grievance.
 2   Q.  Okay.  What did you tell him?
 3   A.  I told him, "No."  I also told him
 4       because they weren't going to do
 5       anything, specifically Mr. Waits.  So
 6       that's why I did not file one.
 7   Q.  I'm sorry.  Go ahead.  That's why you
 8       didn't?
 9   A.  File it.
10   Q.  Okay.  The incidents before that
11       occasion, and the incidents after that
12       occasion, you thought they might do
13       something about those; is that right?
14   A.  The ones prior?
15   Q.  Um-hum.
16   A.  The first one, yes.  Even the second one,
17       knowing that I had as many witnesses and
18       as much facts as I had, I thought perhaps
19       he would.
20   Q.  Mr. Horace they definitely did something
21       about that; didn't they?
22   A.  After two years, ten months and 14 days,
23       yes.
```

98

```
 1   Q.  The man got fired.  You got your
 2       evaluation straightened out.
 3   A.  At that point the damage had been done.
 4       I remained in that environment for two
 5       years, ten months and 14 days.
 6   Q.  When should they have done something
 7       about it?
 8   A.  When it was immediately reported.
 9   Q.  Who did you report it to initially?
10   A.  Mr. Wait.
11   Q.  What did you say?
12   A.  I told him that Mr. Horace was making
13       sexual comments.  Mr. Horace -- we were
14       in a meeting in Mr. Waits' office and
15       that Mr. Horace was even saying that all
16       of the guys were sleeping with me.  At
17       that time, when I made that statement to
18       Mr. Waits, two or three of the guys were
19       in there then.
20   Q.  Which guys?
21   A.  One was Michael Camburis, one was Xavier
22       Davis, George Shields had been out that
23       day.  But I also had told him that Mr.
```

99

```
 1       Horace said I was sleeping with him
 2       too.
 3   Q.  George Shields.
 4   A.  Um-hum.
 5   Q.  And you told Mark Waits that Mr. Horace
 6       had said that about you?
 7   A.  Yes.
 8   Q.  In front of these people, you said it?
 9   A.  Yes.
10   Q.  And Mr. Waits didn't do anything?
11   A.  No.
12   Q.  Did any of those people come up and ask
13       you, "Hey, how is it going?  What's he
14       doing?  Are they doing anything about
15       it?"  These witnesses that you say were
16       there, did they ever come and ask you
17       whether Mr. Waits was doing anything?
18   A.  Not to my knowledge.  I don't recall
19       that.
20   Q.  All right.  Well, how did Mr. Waits come
21       to investigate that thing or interview
22       people?  Do you have any idea?
23   A.  To my knowledge, Mr. Waits did not
```

100

```
 1       investigate that.
 2   Q.  Okay.  You are sure about that?
 3   A.  To the best of my knowledge, Mr. Waits
 4       did not.
 5   Q.  Remember we heard some questions about an
 6       altercation between Ms. Stacey and David
 7       Jones.  Do you remember that?
 8   A.  Which one?
 9   Q.  Tell me about whatever you know about
10       altercations between Ms. Stacey and David
11       Jones.
12   A.  Ms. Stacey would always pretty much -- I
13       guess Mr. Jones got the worst of her
14       lashing.  He asked her -- on working from
15       the latter, the latest thing that I knew
16       she had done to him that she went off on
17       him about was she had asked him to lock
18       the gate when he got ready to leave.  And
19       apparently Mr. Jones forgot to lock the
20       gate.  So the next morning when Mr. Jones
21       returned, she cursed him out again.  And
22       it got kind of heated, and Mr. Jones had
23       really gotten upset.  So I asked her to
```

25 (Pages 97 to 100)

101

1    be quiet, that she was provoking -- I
2    told her that she was provoking him.
3    Because at that point he was becoming a
4    little bit irate. So he told me he was
5    tired of her doing this to him. I pulled
6    Mr. Jones back into another room and told
7    him, you know, "Not to go there. Just
8    talk to Todd about it."
9    Q.  Okay. And who was David Jones?
10   A.  David Jones, the office personnel.
11   Q.  Okay. Where is he now; do you know?
12   A.  No.
13   Q.  Okay. Have you talked to him since you
14       left the Department?
