# ALVERENE BUTLER

# v.

# ALABAMA DEPARTMENT OF TRANSPORTATION, et al.

# MARK WAITS

January 4, 2007



DEFENDANT'S EXHIBIT B

Reagan Reporters, LLC
Phone: 334.262.7556
Fax: 334.262.4437

## Page 1

```
IN THE UNITED STATES DISTRICT CIRCUIT
   FOR THE MIDDLE DISTRICT OF ALABAMA
            NORTHERN DIVISION
ALVERENE BUTLER,
     Plaintiff,
vs.                       CASE NO. 2:06-CV-278-MEF
ALABAMA DEPARTMENT OF
TRANSPORTATION, et al.,
     Defendants.

            *   *   *   *   *   *
                 DEPOSITION
                    OF
                 MARK WAITS,
taken pursuant to notice and stipulation on
behalf of the Plaintiff, and the ALABAMA
DEPARTMENT OF TRANSPORTATION, 1409 Coliseum
Boulevard, Room K-101, Montgomery, Alabama
36130-3050, before DAWN A. GOODMAN, Certified
Shorthand Reporter and Notary Public in and for
the State of Alabama at Large, on Thursday,
January 4, 2007, commencing at 12:45 o'clock
p.m.
```

## Page 2

```
                APPEARANCES

FOR THE PLAINTIFF:
     JAY LEWIS, Esquire
     847 South McDonough Street
     Suite 100
     P.O. Box 5059
     Montgomery, Alabama 36104

FOR THE DEFENDANTS:
     HARRY LYLES, Esquire
     Alabama Department of Transportation
     1409 Coliseum Boulevard
     Room K-101
     Montgomery, Alabama 36130-3050

     H. MITCHELL ALTON, III, Esquire
     Alabama Department of Transportation
     1409 Coliseum Boulevard
     Room K-101
     Montgomery, Alabama 36130-3050
ALSO PRESENT:
     Todd Jackson
```

## Page 3

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the Deposition of Mark Waits is taken pursuant to notice and stipulation on behalf of the Plaintiff; that all formalities with respect to procedural requirements are waived; that said deposition may be taken before DAWN A. GOODMAN, Certified Shorthand Reporter and Notary Public in and for the State of Alabama at Large, without the formality of a commission; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Civil Rules of Procedure for the State of Alabama.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of the Deposition of Mark Waits is hereby waived and that said

## Page 4

deposition may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute, regardless of the waiving of the filing of same.

It is further stipulated and agreed by and between the parties hereto and the witness that the signature of the witness to this deposition is hereby waived.

* * * * * *

Page 5

INDEX
                                    Page
Examination by Mr. Lewis              6

Page 6

PROCEEDINGS
THE COURT REPORTER: Did counsel want the usual stipulations?
MR. LYLES: Yes, please.
MR. LEWIS: Yes.

(MARK WAITS, of lawful age, having been duly sworn, testified as follows:)

EXAMINATION

BY MR. LEWIS:
Q. (By Mr. Lewis) State your name, please.
A. Mark Terence Waits.
Q. Mr. Waits, you have been sitting in here when we talked to everybody else. I'm not going to go over the ground rules for a deposition with you.
   What is your position with ALDOT?
A. I am a Transportation Manager.
Q. And what is a Transportation Manager?

Page 7

A. It's a classification within the Department. My working title is District Engineer.
Q. Okay. And just so I remember, there is a Division Engineer. Then, under it, District Engineer. And then, under that, Project Engineer,; but they are all called something else now?
A. Well, there is Division Engineer and then the Maintenance Engineer and then District Engineer.
Q. Okay.
A. Then your Project Engineer.
Q. So you would report to a Maintenance Engineer?
A. Yes, sir.
Q. Have you had the position that you now occupy for at least five years?
A. Yes, sir.
Q. So at all times material to the Complaint in this case, you were the supervisor of Mr. Jackson?
A. Yes, sir.

