# ALVERENE BUTLER

## v.

## ALABAMA DEPARTMENT OF TRANSPORTATION, et al.

## KAREN STACEY

January 4, 2007



DEFENDANT'S EXHIBIT
C

Reagan Reporters, LLC
Phone: 334.262.7556
Fax: 334.262.4437

KAREN STACEY - 1/4/2007

**Page 1**

IN THE UNITED STATES DISTRICT CIRCUIT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALVERENE BUTLER,
    Plaintiff,
vs.    CASE NO. 2:06-CV-278-MEF
ALABAMA DEPARTMENT OF
TRANSPORTATION, et al.,
    Defendants.

\* \* \* \* \* \*

DEPOSITION
OF
KAREN STACEY,
taken pursuant to notice and stipulation on behalf of the Plaintiff, and the ALABAMA DEPARTMENT OF TRANSPORTATION, 1409 Coliseum Boulevard, Room K-101, Montgomery, Alabama 36130-3050, before DAWN A. GOODMAN, Certified Shorthand Reporter and Notary Public in and for the State of Alabama at Large, on Thursday, January 4, 2007, commencing at 10:10 o'clock a.m.

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:
    JAY LEWIS, Esquire
    847 South McDonough Street
    Suite 100
    P.O. Box 5059
    Montgomery, Alabama 36104

FOR THE DEFENDANTS:
    HARRY LYLES, Esquire
    Alabama Department of Transportation
    1409 Coliseum Boulevard
    Room K-101
    Montgomery, Alabama 36130-3050

ALSO PRESENT:
    Alverene Butler
    Todd Jackson
    Mark Waits

**Page 3**

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the Deposition of Karen Stacey is taken pursuant to notice and stipulation on behalf of the Plaintiff; that all formalities with respect to procedural requirements are waived; that said deposition may be taken before DAWN A. GOODMAN, Certified Shorthand Reporter and Notary Public in and for the State of Alabama at Large, without the formality of a commission; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Civil Rules of Procedure for the State of Alabama.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of the Deposition of Karen Stacey is hereby waived and that said

**Page 4**

deposition may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute, regardless of the waiving of the filing of same.

It is further stipulated and agreed by and between the parties hereto and the witness that the signature of the witness to this deposition is hereby waived.

\* \* \* \* \* \*

1 (Pages 1 to 4)

334.262.7556    Reagan Reporters, LLC    334.262.4437
www.ReaganReporters.com

Page 5

```
 1              I N D E X
 2                           Page
 3  Examination by Mr. Lewis    6
```

Page 6

```
 1              P R O C E E D I N G S
 2        THE COURT REPORTER: Did counsel
 3           want the usual stipulations?
 4        MR. LEWIS: Sure.
 5        MR. LYLES: That's fine.
 6
 7              (KAREN STACEY,
 8               of lawful age, having
 9               been duly sworn,
10               testified as follows:)
11
12              EXAMINATION
13
14  BY MR. LEWIS:
15  Q.  (By Mr. Lewis) Tell us your name, please.
16  A.  Karen Stacey.
17  Q.  Ms. Stacey, how are you employed today?
18  A.  Retired.
19  Q.  Okay. When did you retire?
20  A.  April 1st, 2006.
21  Q.  And from what did you retire?
22  A.  DOT.
23  Q.  What was your job at DOT, your last
```

Page 7

```
 1     job?
 2  A.  I worked in construction.
 3  Q.  Okay. And what was your job title?
 4  A.  EA II/III.
 5  Q.  Is that engineering assistant?
 6  A.  Yes, sir.
 7  Q.  Go back and tell me when you joined the
 8     Department of Transportation, and how you
 9     progressed in the jobs you held at the
10     Department.
11  A.  I came to work in December of 1988. I
12     came as a Steno II. I worked at the
13     District Office. And I worked there
14     until, I believe, '93 or '94. I had
15     taken the EA test and I got that
16     position. And then I went into the
17     Division Office in the --
18        MR. LYLES: Karen, excuse me.
19           Ms. Butler is here.
20  A.  -- Design Bureau. And I stayed there six
21     months and then went out into
22     construction back under District Three.
23  Q.  (By Mr. Lewis) Where is District Three?
```