15   A.  No.
16   Q.  Okay. Was he a black man or a white
17       man?
18   A.  White male.
19   Q.  Okay. How old was he approximately?
20   A.  Approximately 40.
21   Q.  I have some questions too about you
22       getting a letter about having low leave
23       time. Did you get a letter from

102

1    Mr. Jackson?
2    A.  Yes.
3    Q.  What do you feel like was wrong with him
4        sending you a letter like that?
5    A.  My leave time had pretty much been in the
6        same arena the whole time I worked for
7        him. It took two years for him all of a
8        sudden to have a problem with it.
9    Q.  All right. Did he explain to you that
10       there was fewer people working so that he
11       had to make sure that people who were on
12       the job didn't have as much leeway as
13       they did when he had a larger number of
14       people working for him?
15   A.  He didn't explain anything to me about
16       that.
17   Q.  Is that true?
18   A.  What?
19   Q.  Were there more people working for him
20       during the initial part of that two-year
21       period you are talking about and fewer
22       people on your crew there at the last?
23   A.  I don't recall anyone not being present,

103

1    except Mr. Feagin who passed.
2    Q.  Okay. Do you know how many people got
3        letters like that?
4    A.  No.
5    Q.  Do you know whether or not Ms. Stacey got
6        one?
7    A.  No. I am not aware of anyone else who
8        had gotten one.
9    Q.  Actually, tell me again. What does that
10       show that you got that letter as far as
11       your allegations in this lawsuit and so
12       forth? Are you saying they were doing
13       that to harass you?
14   A.  Yes.
15   Q.  If other people got the same letter,
16       would you still that say you got yours
17       because you were being harassed?
18   A.  Yes.
19   Q.  Why is that?
20   A.  Because, as I stated earlier, my time
21       pretty much stayed the same. And it
22       struck me kind of odd that after two
23       years, after I filed a grievance and all,

104

1    all of a sudden there was a problem.
2    Q.  Okay. That's what you base your
3        assertion on that that was done in
4        retaliation and--
5    A.  Yes.
6    Q.  -- it struck you as odd that that
7        happened after --
8    A.  Yes.
9    Q.  -- that period of time? You say your
10       leave stayed about the same. How much
11       did you have?
12   A.  I don't know the exact number.
13   Q.  How much leave did you accumulate at that
14       point in time?
15   A.  I don't recall. I'm not sure.
16   Q.  How many years had you been with the
17       Department?
18   A.  At that time, 11.
19   Q.  At that time, 11. Okay. Let me see.
20       After five years you start getting five
21       hours annual leave every pay period; is
22       that right?
23   A.  I don't remember. It may have been seven

26 (Pages 101 to 104)

ALVERENE BUTLER - 1/5/2007

105

1 annual and four sick. But I'm not
2 exactly sure about that.
3 Q. Every two-week pay period you would get
4 seven hours annual leave and four hours
5 sick leave approximately?
6 A. Yes.
7 Q. And then that leave would accumulate if
8 you didn't use it?
9 A. Right.
10 Q. In order to use all of your leave, you
11 would have to be out, what, about 22
12 hours every month; right? You have to be
13 out close to three days out of each
14 month?
15 A. I guess, yes.
16 Q. This David Jones you told me about, he
17 was like the office manager?
18 A. Yes.
19 Q. Would he be the last one to leave the
20 office?
21 A. No.
22 Q. How come he was supposed to lock the
23 gate?

106

1 A. This particular day, I don't know if we
2 had left early. I don't recall what it
3 was, but we were all leaving. It may
4 have been a rain day perhaps and we were
5 leaving early.
6 Q. Is it your testimony that Mr. Jones and
7 Ms. Stacey were not usually the ones who
8 were the last to leave the office? Would
9 that be true?
10 A. No.
11     MR. LEWIS: Could you clarify that
12         question?
13 Q. (By Mr. Lyles) Okay. If Ms. Stacey says
14 that she and Mr. Jones were usually the
15 last ones to leave the office, would she
16 be incorrect?
17 A. She would be incorrect.
18 Q. All right. And there was some questions
19 about a conversation between you and Mark
20 Waits about estimates. Do you remember
21 those questions, and do you know what
22 that's about? Were you required to do
23 estimates and give them to Mr. Waits or

107

1 to the engineer?