Page 8

Q. And ultimately within your chain of command was Alverene Butler?
A. Yes, sir.
Q. And Karen Stacey?
A. Yes, sir.
Q. There was an accident that we have been talking about during Mr. Jackson's deposition and during Ms. Stacey's deposition that I will represent to you took place on or about January 31st of 2005. Are you aware of that?
A. Yes, sir.
Q. Okay. How did you become aware of that accident?
A. I don't recall the exact day it was brought to my attention and, to tell the truth, I don't know exactly how I found out about it. I just did. I don't know if Todd informed me or some of my personnel in the District Office that handles those type issues brought it to my attention. I just don't recall.
Q. When did you first become aware that

```
                                            9
 1      there had been a confrontation between
 2      Ms. Butler and Ms. Stacey over alleged
 3      comments that Ms. Stacey made?
 4   A. The confrontation I assume you are
 5      speaking of is the confrontation that
 6      occurred on the job site the day that
 7      Todd got called back.
 8   Q. Yes, April 8th, 2005.
 9   A. I believe the confrontation occurred on a
10      Monday, and it was possibly the next day,
11      the next working day.
12   Q. How did you become aware of it?
13   A. I believe Todd Jackson had called me and
14      informed me what was going on.
15   Q. Okay. And what did Mr. Jackson tell you
16      about it?
17   A. He needed to speak to me about some
18      issues that occurred actually the week
19      before, and that happened that Monday.
20   Q. What other issues had occurred the week
21      before?
22   A. When we finally met, he brought to my
23      attention that there was some discussions
```

```
                                           10
 1      between himself and Karen Stacey and
 2      Alverene Butler about some racial slurs
 3      that had been mentioned and plus the
 4      occurrence that occurred on that Monday
 5      where work got interrupted.
 6   Q. And what, if anything, did you do about
 7      that report to you?
 8   A. First, I gathered the information from
 9      Todd as to exactly what happened. Now,
10      I'm talking about the accident, okay -- I
11      mean, the occurrence on Monday, okay, to
12      see what interrupted the work; and then
13      we discussed the issue that had occurred
14      Wednesday or Thursday when he got a
15      report about a racial slur. So I
16      gathered up the information.
17            He was seeking advice on
18      what to do. It was a unique situation as
19      far as our racial harassment policies go,
20      so I sought information from the Division
21      Personnel as far as what steps we
22      probably needed to take from there.
23   Q. Who did you go talk in the Division
```

```
                                           11
 1      Personnel?
 2   A. I talked to Mr. Ed Phillips and Mr. Doug
 3      Furlow.
 4   Q. What, if anything, did they tell you?
 5   A. We sat down and discussed the situation
 6      as far as the complaint for the sexual
 7      harassment, I mean how the racial
 8      harassment allegations went, and the
 9      incident combined with the incident that
10      occurred Monday, okay, as to what to do.
11            And we determined that if
12      there was a racial slur, okay, then Rene
13      had the opportunity, if she wanted to, to
14      file a complaint. None had been filed
15      yet. We didn't discourage her from doing
16      that.
17            But Mr. Furlow advised that
18      I look into the matter to see if there
19      might have been an alleged racial slur by
20      Karen by asking some of the other
21      employees, which is a normal procedure if
22      there is harassment or violation of that
23      policy.
```

```
                                           12
 1   Q. I'm a little unclear. You keep talking
 2      about the incident on Monday, and I'm
 3      assuming that's the April 8th incident in
 4      which the confrontation took place.
 5   A. Yes, I assume it was on April 8th. I'm
 6      not sure. I know it was on a Monday
 7      morning.
 8   Q. All right. I want to make sure I'm
 9      right. All right. I have on my calendar
10      that April 8th was a Friday for 2005.
11   A. Okay.
12   Q. And you're saying that the incident that
13      you're talking about took place on a
14      Monday?
15   A. Right.
16   Q. All right. And that would be April 11th,
17      quite possibly. Would you have any
18      documents in your possession that would
19      reflect the date that you became aware of
20      the incident or when the incident took
21      place itself?
22   A. As far as documents, no. I can't think
23      of any that I would have.
```

Page 13

1  Q. All right. So you decided to talk to
2     some of the employees who were there?
3  A. No, that was advised for me to talk to
4     some of the employees.
5  Q. Did you talk to any of the employees?
6  A. Yes.
7  Q. Who did you talk to?
8  A. The employees that were on that project
9     that were involved in the
10    cross-sectioning that day on the 11th,
11    and that's who I talked to, which I think
12    you have already got most of their names
13    from the previous testimonies.
14 Q. Did you talk to Mr. Johnson, or would you
15    even remember at this point?
16 A. I believe I did, yes, sir.
17 Q. How about Mr. Wynn?
18 A. I believe I did.
19 Q. Okay. And what did Mr. Johnson tell
20    you?
21 A. Mr. Lewis, I don't recall the exact
22    testimony.
23 Q. All right. Do you recall what you