Page 8

```
 1  A.  Under Division Six. It's in Montgomery
 2     County.
 3  Q.  And so I'm familiar with it, or aware of
 4     it, the Department is divided into
 5     divisions. And do those Divisions govern
 6     a specific geographical area?
 7  A.  Yes, sir.
 8  Q.  Okay. And Division Six is in
 9     Montgomery?
10  A.  Yes, sir.
11  Q.  And under each division there are a
12     number of districts?
13  A.  Yes, sir.
14  Q.  Okay. How many districts are there in
15     Division Six?
16  A.  I don't know. I think five.
17  Q.  Okay. Let me go through just a couple of
18     little points before we go any further.
19     We are taking your deposition in the case
20     that Ms. Butler has filed against the
21     Department of Transportation and certain
22     individuals. We are going to be asking a
23     few more questions.
```

### Page 9

) If you don't understand a question, I'm asking, please tell me. There are no right answers or wrong answers. They are just answers. If I'm using a word with which you are not familiar, or a concept with which you are not familiar, I will ask you to stop me and make me clarify it, because we all ask questions in a convoluted fashion sometimes. This is not going to be a long deposition. But if at any time you need to take a break, that's fine. Take a break.

The questions I have to ask everybody: Are you under the influence of any medications or other substance that might alter your ability to perceive what I am asking to give an accurate, truthful response?

A. No.
Q. Okay. Have you ever given your deposition before?
A. Yes.

### Page 10

Q. Then you probably know most of the ground rules. The one that I will ask you to adhere to is please answer my questions verbally with a "yes" or a "no." Don't nod your head, shake your head or say "uh-huh" or "huh-huh." Okay?
A. Okay.
Q. All right. When did you first meet Ms. Butler?
A. When she came -- well, when she come to the District Three, I'm not sure what year.
Q. When, again, did you come to District Three?
A. 1988.
Q. Were you always under the same supervisors since 1988?
A. Was I?
Q. Yes.
A. No.
Q. What supervisor -- to what supervisor did you report at the time of your retirement?

### Page 11

A. Todd Jackson.
Q. When did you first begin reporting to Todd Jackson?
A. I'm not sure the exact year.
Q. Had you worked under another supervisor prior to that?
A. Yes.
Q. And who was that?
A. Jimmy Bradshaw.
Q. Jimmy who?
A. Bradshaw.
Q. Bradshaw. And when you left Mr. Bradshaw's supervision to go to the last job you had, was that a change of locations, a change of projects, or what?
A. Jimmy Bradshaw quit the State, and Todd took his place.
Q. Okay. So it was just a replacement of the supervisor?
A. Uh-huh, yes.
Q. Who did you work for prior to Mr. Bradshaw?

### Page 12

A. Mr. Wiliford.
Q. And did Mr. Bradshaw replace Mr. Wiliford or did you transfer?
A. I think so.
Q. You think what?
A. I don't recall right this minute, I am thinking Richard retired and then Jimmy took his place.
Q. In other words --
A. But I can't remember.
Q. During that period of time you didn't move or change offices, but your supervisors changed above you?
A. Well, we changed locations because, as they build roads or projects they tear down houses sometimes, so we had to move locations, but I was still in the same project.
Q. Same group?
A. Uh-huh, yes.
Q. All right. Okay. So you were already in the group when Ms. Butler moved in?
A. Yes.

### Page 13

```
1   Q.  When she got there, how did you two get
2       along?
3   A.  Fine.
4   Q.  Did you have an opportunity to work with
5       her?
6   A.  Yes.
7   Q.  How was her work performance?
8   A.  I mean, it was fine. I'm not her
9       supervisor, but we did our job.
10  Q.  Okay. And you don't have any particular
11      complaints about the way she did her
12      job?
13  A.  I mean, I wasn't in a position to
14      complain.
15  Q.  You worked with her?
16  A.  Well, not at first.
17  Q.  Okay.
18  A.  We were in the same office.
19  Q.  When did you start working with her?
20  A.  There was Project Engineers in the same
21      building. She worked for one, and I
22      worked for one.
23  Q.  Okay.
```