2 A. Yes.
3 Q. What are estimates; do you know?
4 A. I am assuming that he is speaking of the
5 monthly estimate that's sent out to the
6 contractors for the work performed.
7 Q. Were you involved in computing those?
8 A. Some, yes. Very little.
9 Q. Did you ever have any conversations with
10 Mr. Waits about those?
11 A. Yes.
12 Q. What was the substance of that
13 conversation?
14 A. Actually, he was talking to me and Ms.
15 Stacey, and he mentioned to Ms. Stacey
16 about beginning to teach me how to do
17 them.
18 Q. Okay. Did she do that?
19 A. No.
20 Q. Okay. Did you ever get in trouble for
21 not knowing how to do them?
22 A. No.
23 Q. Let me ask you something about this

108

1 certification we are talking about.
2 A. Um-hum.
3 Q. Did you at some point complain to Ms.
4 Stacey that there was some gentleman that
5 got to take his certification test
6 separate from everybody else? Got to go
7 in like an office and take it?
8 A. No. My exact words were, "There were
9 people who were taking their test in the
10 coordinator's office."
11 Q. Okay. Let me ask you a couple of things
12 about that. Who were the people?
13 A. David Jones was one of them.
14 Q. Was he related to anybody then?
15 A. He was married to the training
16 coordinator.
17 Q. Okay. And he got to take it in an
18 office?
19 A. Right.
20 Q. What is the significance of getting to
21 take it in the office?
22 A. Well, there is no one there but you and
23 the coordinator.

27 (Pages 105 to 108)

109

1  Q.  Which means? Are you saying he
2     cheated?
3  A.  You can cheat. I don't see any other
4     need for you to take it behind closed
5     doors.
6  Q.  Are you saying that Mr. Jones cheated?
7  A.  I'm not saying that Mr. Jones cheated
8     because I wasn't in there. I'm saying
9     Mr. Jones unfairly took the test.
10 Q.  Okay. Did you tell Ms. Stacey that the
11    reason you failed the test was to see if
12    they would let you go in the
13    coordinator's office and retake it?
14 A.  No.
15 Q.  Never said that?
16 A.  No.
17 Q.  Did you tell them that you were testing
18    them to see if you got special
19    arrangements on taking a retest like Mr.
20    Jones did?
21 A.  No.
22 Q.  Never told her that?
23 A.  No.

110

1  Q.  She is mistaken if she says you told her
2     that?
3  A.  No. She lied.
4  Q.  She lied. She lies a lot; doesn't she?
5  A.  Sure does.
6        MR. LYLES: Object.
7  Q.  (By Mr. Lyles) Okay. Did you ever tell
8     Mr. Waits, or intimate to Mr. Waits, that
9     you failed that test on purpose?
10 A.  No.
11 Q.  Never said that?
12 A.  No.
13 Q.  Did you ever write him a note saying you
14    did?
15 A.  No. I told -- what my letter said was
16    that it had caused me a lot of stress
17    taking the test. I also mentioned to him
18    it's the same statement pretty much that
19    I made to Ms. Stacey about it being
20    unfair that they had people going behind
21    closed doors taking it and everybody else
22    was stressing out taking it.
23 Q.  Okay. Did you fail the test on

111

1     purpose?
2  A.  No.
3  Q.  But you passed it the first time and you
4     failed it, what, two more times?
5  A.  I don't think I took it but one other
6     time.
7  Q.  Okay. You're testifying here today that
8     you did the best you could on it?
9  A.  Yes. I even organized study groups.
10 Q.  Okay. How did the people do that were in
11    your study group?
12 A.  I don't know.
13 Q.  Mr. Waits was asked some questions about
14    events that purportedly happened prior to
15    the confrontation on the job site between
16    you and Ms. Stacey. Okay.
17 A.  Um-hum.
18 Q.  Do you contend that even prior to that
19    that he called employees and asked them
20    about you and your work performance?
21 A.  I don't understand the question. Would
22    you repeat it?