Page 14

1     learned from that, how you finally put
2     together what had happened?
3  A. Yes, sir. Based on the information that
4     I received and trying to determine what
5     happened that delayed the work, okay, I'm
6     talking about the incident. Mr. Jackson
7     was very upset when he came to me and
8     because of the stoppage of work. That
9     was his biggest issue: My work got
10    stopped because something happened.
11         What I gathered from my
12    initial investigation was that the
13    previous week, the week of the 8th, he
14    was dealing with Karen and Rene's issue
15    about the racial slur, and he had been
16    informed or had instructed Rene that
17    Friday, the 8th, that he didn't know how
18    to handle it just yet. Just keep it to
19    yourself. Don't talk to nobody. Let me
20    get with Mr. Waits on Monday, and I will
21    get back with you.
22         Well, on Monday morning, I
23    was tied up in an emergency on the

Page 15

1     interstate most of the day and didn't get
2     the opportunity to handle that. Well,
3     upon my discovery and investigation that
4     Monday morning, before those crews ever
5     left the office, Rene had approached some
6     of the other employees there and brought
7     the issue up and was quizzing them about
8     the racial slur and statements she had
9     made to them earlier.
10         The general consensus was,
11    from the employees that I talked to, was
12    that she did do this. And she brought it
13    to them; they didn't bring it to her.
14    And they pretty much told her at the time
15    they don't want to talk about this
16    anymore. Leave it alone. They did not
17    want to discuss this.
18         Well, when they got out to
19    the job site -- everyone -- to start
20    cross-sectioning as directed by Todd, one
21    of the ones that she approached that
22    morning, one of the employees, other
23    employees, who pretty much said he had

Page 16

1     had enough of it to her that morning
2     brought it to Karen's attention, "Rene's
3     got something she wants to say to you."
4     And that's what stopped the work. That's
5     when the discussion between the two went
6     on and the work got stopped.
7          And it was in my
8     interpretation and investigation and
9     opinion that if Rene, at the time, had
10    not brought the issue up as instructed on
11    that Friday, that Monday morning that
12    incident would have never happened as it
13    did, because the employees would not have
14    even thought about this issue. They
15    would have gone to work as Todd told them
16    to go to work. So based on that, I
17    concurred with Todd's recommendation to
18    do a reprimand for Rene disrupting work.
19    That's where the reprimand came from.
20         As far as the racial
21    harassment slur or the racial slur, there
22    again, Mr. Furlow was involved in that at
23    that time, too, with recommendations to

MARK WAITS - 1/4/2007

**Page 17**

1  find out if there was anything said at
2  the time. Right after that, I believe
3  that very week, I think Rene actually
4  filed a complaint, so we dealt with it in
5  the formal manner instead of the informal
6  manner.
7  Q.  I'm still a little confused about time
8  lines. Let me see if I can nail it down.
9      Your understanding is that
10  the week before this Monday incident, the
11  confrontation -- we'll call it the
12  confrontation, all right, that stopped
13  the work, okay? The week before that,
14  Mr. Jackson knew about the racial slurs
15  because Ms. Butler had told him about
16  it.
17  A.  Ms. Stacey had told him about it.
18  Q.  Stacey had told him about it?
19  A.  (Witness nods head.)
20  Q.  Okay. All right. And Stacey had told
21  him, as you understand it, that she had
22  understood that Ms. Butler was going
23  around claiming she, Ms. Stacey, had made

**Page 18**

1  racist statements?
2  A.  Correct.
3  Q.  Okay. All right. And then, if the
4  confrontation took place, it would have
5  been on that -- probably on that Monday,
6  the 11th, which would have followed the
7  week in which Mr. Jackson learned of
8  this?
9  A.  Um-hum, that's correct.
10  Q.  All right. Prior to that confrontation,
11  had you spoken with any of Ms. Butler's
12  co-workers about whether she was creating
13  a hostile environment or whether she was
14  causing trouble?
15  A.  No.
16  Q.  You didn't call several of them into your
17  office one at a time to ask them these
18  things prior to the confrontation?
19  A.  Could you be more specific on the dates?
20  Q.  Well, no, I can't. I wish I could. I
21  just can't. But it would have been
22  sometime prior to the time of this
23  interaction between Ms. Stacey and

**Page 19**

1  Ms. Butler.
2  A.  Okay. Let me see if I can clarify. I
3  don't understand your question. Are you
4  saying prior to that would I have called
5  employees in, co-workers, to question
6  them about Ms. Rene and Ms. Stacey?
7  Q.  No. About -- specifically about
8  Ms. Butler.
9  A.  I can say I have talked to other
10  employees or co-workers about
11  Ms. Butler.
12  Q.  And what have you talked to them about?
13  A.  It was dealing with another supervisor
14  she had previously a couple years
15  before.
16  Q.  Was that a supervisor against whom she
17  had made a complaint?
18  A.  Yes.
19  Q.  What was his name?
20  A.  Jim Horace.
21  Q.  And what was the nature of that
22  complaint?
23  A.  She had filed a sexual harassment case or