### Page 14

```
1   A.  Then she was moved eventually to the one
2       that I was with, and we worked in the
3       office, and then when we got a paving
4       project, we both went out to the field
5       together.
6   Q.  So you had an opportunity to observe her
7       in the field and her work?
8   A.  Yes.
9   Q.  Any particular complaints about the way
10      she did her work?
11  A.  I mean, I don't understand what you want
12      me --
13  Q.  Let me back up. Did she do her work well
14      from what you observed?
15  A.  As long as me and her were together. I
16      can't tell you when we weren't
17      together.
18  Q.  Right; as long you were together, her
19      work was good?
20  A.  We did what we were supposed to do.
21  Q.  All right. Okay. When you were in the
22      field, did you actually do manual
23      labor?
```

### Page 15

```
1   A.  Yes.
2   Q.  Okay. You poured concrete?
3   A.  No. That's the contractor's job.
4   Q.  Did you pour cylinders for testing?
5   A.  Yes.
6   Q.  You did? Okay. Did you take those
7       cylinders to the place to be tested?
8   A.  Yes.
9   Q.  Did you perform other measurements and
10      tests?
11  A.  Yes.
12  Q.  And did Ms. Butler do that too?
13  A.  Yes.
14  Q.  Did you ever suggest to Mr. Jackson that
15      Ms. Butler had not worked the hours that
16      she claimed to have worked?
17  A.  No.
18  Q.  Did you make that claim about either
19      Mr. Johnson or Mr. Wynn or Ms. Knight?
20  A.  No.
21  Q.  Were you involved in an automobile
22      accident sometime in 2005?
23  A.  Yes.
```

### Page 16

```
1   Q.  Tell me about that accident.
2   A.  We had left the job site to go get
3       something to eat at Taco Bell, and I was
4       pulling across traffic. It was raining,
5       and I was in the suicide lane, and I --
6       there was nothing coming from down toward
7       the interstate our way, and I pulled
8       across. And a guy at Entec, he pulled
9       out, and I was committed, tried to stop.
10      It was raining and, you know, me and
11      Alverene both were yelling, you know,
12      "He's going to hit us," or Alverene was
13      yelling, "stop" and he came across the
14      front of the car.
15  Q.  Okay.
16  A.  Truck.
17  Q.  Did you hit him, or did he hit you? That
18      may be a bad question. First of all,
19      tell me what a suicide lane is.
20  A.  It's the lane in the mirror that has
21      arrows pointing both ways, you know.
22      That's what I think we just kind of
23      call -- we call it.
```

**Page 17**

Q. When I am asking who hit whom, you didn't hit head on?
A. No.
Q. Okay. Did your car -- the front of your car -- impact the other car?
A. No; he come across, the front of mine.
Q. Okay. So the front of his car hit your car?
A. Yes. He come across the side of his car.
Q. All right.
A. Hit the front of the truck.
Q. Okay. Well, that's what I am asking. You were continuing to drive forward and he cut in front of you; correct?
A. Correct.
Q. Okay. And you hit the side of his car?
A. He come across the front of the State truck. My air bags didn't go off. I did not strike him. The air bags didn't go off or nothing. He was pulling out of Entec. I was trying to stop. The roads were wet and, when we came to a stop, he

**Page 18**

had went across and he hit the front of the State truck.
Q. And did you report to anybody about that accident?
A. Yes.
Q. And to whom are you required to report when you have an accident like that?
A. If there is an injury, 911, and Todd.
Q. You report to your supervisor?
A. Yes.
Q. At any point immediately following that accident, did you comment to Alverene or anybody else, quote, "did you see that stupid motherfucking nigger hit me?"
A. No.
Q. You didn't say anything like that?
A. No.
Q. Never used that word?
A. No.
Q. All right. Did, at some point, you become aware that Alverene had told a different story about that accident than you did?

**Page 19**

A. Yes.
Q. Okay. And how did you become aware of that?
A. From James Feagin.
Q. Who is James Feagin?
A. He was an EA with us.
Q. Is he now deceased?
A. Yes.
Q. And what exactly did James Feagin tell you?
A. That that's what Rene was saying.
Q. What was?
A. That I said M-F-N.
Q. Okay. Did he also tell you that she had told a different version of how the accident occurred?
A. I don't remember him saying that. We were talking about what the racial slurs were.
Q. Okay. So it was your understanding that she had reported to somebody that you had used that racial slur?
A. To the other Blacks.