23 Q.  As part of your lawsuit, do you contend

112

1     that Mr. Waits improperly called
2     employees and asked them if you would be
3     a troublemaker?
4  A.  Asked if I would be a troublemaker?
5  Q.  Um-hum.
6  A.  No. Did they think that I was creating a
7     hostile work environment.
8  Q.  When did he do that?
9  A.  During the time that he was calling
10    people in in reference to the
11    altercation.
12 Q.  Okay. So that happened after the
13    altercation?
14 A.  Yes.
15 Q.  As far as you know. Okay. Mr. Waits was
16    asked if there was a conversation between
17    him and Ms. Stacey about ways to get rid
18    of you. Are you contending that he and
19    Ms. Stacey talked about ways to run you
20    off or to get you fired?
21 A.  Would your repeat that?
22 Q.  Did Ms. Stacey ever tell you that Mr.
23    Waits had asked her about ways to get rid

ALVERENE BUTLER - 1/5/2007

113

1  of you?
2  A.  No.
3  Q.  Or if there was any way to get rid of
4     you?
5  A.  No. I don't recall.
6  Q.  I'm sorry.
7  A.  I don't recall.
8  Q.  Okay. Your ACI certificate, that was --
9     you took it once and you passed the whole
10    thing without any problem?
11 A.  Um-hum.
12 Q.  When that was about to expire, you had to
13    retake it and you failed that?
14 A.  Um-hum. Parts of it.
15 Q.  Okay. Was there another time after that
16    you were put in another class and you
17    still failed it?
18 A.  I don't recall that.
19 Q.  There was some questions asked about
20    whether hours were ever deducted from
21    your time.
22 A.  Um-hum.
23 Q.  And that Ms. Knight -- was there a

114

1  Mr. Wynn?
2  A.  Um-hum.
3  Q.  And Mr. Wynn because of statements that
4     were made by Karen Stacey?
5  A.  Yes.
6  Q.  Are you contending that that did
7     happen?
8  A.  Yes.
9  Q.  Was that the time we talked about earlier
10    that the stuff was posted and the next
11    day it would be different?
12 A.  Yes.
13 Q.  So you are just assuming that that was
14    the cause that that was changed; is that
15    right?
16 A.  Well, Todd would actually tell us that we
17    didn't work those hours.
18 Q.  Would he say, "Karen told me you didn't"?
19 A.  No.
20 Q.  Okay. As far as Karen's involvement in
21    it, that's an assumption on your part?
22 A.  Yes. Based on what she had done with
23    other employees.

115

1  Q.  Okay. Now, as a part of the ACI
2     certification, is that a requirement that
3     you do your job and grade prior to that
4     test, that you had some experience in
5     what you were taking the test about?
6  A.  I don't understand the question.
7  Q.  What was ACI certification? What were
8     you being certified in?
9  A.  Concrete.
10 Q.  What about concrete?
11 A.  That's what the test was. Certification.
12    You had to be certified in using it
13    properly, or testing it properly,
14    checking it properly.
15 Q.  In order to be eligible to take that
16    test, wasn't it a requirement that you
17    have actually hands-on experiences in
18    doing those things?
19 A.  I don't recall that. They were -- this
20    class was.
21 Q.  Okay. I asked the question improperly
22    and I apologize.
23 A.  Okay.

116

1  Q.  Part of the requirement for your position
2     was that you be certified; is that right?
3  A.  For which position?
4  Q.  The position you were in.
5  A.  I don't think so. I was already there.
6  Q.  Okay. Did that EA II/III require that
7     you be ACI certified?
8  A.  I don't think so.
9  Q.  What about if you were in certain
10    classifications within that
11    classification, certain job functions,
12    were you required to be ACI certified?
13 A.  I'm not sure.
14 Q.  If you were like an inspector out on the
15    site, you were supposed to be checking
16    stuff. Was there a requirement that you
17    be certified in that?
18 A.  I don't think so, because I wasn't always
19    ACI certified.
20    MR. LYLES: Mr. Lewis,
21    would you and Ms. Butler
22    give me about five minutes.
23    I think I'm through.

29 (Pages 113 to 116)

117

1    MR. LEWIS: Let me give you this.
2       This, with the exception of
3       materials that Ms. Butler, I
4       think, prepared for her
5       lawyers.