**Page 20**

1  a complaint against Jim Horace.
2  Q.  Okay. And was it as a consequence of her
3  having filed that complaint against
4  Mr. Horace that she was transferred from
5  his supervision to Mr. Jackson's
6  supervision?
7  A.  No.
8  Q.  Why was she transferred from Mr. Horace's
9  supervision?
10  A.  After the complaint on Mr. Horace was
11  filed for sexual harassment, our EEO
12  officers did a thorough investigation,
13  and they recommended at that very day
14  that the complaint was filed to have
15  Ms. Butler and others removed from his
16  direct supervision. When I say, "they,"
17  the Division Engineer at that time.
18  Q.  And, in fact, he was left without anybody
19  to supervise?
20  A.  I don't recollect, Jay, if he had anybody
21  or not. It could be.
22  Q.  At that time prior to this confrontation,
23  and even prior to the automobile accident

5 (Pages 17 to 20)

**Page 21**

1  that sparked all of the controversy, did
2  you have any conversations with anybody
3  about whether or not Ms. Butler would be
4  a potential troublemaker in her
5  assignment?
6  A. No.
7  Q. Okay. Did you ask anybody whether they
8  thought she had a chip on her shoulder?
9  A. Specify -- those exact terms? No.
10 Q. Or any terms implying the same thing,
11 that Ms. Butler was going to be touchy,
12 that she was going to be easily offended,
13 that she was going to be hard to get
14 along with? Anything like that?
15 A. No.
16 Q. Okay. All right. Now tell me what --
17 you had indicated earlier you had talked
18 to co-workers, slash, employees about her
19 transfer or about her previous
20 supervisor. Can you explain?
21 A. I didn't say that earlier. You may be
22 mis --
23 Q. I may have misheard you. Before the

**Page 22**

1  confrontation in April, had you had any
2  discussions with anybody, any of Ms.
3  Butler's co-workers, about Ms. Butler?
4  A. And I told you earlier I did.
5  Q. Okay. And what was that about?
6  A. It was about the Jim Horace complaint.
7  Q. Right.
8  A. During that time of the complaint.
9  Q. But not after she had been transferred?
10 A. Not after she had been transferred.
11 Q. I got it. Now I understand. Now,
12 following the confrontation, you said you
13 talked to several of the people who had
14 been out there at the time.
15 A. Um-hum. Yes, sir.
16 Q. Did any of them -- did you ask any of
17 them whether or not Ms. Butler was
18 creating a hostile environment?
19 A. Yes.
20 Q. And what did they tell you?
21 A. Some said yes and some said no.
22 Q. Can you recall who said yes?
23 A. No, sir; I can't recall offhand.

**Page 23**

1  Q. You've heard me ask Mr. Jackson about
2  some policies. Let me show you something
3  I will identify as a memorandum
4  purportedly from you. It is not dated,
5  and I will read you -- yes, it is dated,
6  August 24th, 2005, to all District Three
7  supervisors. It has to do with, I
8  believe, leave policies, approved and
9  disapproved leave. You take a minute and
10 glance over that.
11 A. Yes, sir.
12 Q. Okay. Now, was I correct it said August
13 24th, 2005?
14 A. That's what the date on the memorandum
15 is.
16 Q. All right. In it, you're asking your
17 supervisors to go back to specifically
18 April 8th, 2005, and conduct, what, a
19 survey or an audit of the leave that's
20 been approved?
21 A. Yes, sir.
22 Q. Okay. What was the purpose of that
23 memo?