**Page 20**

Q. Okay. But that's something that you deny?
A. Yes.
Q. At some point, did you discuss that matter with Ms. Butler?
A. Yes.
Q. Okay. Tell me when that happened.
A. Do you want the date? It was in April.
Q. Okay. Of 2005?
A. Yes. The wreck happened in January.
Q. Tell me how that conversation came about.
A. We were out on the job site taking cross-sections and, Jesse made the comment that if Rene had something to say she should go on and say it. So we were trying to take cross-sections, so I told her, I asked, did she have something to say. She got out of the truck. She come over there and said that I said M-F-N.
Q. Okay. And what happened then?
A. I denied it.
Q. Anything else?
A. What are you asking?

21

1  Q. Tell me the whole conversation. All I
2     here --
3  A. With all of the employees or just with
4     me?
5  Q. With you and Ms. Butler.
6  A. I denied it, and she said that that's
7     what I said.
8  Q. Was there anything further to that
9     conversation?
10 A. With other employees, there was.
11 Q. And tell me about that.
12 A. Because she said I was lying. I told her
13    she was lying, and then there was other
14    things that were being said that she said
15    that James Feagin said, and I had already
16    confronted James with that when the
17    others came out. So I asked James, Did
18    he say that he was going to string me up
19    on the job if she didn't watch my back?
20    And he said, "No." Then I told her then
21    she was lying.
22 Q. So who initiated that conversation?
23 A. Jesse.

22

1  Q. From what I am hearing, the conversation
2     between you and Ms. Butler out on the job
3     site was initiated by you; is that
4     correct?
5  A. No, I was doing my work.
6  Q. Well, did she come over to you, or did
7     you go over to her and say whatever you
8     said to start the conversation?
9  A. We didn't neither one goes to each other.
10    I was standing by a truck, and she was in
11    a truck.
12 Q. Okay. But you were the one who made the
13    statement or asked her if she had --
14 A. No, I didn't asked her. I asked her if
15    she has something to say she needs to say
16    it.
17 Q. Okay. All right.
18        MR. LYLES: What he's asking is
19           was that after Jesse told you
20           what he told you?
21 A. Yeah, Jesse had already said, made that
22    statement.
23 Q. (By Mr. Lewis) How long before that had

23

1     Jesse made that statement?
2  A. I don't remember.
3  Q. And that was the statement in which he
4     said that she accused you of using a
5     racial slur; is that correct?
6  A. No, he said if she had something to say,
7     she should say it.
8  Q. Okay. And then you asked that she go
9     ahead and say it if she had something to
10    say; correct?
11 A. I just made that statement, but we were
12    trying to move the tapes and stuff to
13    finish cross-sections.
14 Q. All right. You had indicated that there
15    was some other conversations with some
16    other employees on the site, and would
17    you continue telling me about those
18    conversations.
19 A. The one with me and James?
20 Q. Yes. Was there any more to it than
21    you've already told?
22 A. At that particular day or at all?
23 Q. That particular day.

24

1  A. No. I mean, we had cross-sections to do,
2     and I called Todd, and I just told him
3     that things were getting out of hand. We
4     had cross-sections, We had to pay the
5     contractor, so we started back to work.
6  Q. When you said, "Things were getting out
7     of hand," what did you mean?
8  A. I mean, I knew what job. I was in charge
9     out there. Me and James were Chief
10    Inspectors and we were in charge of
11    getting them. And James had cancer, so I
12    was doing most of the legwork; he was
13    staying -- riding in the truck, writing
14    and stuff. I mean, I knew we had to pay
15    the contractor. They were coming up
16    behind us, if they cover up what we
17    needed to do cross-sections of, there is
18    no way to get it back.
19 Q. Okay. But I understand you had work to
20    do. What did you mean, "things were
21    getting out of hand"?
22 A. With all of the conversations. There
23    wasn't time for all of this to be going

Page 25

```
 1      on. We had work to do. We had a
 2      specific task that had a specific time
 3      limit, and that was the whole purpose of
 4      us being out there at that place.
 5   Q. Okay. But what you've just described is
 6      a conversation is just a couple of
 7      seconds. So what else was taking place
 8      that was causing what you perceive to be
 9      some interruption of your work?
10   A. Because this had been building up
11      apparently since January, I had just
12      found out like the week before. It was
13      getting to be a hostile work environment
14      because we had done quit riding together,
15      and, I mean, everybody. There was
16      tensions between the Blacks and the
17      whites because of stuff being told to one
18      group and another group.
19   Q. And what was some of the "stuff being
20      told to one group and another group"?
21   A. Rene told me that James Feagin said one
22      day while they were out there that he
23      said, where is your f'in road dog?
```