6    MR. LYLES: Um-hum.
7    MR. LEWIS: This is my entire
8       client document file. You
9       are welcome to have copies
10      made for that.
11   MR. LYLES: All right.
12      (Short recess)
13 Q.  (By Mr. Lyles) Ms. Butler, some of the
14      things that I've asked you about are to
15      give me reasons that you came to the
16      conclusion that Mr. Waits was a racist.
17      Okay.
18 A.  Um-hum.
19 Q.  And we've talked about several things
20      about him being -- if he was out to get
21      somebody, he got them, so on and so
22      forth. Other than what we talked about,
23      have you got any other examples or

118

1    evidence that you can tell me about that
2    would show that Mark Waits is a racist?
3    MR. LEWIS: Let me object to the
4       form of this, and let me
5       explain the objection.
6    MR. LYLES: Okay.
7    MR. LEWIS: We have never claimed
8       that Mark Waits is a racist.
9       We have claimed that there
10      was racial discrimination and
11      retaliation.
12   MR. LYLES: She said he was a
13      racist at the beginning of
14      the deposition.
15   MR. LEWIS: I understand what she
16      said, and she said it in
17      response to your assertion
18      that that's the way she felt.
19      I am just clarifying for the
20      record.
21   MR. LYLES: Okay.
22   MR. LEWIS: That we are making no
23      aspersions on Mr. Waits'

119

1       character as a human being.
2    MR. LYLES: But you are saying
3       that he acted based on race?
4    MR. LEWIS: I am saying that he
5       fulfilled the elements of
6       Title 7, discrimination and
7       retaliation claim. That's
8       what we are saying. The
9       Complaint speaks for
10      itself.
11   MR. LYLES: It is only because you
12      are so much smarter than I am
13      that you can see the
14      difference between those two?
15   MR. LEWIS: You have got --
16 Q.  (By Mr. Lyles) Any other reasons that you
17      claim that Mr. Waits acted, or that his
18      actions were based on racial
19      discrimination?
20 A.  Not that I can recall at this time.
21 Q.  What about Mr. Jackson?
22 A.  Not that I can recall at this time.
23 Q.  Okay. Your attorney has been kind enough

120

1    to hand me an affidavit signed by
2    Mr. Calvin Johnson?
3 A.  Um-hum.
4 Q.  What was the last time you talked to
5    Mr. Johnson?
6 A.  What day did he come to your office?
7 Q.  This affidavit is dated January the 5th.
8    MR. LEWIS: It's dated today.
9    MR. LYLES: Here is what I am
10      trying to get to, Jay.
11      Obviously, we are going to
12      have to depose him.
13   MR. LEWIS: Sure.
14   MR. LYLES: At some point, can I
15      get with you and find out how
16      to get in touch with him?
17   MR. LEWIS: Yes.
18   MR. LYLES: I'm not going to hold
19      you responsible for producing
20      him. Obviously, if y'all got
21      an affidavit, you know where
22      he is.
23   MR. LEWIS: Right. Not a

ALVERENE BUTLER - 1/5/2007

121

1        problem.
2        MR. LYLES: We can skip that part,
3        Ms. Butler.
4        MR. LEWIS: I can tell you he came
5        in one day last week.
6  Q.  (By Mr. Lyles) All right. Now, are you
7     familiar with -- or do you know who Mr.
8     Jackson's Chief Inspectors are at this
9     point?
10  A.  No.
11  Q.  Do you know whether they are black or
12    white?
13  A.  No.
14  Q.  How does one get to be a Chief Inspector?
15    Are you chosen by the job foreman or the
16    by the person in Mr. Jackson's
17    position?
18  A.  They are chosen by the Project
19    Engineer.
20  Q.  That would be Mr. Todd?
21  A.  Yes.
22  Q.  So whoever his Chief Inspectors are, he
23    choose them; is that right?

122

1  A.  Yes.
2  Q.  If things were done the way that you
3    understand that they were done?
4  A.  Yes.
5  Q.  Well, I think there was something else I
6    forgot about and I forgot to ask it.
7    What was Ms. Stacey's role when you
8    worked with her? Was she an inspector?