**Page 24**

1  A. The Department had our -- what is Lamar
2  McDavid's title? Our Finance Director
3  put a memorandum out about disapproved
4  leave. And if it's disapproved leave,
5  then that employee is not entitled to
6  that leave. They may be on leave without
7  pay.
8  Q. Okay.
9  A. My direct supervisor informed me that we
10 could not put an individual on leave
11 without pay, contrary to the memorandum
12 the Finance Director or Bureau Chief put
13 out. He instructed me to allow them
14 leave, even though it was disapproved.
15    Well, when the auditors came
16 in and audited our payrolls, okay, around
17 that date, they found leave slips that
18 had disapproved leave on them, but
19 they were allowed the leave. In other
20 words, their time sheets, their payroll
21 sheets showed that they were allowed that
22 leave, and they said that this is
23 incorrect; you have to have a

```
                                    25
 1        supplemental payroll sheet made out to
 2        correct that.
 3              So any previous payrolls
 4        that allowed them to use this leave,
 5        whether it's sick, annual, or comp time
 6        or whatever the case may have been, and
 7        it was disapproved, that a supplemental
 8        payroll would have to be made out; and
 9        that's what this was pertaining to.
10   Q.   Okay.
11   A.   We finally got the official word and my
12        supervisors above me that any disapproved
13        leave now would be AWOP.  So we had to
14        correct all of our leave or payrolls by
15        supplemental payroll.
16   Q.   So you had to go back from August back
17        through April in order to do that?
18   A.   They audited us, I think it was, around
19        the 1st of May to that period, and found
20        some, so we had to go back to the first
21        of the year.
22   Q.   Did this memorandum go out to all
23        District Three supervisors?

                                    26
 1   A.   Yes.
 2   Q.   Let me read, I'm just going to read this
 3        last paragraph because I don't have a
 4        copy for the record.
 5              "This office is reviewing
 6        all previous leave slips from April 8th,
 7        2005, in order to identify disapproved
 8        leave for possible payroll corrections.
 9        I strongly suggest that you discuss this
10        matter with all of your employees and
11        acknowledge their complete understanding.
12        Should you need any other assistance on
13        this matter, please feel free to contact
14        me."
15              Help me understand this.  I
16        heard what you said about disallowed
17        leave.  It would be charged as leave
18        without pay.
19   A.   Um-hum.
20   Q.   I don't understand the process by which
21        leave would be disapproved or disallowed
22        and it would still be allowed on the
23        payroll.

                                    27
 1   A.   Right.  Okay.  I'll try.  I thought I
 2        explained it.  Maybe I did a poor job of
 3        that earlier.  It's the Department's
 4        policies and procedures that if you
 5        disapprove a leave slip that that
 6        individual is not entitled to their
 7        leave, okay?  And if they take off,
 8        they're leave without pay.
 9   Q.   Right.
10   A.   My direct supervisors pulled out the same
11        policy and procedures, and it said the
12        only person that had the authority to put
13        an individual on leave without pay is the
14        appointing authority:  That would be the
15        Director of Transportation, and he held
16        steady to that.  In other words, if Todd
17        was to come to me and ask me for leave
18        and I said no, and he took it anyway, I
19        could not put him on leave without pay.
20        I just wrote "disapproved," and it would
21        be dealt with through his performance
22        appraisal.
23   Q.   I see.

                                    28
 1   A.   Violation.  Well, after finding
 2        clarification to that issue, and
 3        especially when the auditors found leave
 4        slips that were disapproved and the leave
 5        was allowed, we clarified that and went
 6        back to the policy that the Finance
 7        Bureau Chief put out that any disapproved
 8        leave would be leave without pay.  Well,
 9        we had to correct the ones that were
10        incorrect.
11   Q.   All right.
12   A.   As a whole set.  All the way across the
13        District.
14   Q.   So if leave had been disapproved, not
15        only was the leave charged against the
16        leave balance of the employee, but the
17        employee was paid for the time leave was
18        taken?
19   A.   Say that one more time.
20        MR. LYLES:  That's what his view
21        is.
22   Q.   (By Mr. Lewis) Yeah, I'm trying to
23        summarize.  Up until this memorandum
```

Page 29

```
 1      came, if an employee asked for leave and
 2      you turned it down or the supervisor
 3      turned it down, it was -- the only thing
 4      that happened was a notation was made
 5      "disapproved," and it would be taken up
 6      as a performance issue?
 7   A. Right.
 8   Q. But the employee could still take that
 9      leave and would be paid for it, and it
10      would be charged against his leave
11      balance?
12   A. Right.
13   Q. Okay.
14         MR. LYLES: A great system.
15         MR. JACKSON: We all thought it
16             was okay, too.
17   A. Jay, this memorandum right here that was
18      put out in that last paragraph you just
19      read was to get all of the supervisors to
20      discuss it with their employees, because
21      I didn't want the precedent set or to
22      promote employees into thinking that they
23      could take leave. I wanted them to
```