Page 26

```
 1          And she said, "Who are you
 2      talking about?"
 3          And I done forgot what his
 4      response was, but he said, "You better
 5      watch your back if you care about her or
 6      you're going to find her strung up out
 7      here."
 8   Q. Who was he referring to?
 9   A. Me. And so I said something about
10      confronting him and said, no, she would
11      handle it.
12   Q. Are you talking about Alverene?
13   A. Yes. And so this was building up until
14      apparently the time that I finally
15      confronted James and said, "Look, James,
16      I want to know what" because me and James
17      had worked together years before. We had
18      worked together a lot in the past, and we
19      had never had a problem.
20   Q. So you reported this conversation to
21      Mr. Jackson. What did you tell
22      Mr. Jackson?
23   A. I just told him that it was being said
```

Page 27

```
 1      that I said racial slurs and that I
 2      didn't want no trouble on the job. I was
 3      retiring in December -- that we need to
 4      clear it up.
 5   Q. Okay. Did you get written up at all for
 6      that?
 7   A. No, no.
 8   Q. All right. Have you ever cussed
 9      Mr. Jackson out?
10   A. Cussed Mr. Jackson out? No. I never
11      cussed anybody else out.
12   Q. Have you ever gotten angry in the office
13      and thrown things?
14   A. No.
15   Q. Did you ever tell Ms. Butler that Mr.
16      Waits was either gunning for her or she
17      was on his list or anything like that?
18   A. No.
19   Q. Did either Mr. Waits, Mr. Jackson or Mr.
20      Estes ever ask you to watch Ms. Butler or
21      to report on Ms. Butler?
22   A. No.
23   Q. And you never reported that Ms. Butler
```

Page 28

```
 1      was padding her time sheet?
 2   A. No. I didn't do the time sheets.
 3   Q. All right. Are you aware of whether or
 4      not Ms. Butler was written up as a result
 5      of the confrontation between you and her
 6      over the racial slur -- alleged racial
 7      slur?
 8   A. Repeat that.
 9   Q. Are you aware of whether or not
10      Ms. Butler was ever written up as a
11      result of the confrontation over the
12      alleged racial slur?
13   A. Not about the racial slur, no, sir.
14   Q. Are you aware of whether she was written
15      up or not at all?
16   A. Ever? Yes.
17   Q. Okay. And to your knowledge, what she
18      was written up for?
19   A. I don't know right now.
20   Q. Okay. Did Mr. Waits ever come to you to
21      ask whether or not Ms. Butler was
22      creating a hostile environment?
23   A. No.
```

**Page 29**

1  Q. Did he ever come to you asking you
2     anything at all about Ms. Butler?
3  A. No.
4  Q. Did he ever ask you into his office to
5     ask about Ms. Butler?
6  A. No.
7  Q. During the time that you and Ms. Butler
8     worked together, did you have child care
9     responsibilities?
10 A. I have a daughter that's in school
11    still.
12 Q. Did you ever get permission or ask
13    permission or were allowed to come in a
14    few minutes late in the mornings so that
15    you could drop your daughter off or
16    prepare her for what she was going to do
17    that day?
18 A. Ever since I was employed with the State?
19 Q. Yes.
20 A. Yes.
21 Q. And during what period of time were you
22    doing that?
23 A. From the day I started in 1988 to the day

**Page 30**

1     Todd put us in the field and me over
2     construction jobs.
3  Q. Was Ms. Butler working there at that
4     time?
5  A. Some of it.
6  Q. Okay. Was there a policy change at any
7     point by which you were no longer
8     permitted to do that?
9  A. No.
10 Q. All right. Was there ever a policy
11    change instituted by which workers were
12    only allowed to call in sick or late once
13    a month?
14 A. Yes.
15 Q. Okay. Do you know how long that policy
16    lasted?
17 A. I retired in April the 1st and it was
18    still ongoing.
19 Q. Still ongoing at the time. During the
20    period -- when was it instituted?
21 A. I don't remember the month.
22 Q. Okay. Did it last for a year or more?
23 A. Probably.