9  A.  Yes.
10  Q.  Was she a Chief Inspector?
11  A.  I'm not sure if that's what she was on
12    this last job.
13  Q.  Okay. Tell me what the difference
14    between just being an Inspector and being
15    a Chief Inspector would be?
16  A.  The Chief Inspector pretty much, I guess,
17    would delegate the duties.
18  Q.  Okay.
19  A.  As well as make sure everything is
20    running the way it should be.
21  Q.  They are in charge of getting it done; is
22    that right?
23  A.  Pretty much.

123

1  Q.  Other than Mr. Johnson here at this time,
2    do you know anybody that you would
3    contend would be a witness to or support
4    your contentions in this lawsuit?
5  A.  Yes.
6  Q.  Okay. Who would that be?
7  A.  That would be Reeser Knight.
8  Q.  Okay. Where is she now; do you know?
9  A.  Not exactly.
10  Q.  Okay. Who else?
11  A.  Peter Smith.
12  Q.  Okay. Have you talked to him recently?
13  A.  No.
14  Q.  Okay. Who else?
15  A.  Melvin Wynn.
16  Q.  Where is Mr. Wynn now?
17  A.  He is still with ALDOT.
18  Q.  Okay. Who else?
19  A.  Mr. Jeff Hollinsworth.
20  Q.  Hollinsworth?
21  A.  I think that's his last name.
22  Q.  Okay. Was that a former fellow employee?
23    Did you work with him?

124

1  A.  Yes.
2  Q.  Is he still with ALDOT?
3  A.  Yes.
4  Q.  Can you think of anybody else?
5  A.  Not at this time.
6     MR. LYLES: Okay, Jay. I'm
7     through.
8
9     EXAMINATION
10
11  BY MR. LEWIS:
12  Q.  (By Mr. Lewis) I've got one a couple of
13    things just to clear up regarding your
14    contention that you were asked to counsel
15    Reeser Knight about the fact that she was
16    being watched --
17  A.  Um-hum.
18  Q.  -- or somebody was out to get her?
19  A.  Um-hum.
20  Q.  Would you describe that for me? Who told
21    you to do that, or who asked you to do
22    it, and what happened?
23  A.  Mr. Jackson called me in his office one

31 (Pages 121 to 124)

ALVERENE BUTLER - 1/5/2007

125

1    morning. Ms. Knight -- before we would
2    leave out, we would normally got in the
3    kitchen around the table, everybody
4    waiting to go out to the site. And
5    Mr. Jackson called me in his office and
6    told me that I needed to pull Ms. Knight
7    to the side and tell her that she needed
8    to watch herself and make sure she was,
9    you know, doing her job, because Mr.
10   Waits was gunning for her. And that -- I
11   kind of finished up the last part of
12   that. "Yes, I know. When he is gunning
13   for someone, he gets his man." And I
14   told him that I would take her to the
15   side and do so, and I did.
16 Q.  What was her response to that?
17 A.  She pretty much felt that way anyway.
18 Q.  This comment that you have said you made
19   to Stacey that I'm not your house nigger.
20 A.  Um-hum.
21 Q.  What was that all about? What
22   happened?
23 A.  We had been -- we was en route to my

126

1    father's office. And we had stopped at a
2    couple of places. And the places that we
3    had stopped, she was like, you get this
4    and you do that. And I had been telling
5    her about the second or third store not
6    to do that. The stores that we had gone
7    in, the workers were predominantly black.
8    And I told her not to do that, that it
9    looked demeaning. And I made some
10   statement to her about, you know, "It's
11   not Christian's act" or something. By
12   the time we got to the third place, she
13   really, you know, just let it out doing
14   something of the same nature. So by the
15   time we got to my father's office, we
16   came in and he asked her what we were up
17   to. This was during the time she was
18   trying to meet with him to get with his
19   people to get the loan. And I told -- my
20   exact words were to him, "Before you do
21   anything to help her, tell her to quit
22   treating me like I'm her house nigger."
23   And he asked me why would I say that? And

127

1    then I explained what she had done in the
2    stores. And he made the statement to us,
3    "Y'all are supposed to be Christians.