Page 30

```
 1      understand that if they took it that they
 2      weren't going to get paid if it was
 3      disapproved, okay?
 4   Q. (By Mr. Lewis) Okay. When you went back
 5      and did the supervisor supplemental
 6      payroll that you were talking about, did
 7      that affect some employees' future pay?
 8      In other words, let me ask it this way.
 9      Let me ask an example. If, for example,
10      Joe Jones had asked for leave in May of
11      2005, eight hours' leave --
12   A. All right.
13   Q. -- and you said no and you wrote
14      "disapproved."
15   A. This would be like in April when he
16      asked?
17   Q. No, let's say -- yeah, he asks in April.
18      He takes it in May.
19   A. All right.
20   Q. Now, we're into August or September.
21   A. Um-hum.
22   Q. And this memo is coming out. Would he be
23      docked in a future paycheck for this
```

Page 31

```
 1      disapproved leave he took in May?
 2   A. Mr. Lewis, I don't know how the payrolls
 3      and accounts reimbursements are set. I
 4      think he has to write them a check, but
 5      I'm not sure. I don't know.
 6   Q. In other words, he would have to pay them
 7      back for any disallowed leave?
 8   A. I don't know how they work that. I don't
 9      know if they deduct his leave and have to
10      write them a check. I just don't know.
11   Q. Okay. Would there be documents
12      reflecting when the auditors would have
13      given instructions to go back to April
14      8th?
15   A. I'm sure they probably have a record of
16      when they audit payrolls. I don't know.
17      I really don't know.
18   Q. I'm just concerned about why that
19      particular date.
20   A. Right.
21   Q. Unless that's simply the first date that
22      was covered by the audit.
23   A. I don't know. I can't tell you.
```

Page 32

```
 1   Q. Let me ask you about a meeting that
 2      Ms. Butler has told me took place between
 3      you and her on April 22nd, 2005. And I
 4      know you are not going to remember exact
 5      dates. But did you have a meeting late
 6      in April with Ms. Butler?
 7   A. I don't recall.
 8   Q. Okay. Did you have a meeting with her in
 9      which you asked her about her grievances
10      and what her grievances were?
11   A. I don't recall. I just don't recall.
12   Q. And I'll ask a couple more. Maybe it
13      will jog your memory, maybe not.
14             Did you ever ask her in a
15      meeting whether she was familiar with the
16      procedure for filing complaints about
17      racial slurs?
18   A. I don't recall.
19   Q. Okay. What is an estimate?
20   A. The contractor performs work for us.
21   Q. Uh-huh.
22   A. And we have pay items set up on each
23      contract that has a unique value to each
```

**Page 33**

    unit as work. And as he does the work during the month, we measure or count those items of work, compile all of the quantities up, put a dollar value on it and call it an estimate for a monthly voucher.

Q. All right. Did you have a conversation with Ms. Butler in which you talked to her about estimates, if you recall?

A. I couldn't recall.

Q. Okay. Did you have a discussion with Ms. Butler at any time about her appraisal, annual appraisal, that was to have been given to her sometime in April of 2005?

A. Are you talking about the appraisal she got in April of 2005?

Q. Yes. Performance appraisal.

A. Mr. Lewis, I could have. I just don't recall. I know I remember talking to her about appraisals in the past, but it could have been dealing back with one previous. I just don't recall that exact

**Page 34**

one.

Q. Do you recall asking her about these racial slurs that Karen Stacey was supposed to have made?

A. No, sir. I don't recall asking her.

Q. Do you know anything about Ms. Butler's ACI certification?

A. Yes, sir.

Q. Okay. Tell me what you know about that process that she went through.

A. I know Ms. Butler had taken the ACI previously and had passed. And every so many years you have to go back and take it again, okay, to get recertified. And I don't remember the exact dates, but I know Ms. Butler had failed a portion of it, which there is actually three portions, Mr. Lewis; and if you fail one part, you fail it all, okay?

    And we re-entered her into another class to take the ACI again, and she failed it again. That was in the year of -- I would have to pull the

**Page 35**

records out. November of '04 to April of '05, somewhere in there she took it twice and failed it twice.

Q. Were some employees allowed to take the test in the coordinator's office?

A. Not that I am aware of. I physically don't know that.

Q. Okay. Was there ever a conversation at which you were present with Stacey about finding some way to get rid of Ms. Butler?

A. No.

Q. Were you ever aware of any situation by which hours were deducted from the pay of Mr. Johnson, Ms. Butler, Mr. Wynn and Ms. Knight as a result of statements made by Stacey?

A. No, sir.

Q. Have you told me everything you can remember about the meetings that you had with Ms. Butler's co-workers during your investigation of the confrontation?