**Page 31**

1  Q. During that period of time did you
2     ever --
3  A. Not to my knowledge.
4  Q. During the times that Ms. Butler and
5     Mr. Johnson and Mr. Wynn and Mr. Knight
6     were riding together in the field -- do
7     you recall that?
8  A. Yes.
9  Q. Okay. During that period of time who
10    would leave the office last, do you know
11    who would be the one to close up and lock
12    the gate and stuff like that?
13 A. Well, it's according to whether we had,
14    what kind of construction job. I mean,
15    if we were finished before the office
16    help left, the office help locked up; if
17    we were last in, then we locked up --
18    whoever.
19 Q. And who were you riding with at that
20    time?
21 A. I had a truck. I was Chief Inspector. I
22    rode by myself.
23 Q. Okay. Did Ms. Butler ever call in to

**Page 32**

1     report to you that she was ill and
2     couldn't come to work? Do you remember
3     any case like that?
4  A. Before the accident?
5  Q. I am specifically referring to the summer
6     of 2005, that would be after the
7     accident.
8  A. We weren't talking by then.
9  Q. How long did you go without talking?
10 A. Probably April until maybe November or
11    so. Sporadic, just like, hey, how you
12    doing, in between.
13 Q. Okay. Did you ever have leave that was
14    previously approved disapproved, later
15    disapproved after the fact?
16 A. Not that I know of.
17 Q. Have you ever gone through Ms. Butler's
18    personnel file?
19 A. Not when I worked out in the field.
20 Q. Well, let me ask you about August 30th,
21    2005, on that day, did you go through her
22    personnel file?
23 A. I don't remember that day.

KAREN STACEY - 1/4/2007

### Page 33

1  Q. Do you remember ever going through Ms.
2     Butler's personnel file?
3  A. When I worked in the office.
4  Q. Did you go through Ms. Butler's personnel
5     file when you worked in the office?
6  A. I mean, I typed the evaluations and all,
7     and I had to file them.
8  Q. On August 30th, 2005, were you working in
9     the office?
10 A. I don't remember.
11 Q. Would your personnel file reflect whether
12    you were working in the office or out in
13    the field?
14 A. No.
15 Q. Are there documents that would reflect
16    where you were working as of August 30th,
17    2005?
18        MR. LYLES: Tell him, if you
19        know.
20 A. I don't know. I was assigned out in the
21    field. I may have been inside drawing
22    cross-sections. I don't remember. I
23    don't even remember what day that was

### Page 34

1     on.
2  Q. (By Mr. Lewis) Do you remember Reeser
3     Knight?
4  A. Yes.
5  Q. Did you ever talk to Ms. Knight about any
6     discomfort she experienced on the job?
7  A. Any discomfort Reeser experienced?
8  Q. Yes.
9  A. What, in specific, are you --
10 Q. Well, any complaints that she had about
11    the job?
12 A. No. She was pregnant when she left, and
13    we would talk about that, you know, and
14    that, being careful, because my daughter
15    was pregnant at the time. I mean, just
16    general. I didn't have a problem with
17    Reeser. Just general conversation.
18 Q. You had annual appraisals; is that
19    correct?
20 A. Yes.
21 Q. And were your appraisals generally
22    good?
23 A. Yes.

### Page 35

1  Q. When Mr. Jackson -- I assume he would be
2     your rating supervisor?
3  A. Yes.
4  Q. Did he have conversations with you in
5     which you went over the results of your
6     appraisal?
7  A. Yes.
8  Q. Where would those conversations take
9     place?
10 A. Well, if construction was going on, we
11    had to be there. He had to come out to
12    the construction office, I mean, field,
13    to the field. If it wasn't, he would
14    call me in his office.
15 Q. So you occasionally got your appraisal
16    feedback out in the field?
17 A. Yes.
18 Q. Did you ever run compactions?
19 A. Yes.
20 Q. Did you ever take slump tests?
21 A. Yes.
22 Q. Were you ever offered a job as Civil
23    Engineer promotion?