4    You can't conduct yourself like that." I
5    told him, I said, "That's what I was
6    telling her." She kept denying that she
7    had done it. You know, it was just a
8    done deal. That was on that particular
9    occasion.
10 Q.  And is it your belief that being treated
11   like a, quote, house nigger is
12   demeaning?
13 A.  Yes.
14 Q.  I just never heard of that before.
15   Mr. Lyles asked you early on about the
16   manual labor that you did that you say
17   that Stacey did not do. You indicated
18   that Stacey had told you that she wasn't
19   going to do it. Tell me about that
20   conversation.
21 A.  We -- I was working still under Jay
22   Wyatt, which is was the other Project
23   Engineer that was in the same office as

128

1    Mr. Jackson. And we really didn't have a
2    lot going on. So Ms. Stacey was working
3    with Todd at the time, and they were --
4    had a lot of work going on on the job.
5    So I went and asked my supervisor, Jay
6    Wyatt, could I ride out to see if I could
7    be of some help. Because they were a
8    little short-staffed. When we got out
9    there, I went to the Chief Inspector, who
10   was Mr. Feagin, and asked him was there
11   anything I could do to help Mr. Feagin
12   and Mr. Feagin, and Mr. Wynn, I believe,
13   said, "Yes. You can help get these
14   concrete cylinders and get them over to
15   where we drop the cylinders off at." And
16   she made the statement, she said, "I
17   didn't come out here to do no work." She
18   said, "They know I am not going to do
19   it." I said, "We are not doing anything,
20   and they need the help." At that time I
21   asked her did she know where they were
22   supposed to be taken. She told me, "No."
23   She had never taken any over there. I

ALVERENE BUTLER - 1/5/2007

129

1  made the statement to her that that was
2  really sad that she had been in this
3  field for so long and did not even know
4  where the cylinders were to be taken. I
5  said, "But since they say they need the
6  help, I volunteered to help get the
7  cylinders and we will take them over
8  there." And that's what we did.
9      Then on the next occasion, we
10  had a night job that it was mandatory
11  everybody be here. Be at the job out
12  here at the Mitylene, just before you get
13  to the Mitylene exit. They were having
14  to make cylinders. We were having to
15  make them real quick. And I told her, I
16  said, "Let's go down here and give them a
17  hand." She said, "I'm not getting ready
18  to do any of that." She said, "Just stay
19  up here with me. Because Todd knows I'm
20  not getting ready to do any of that." I
21  said, "Well, they need the help." I
22  walked off and went on to start helping
23  the guys work.

130

1  Q.  Did you work with her long enough to be
2      able to observe whether or not she ever
3      did any manual labor?
4  A.  Yes.
5  Q.  And it's your observation that she
6      didn't?
7  A.  Yes.
8  Q.  Do you know whether or not any of this
9      refusal to do manual labor took place in
10     the presence of Mr. Jackson or Mr.
11     Waits?
12 A.  I'm not sure. I don't recall.
13 Q.  In other words, were they ever standing
14     around there when she refused to do
15     anything?
16 A.  I know that Mr. Jackson was the night on
17     the bridge. Whether or not he heard her
18     make the statement, I'm not sure. I
19     don't remember.
20     MR. LEWIS: That's all I have
21         got.
22     MR. LYLES: I don't have anything
23     else.

131

1      THE COURT REPORTER: Did you guys
2          want to read and sign it?
3      MR. LEWIS: No, we will waive
4          that.
5      (Whereupon, the deposition
6          adjourned at 1:30 o'clock
7          p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

132

1          CERTIFICATE OF COURT REPORTER.
2      I, DAWN A. GOODMAN, do hereby certify;
3      That I am a Certified Shorthand Reporter
4  of the State of Alabama;
5      That the foregoing pages are a true and
6  correct transcript of the Deposition of
7  Alverene Butler;
8      I further certify that I am not interested
9  in the outcome of said matter nor connected
10 with or related to any of the parties of said
11 matter or to their respective counsel.
12     Dated this 10th day of January, 2007, at
13 Prattville, Alabama.
14
15
16     _____
           DAWN A. GOODMAN, CSR
           State of Alabama
17
18
19
20
21
22
23

33 (Pages 129 to 132)