A. Have I told you everything?

**Page 36**

Q. That you can remember about those meetings?

A. I have answered your questions pertaining to them, yes, sir.

Q. Let me ask you this, then, and that's a good answer. I appreciate that. It makes me work.

    Do you recall a specific meeting with Mr. Johnson?

A. Yes, sir. I remember talking to the employees, but I don't remember the specific meetings. I wrote down the information pertaining to Ms. Butler's complaint in the initial investigation. And other than that, I would have to go read them just to refresh my memory on what was discussed.

Q. Did you maintain those notes?

A. I think there are some departmental records as far as -- I don't know how that's kept through EEOC documents.

    MR. LYLES: If we have got it, we'll turn it over to you.

**Page 37**

1  MR. LEWIS: Yeah, I need to do a
2  request anyway.
3  MR. LYLES: Just for the record,
4  the records that Mr. Waits is
5  talking about, I'm going to
6  check on that. If we have
7  such a record, I will turn it
8  over to counsel.
9  Q. (By Mr. Lewis) Okay. Going back to
10  that -- I got distracted when you started
11  talking about the stuff that you had
12  written down -- do you recall anything
13  specifically about the meeting you had
14  with Mr. Johnson?
15  A. No, sir. Not just right offhand.
16  Q. So you wouldn't know whether he had ever
17  told you that he felt that Ms. Butler was
18  being treated unfairly?
19  A. No, sir.
20  Q. Okay. How about any meeting with
21  Mr. Feagin? Do you remember anything
22  about the substance of the conversation
23  with Mr. Feagin?

**Page 38**

1  A. No, sir. No, sir. It's been a long time
2  ago.
3  Q. It has. And I'll ask you the same
4  question about Mr. Wynn.
5  A. Um-hum.
6  Q. Same answer?
7  A. Yes, sir. I have so many employees in
8  the District and so many -- it's just
9  hard for me to give an accurate answer.
10  Q. And Ms. Knight?
11  A. The same with Ms. Knight.
12  Q. And Mr. Taylor, the same answer?
13  A. Yes, sir.
14  Q. And did you talk to Ms. Stacey about the
15  confrontation?
16  A. The confrontation on the -- yes, I'm sure
17  I did. If I did the initial
18  investigation, that was probably brought
19  into it.
20  Q. Do you remember anything she said?
21  A. Other than what Todd brought up earlier
22  today and what I heard Karen say, it just
23  kind of brings back the same things I

**Page 39**

1  heard before.
2  Q. Did you have -- do you recall any
3  specific conversation about whether or
4  not Ms. Stacey did make or did not make
5  the statements attributed to her by
6  Ms. Butler during the accident?
7  A. I'm sorry. Say that again.
8  Q. That was really convoluted. Do you have
9  any specific recollection of whether you
10  discussed with Ms. Stacey whether or not
11  she made the statements that Ms. Butler
12  attributed to her?
13  A. Are you asking me if I asked Ms. Stacey
14  did she say that?
15  Q. Yes.
16  A. I did, and she said she did not say
17  that.
18  Q. All right. Fair enough. Other than --
19  strike that.
20  We know that Ms. Butler got
21  a reprimand because of that
22  confrontation. And we know that the
23  reprimand was given out to Mr. Jackson, I

**Page 40**

1  believe.
2  A. Was issued by Mr. Jackson, yes, sir.
3  Q. Okay. Would you have any idea or did you
4  discuss with Mr. Jackson why he didn't
5  give a reprimand to Ms. Stacey?
6  A. We did discuss the reprimand. And
7  Mr. Jackson felt that Ms. Butler deserved
8  the reprimand because she did not follow
9  his instructions from the previous Friday
10  not to discuss this with other employees
11  until he got back with them. If that had
12  been adhered to, then the confrontation
13  may not have ever happened, and that's
14  what disrupted the work.
15  Q. Okay. All right. I understand. So
16  it's -- and I may have heard this wrong
17  earlier. So it's your understanding that
18  Mr. Jackson had had a conversation with
19  Ms. Butler the previous week.
20  A. Yes, sir.
21  Q. About not discussing it with anybody?
22  A. Yes, sir.
23  Q. Okay. And that would have been after Ms.