### Page 36

1  A. Yes, it was a TT.
2  Q. What is that?
3  A. That's the name they replaced Civil
4     Engineer with, Transportation
5     Technologist.
6  Q. All right. When were you offered that
7     job?
8  A. It was between the summer and the fall of
9     2005. I was offered a couple of
10    different times. I went on interviews,
11    and then one was offered.
12 Q. Okay. And did you accept that
13    position?
14 A. No.
15 Q. Why didn't you accept the position?
16 A. I was retiring.
17 Q. If you were retiring, why did you apply
18    for the position?
19 A. I took the test for the CE before it was
20    even changed to TT. I was on the
21    register. I had taken it, I don't know
22    how many years, or a year, before or
23    something.

334.262.7556        Reagan Reporters, LLC        334.262.4437
www.ReaganReporters.com

**Page 37**

1  Q. But you interviewed for the position
2     knowing that you were going to retire?
3  A. I interviewed for the position feeling
4     pretty sure I would retire.
5  Q. By the time it was offered to you, you
6     knew you were going to retire?
7  A. Yes.
8  Q. Have you ever received a written
9     reprimand in your position at ALDOT?
10 A. Not that I recall.
11 Q. Going back to that accident, and I asked
12    you about whether or not you had ever
13    understood that Ms. Butler had told a
14    different version of how that accident
15    occurred, and you talked about the racial
16    slur. Did you ever hear whether or not
17    Ms. Butler ever told anybody that the
18    accident was actually your fault?
19 A. The accident was my fault. It was
20    faulted to me.
21 Q. Okay.
22 A. So I don't know what you want me to
23    say.

**Page 38**

1  Q. All right. Did you ever report to Mr.
2     Jackson that the accident was not your
3     fault?
4  A. I said it wasn't my fault as far as I was
5     stopped, and he come across, but it was
6     my fault in the sense that I was in that
7     lane of traffic, so that's how it was
8     faulted. I did not just pull out in
9     front of him for him to hit me.
10        MR. LYLES: Here is a copy of the
11    accident report. It shows
12    that she was faulted with the
13    accident.
14 Q. (By Mr. Lewis) All right. So my
15    question -- and I really don't want to
16    beat this horse, because I think it's
17    already dead: Did you ever hear that
18    Ms. Butler had told a different story
19    about how the accident took place from
20    the one you had told to Mr. Jackson?
21 A. I mean --
22 Q. I know --
23 A. I mean, I don't know what you want me to

**Page 39**

1     say.
2  Q. Just tell me whether or not you ever
3     heard that Ms. Butler's version of the
4     accident differed from what you had told
5     Mr. Jackson.
6  A. Her version differed to the point of
7     where I stopped or whether the guy
8     stopped.
9  Q. Okay.
10 A. That's the only thing. The proof of
11    where they stopped and the accident
12    report. That's evidence itself.
13 Q. And did you ever confront Ms. Butler over
14    the fact that she had been saying things
15    different about how the accident occurred
16    from what you had been saying?
17 A. I don't remember. It might have been
18    during the time we were, you know, at the
19    hospital, when I went to meet her.
20    Because I went to the hospital after the
21    accident with her.
22 Q. Okay. Was she hurt in the accident?
23 A. I mean, you have her doctor's reports. I

**Page 40**

1     don't have them. Was she bleeding?
2  Q. To your knowledge, was she hurt? Did
3     she go?
4  A. She went to the hospital.
5  Q. She went to the hospital. Okay, that's
6     all I needed.
7        Did you ever -- have I asked
8     you whether or not you ever told
9     Ms. Butler that Mr. Waits was gunning for
10    her and had her on his list? Did you
11    ever tell her that anybody in management
12    at ALDOT was either out to get her or had
13    something --
14 A. No.
15 Q. -- against her? Did anybody in
16    management at ALDOT -- I'm talking about
17    primarily Mr. Waits, Mr. Jackson, Mr.
18    Estes -- did anybody in management at
19    ALDOT ever tell you to watch out for
20    Ms. Butler or be careful around Ms.
21    Butler.
22 A. No.
23        MR. LEWIS: How about giving me a

**Page 41**

1 minute?
2 (Short recess)
3 Q. (By Mr. Lewis) One other thing. Let me
4 see if I can clear this up in my mind.
5 In order to be certified as a CE or a
6 Transportation Technologist now, did you
7 have to take an ACI test?
8 A. No, you have to take a CE test.
9 Q. Okay.
10 A. Then to have your EA II and III, and I,
11 maybe on -- I'm not quite sure you have
12 to have your, you know, ACI test and
13 all.
14 Q. What is ACI; do you know what that stands
15 for?
16 A. Something Concrete Institute.
17 Q. Okay.
18 A. American or Alabama. I don't know which
19 one.
20 Q. When did you take your course?
21 A. I have no idea. It will be in my file.
22 Q. And did you take a test at the end of
23 that course?