Page 41

1  Stacey came to Mr. Jackson and complained
2  that Ms. Butler was attributing remarks
3  to her?
4  A. To other co-workers, yes.
5  Q. Okay. And the reprimand was given out
6     because Ms. Butler had talked to the
7     other co-workers, not because of the
8     confrontation with Ms. Stacey. That's
9     what Ms. Butler had done wrong?
10 A. The reprimand was issued to Ms. Butler
11    because she did not follow Mr. Jackson's
12    orders and, because of the failure, work
13    was disrupted.
14 Q. Even though Ms. Stacey was the one who
15    initiated the conversation?
16 A. I don't know that Ms. Stacey initiated
17    it.
18 Q. Okay. Do you know whether Ms. Stacey was
19    given any instructions about discussing
20    the matter?
21 A. No, I do not recall.
22 Q. Okay. Let me go through my notes for a
23    second. I don't need privacy.

Page 42

1     MR. LYLES: Probably wanted to
2        talk to yourself out loud?
3     COURT REPORTER: Do you want
4        to read and your sign your
5        deposition?
6     MR. LYLES: You can do that
7        or waive it. She is good.
8        Just waive it.
9  A. Just waive it.
10 Q. (By Mr. Lewis) Just two other things and
11    I think we will be through.
12       No. 1, are you personally
13    aware of any complaints about Ms.
14    Butler's work performance or her job
15    knowledge or competence to perform
16    functions of her position?
17 A. I don't believe I could answer it in that
18    form of the question. Repeat that.
19 Q. Is she a pretty good worker in terms of
20    knowing what she was doing and doing the
21    job?
22 A. I don't directly supervise her work. All
23    I can do is look at the evaluations that

Page 43

1     come in and any comments that her
2     supervisor may make and review her
3     performance through her training records,
4     certifications she should acquire to --
5     in order to do her job. A lot of that is
6     about all I can actually observe of her
7     work, personally.
8  Q. What are the requirements for promotion
9     to a CE, at that time?
10 A. The requirements for a CE? The State
11    Personnel Board has that in place for
12    someone to either get promoted or hired
13    into the State, which essentially means
14    meet minimum qualifications, submit an
15    application. If that classification of a
16    job requires examinations, go take an
17    examination.
18       Once you take an
19    examination, you're placed on a register,
20    and hopefully your name will be ranked
21    high enough on that ranking on that
22    register that when there is a vacancy and
23    they call off of the register, you might

Page 44

1     get a notice to go take an interview for
2     it.
3  Q. All right. With CEs under Mr. Jackson,
4     for example, who would be the
5     decision-maker as to who to hire off the
6     register?
7  A. CEs under Mr. Jackson?
8  Q. Yes.
9     MR. LYLES: Vacancy in your
10       District.
11 Q. (By Mr. Lewis) Yes.
12 A. Oh, in my District? I do the interview
13    and selection. There's actually -- the
14    way the department is structured, the
15    interview team through the SPD that we
16    have that sits down and interviews makes
17    the selection off of the register that's
18    forwarded to that team.
19 Q. Are you aware of whether Ms. Butler was
20    on that register?
21 A. No, she was not.
22 Q. She was not?
23 A. She was not on -- none of the registers

11 (Pages 41 to 44)

**Page 45**

1  I've ever interviewed for. I can't say
2  if she is on the register as a whole or
3  not.
4  Q. And then the last thing I want to go
5  into, and we've touched on this before.
6  This prior complaint she had against
7  Mr. Horace --
8  A. Um-hum.
9  Q. -- did you ever discuss with either Mr.
10  Jackson or anybody in Mr. Jackson's
11  office Ms. Butler's complaint about
12  Mr. Horace?
13  A. I never discussed it with Mr. Jackson. I
14  did discuss it with some of the
15  co-workers of Rene that were assigned to
16  Mr. Jackson, because they were directly
17  involved in the complaint of
18  Mr. Horace.
19  Q. Tell me about the conversations you had
20  with them.
21  A. It was during the complaint process with
22  Mr. Horace.
23  Q. It was not after she had been

**Page 46**

1  transferred?
2  A. No.
3     MR. LEWIS: I have nothing else.
4        Thank you.
5     MR. LYLES: Okay.
6     (Whereupon, the deposition
7        adjourned at 2:00 o'clock
8        p.m.)

**Page 47**

1  CERTIFICATE OF COURT REPORTER.
2  I, DAWN A. GOODMAN, do hereby certify;
3     That I am a Certified Shorthand Reporter
4  of the State of Alabama;
5     That the foregoing pages are a true and
6  correct transcript of the Deposition of Mark
7  Waits;
8     I further certify that I am not interested
9  in the outcome of said matter nor connected
10  with or related to any of the parties of said
11  matter or to their respective counsel.
12     Dated this 10th day of January, 2007, at
13  Prattville, Alabama.

16     DAWN A. GOODMAN, CSR
       State of Alabama