**Page 42**

1 A. Yes. You take a field test and a written
2 test.
3 Q. Where did you take your written test?
4 A. In -- we were either in the Division or
5 this main building back there in the
6 conference. I can't remember where.
7 Q. Did you take it in the coordinator's
8 office?
9 A. No. I took it with everybody. I passed
10 it.
11 Q. All right.
12 A. As a matter of fact, I think made a 98 on
13 it.
14 Q. And that test is good for how long?
15 A. Four years, five.
16 Q. You can't get your answers from him.
17 A. Well, see, I'm retired. I've been
18 retired nearly a year ago. I don't
19 remember.
20 Q. All right. One other thing. Do you
21 have, or have you had, a relationship
22 with either Mr. Waits or Mr. Jackson
23 outside the workplace? In other words,

**Page 43**

1 outside the employee --
2 A. Ever?
3 Q. Yes.
4 A. Me and Mark knew each other. I knew him
5 before he ever worked with the State. I
6 knew his family.
7 Q. Okay.
8 A. I knew his daddy.
9 Q. So y'all were friends prior to working
10 for the State?
11 A. Yeah. I mean, we didn't go to each
12 other's house, but I worked with -- his
13 dad worked over at the District.
14 Q. How about Mr. Jackson?
15 A. I met him on the job.
16 Q. And no relationship outside the job?
17 A. You were asking me personal relationship
18 with just him or with his family?
19 Q. Well, both.
20 A. Well, I mean, we speak and all, but as
21 far as going to his house and all, no.
22 Q. You don't socialize?
23 A. No.

**Page 44**

1 Q. How about with Mr. Waits?
2 A. No. You mean, ever or now?
3 Q. Well, you've already explained that prior
4 to that, you did.
5 A. I don't socialize with anybody I used to
6 work with anymore. I am retired.
7 Q. Other than Ms. Butler, had you had
8 confrontations with any of your other
9 co-workers over the years?
10 A. Yes.
11 Q. Can you remember the names of the people
12 with whom you had those confrontations?
13 A. Eric Robbins.
14 Q. And who is Eric Robbins?
15 A. He was a fellow employee of ours.
16 Q. What was that about?
17 A. He was getting in to my personal
18 business, and I let him know fast that
19 that was none of his business.
20 Q. Who else?
21 A. I don't remember. I worked with the
22 State 25 years.
23 Q. How about, say, within the last five

45

1    years before you retired?
2  A. When you are saying "confrontation," are
3     you talking about having a discussion, or
4     are you talking about --
5  Q. No. I'm talking about --
6  A. -- disagreements.
7  Q. -- confrontations in which voices were
8     raised and tempers flared and --
9  A. I've raised my voice at Todd. I mean, I
10     don't know what you mean. I've given my
11     opinion to Mark, I mean. Did I--
12  Q. How about any confrontations that ended
13     with two of you not speaking to each
14     other?
15  A. Me and Rene.
16  Q. That's it?
17  A. Yes.
18        MR. LEWIS: Okay. That's all I
19     have.
20     (Whereupon, the deposition
21        adjourned at 10:50 o'clock
22        a.m.)
23

46

1         CERTIFICATE OF COURT REPORTER
2     I, DAWN A. GOODMAN, do hereby certify;
3     That I am a Certified Shorthand Reporter
4  of the State of Alabama;
5     That the foregoing pages are a true and
6  correct transcript of the Deposition of Karen
7  Stacey;
8     I further certify that I am not interested
9  in the outcome of said matter nor connected
10  with or related to any of the parties of said
11  matter or to their respective counsel.
12     Dated this 9th day of January, 2007, at
13  Prattville, Alabama.
14
15

16         _____
           DAWN A. GOODMAN, CSR
           State of Alabama
17
18
19
20
21
22
23