# ALVERENE BUTLER

# v.

# ALABAMA DEPARTMENT OF TRANSPORTATION, et al.

# PATRICK TODD  JACKSON

## January 4, 2007



DEFENDANT'S
EXHIBIT

D

**Reagan Reporters, LLC**
**Phone: 334.262.7556**
**Fax: 334.262.4437**

PATRICK TODD JACKSON - 1/4/2007

**1**

```
        IN THE UNITED STATES DISTRICT CIRCUIT
           FOR THE MIDDLE DISTRICT OF ALABAMA
                   NORTHERN DIVISION

ALVERENE BUTLER,
     Plaintiff,
vs.                    CASE NO. 2:06-CV-278-MEF
ALABAMA DEPARTMENT OF
TRANSPORTATION, et al.,
     Defendants.

        _____
                *   *   *   *   *   *
                     DEPOSITION
                        OF
                PATRICK TODD JACKSON,
taken pursuant to notice and stipulation on
behalf of the Plaintiff, and the ALABAMA
DEPARTMENT OF TRANSPORTATION, 1409 Coliseum
Boulevard, Room K-101, Montgomery, Alabama
36130-3050, before DAWN A. GOODMAN, Certified
Shorthand Reporter and Notary Public in and for
the State of Alabama at Large, on Thursday,
January 4, 2007, commencing at 11:10 o'clock
a.m.
```

**2**

```
 1              APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4        JAY LEWIS, Esquire
 5        847 South McDonough Street
 6        Suite 100
 7        P.O. Box 5059
 8        Montgomery, Alabama 36104
 9
10   FOR THE DEFENDANTS:
11        HARRY LYLES, Esquire
12        Alabama Department of Transportation
13        1409 Coliseum Boulevard
14        Room K-101
15        Montgomery, Alabama 36130-3050
16
17   ALSO PRESENT:
18        Alverene Butler
19        Mark Waits
20
21
22
23
```

**3**

```
 1              STIPULATIONS
 2        It is hereby stipulated and agreed by
 3   and between counsel representing the parties
 4   that the Deposition of Patrick Todd Jackson is
 5   taken pursuant to notice and stipulation on
 6   behalf of the Plaintiff; that all formalities
 7   with respect to procedural requirements are
 8   waived; that said deposition may be taken
 9   before    DAWN A. GOODMAN, Certified Shorthand
10   Reporter and Notary Public in and for the State
11   of Alabama at Large, without the formality of a
12   commission; that objections to questions, other
13   than objections as to the form of the
14   questions, need not be made at this time, but
15   may be reserved for a ruling at such time as
16   the deposition may be offered in evidence or
17   used for any other purpose as provided for by
18   the Civil Rules of Procedure for the State of
19   Alabama.
20        It is further stipulated and agreed by
21   and between counsel representing the parties in
22   this case that the filing of the Deposition of
23   Patrick Todd Jackson is hereby waived and that
```

**4**

```
 1   said deposition may be introduced at the trial
 2   of this case or used in any other manner by
 3   either party hereto provided for by the
 4   Statute, regardless of the waiving of the
 5   filing of same.
 6        It is further stipulated and agreed by
 7   and between the parties hereto and the witness
 8   that the signature of the witness to this
 9   deposition is hereby waived.
10
11        *   *   *   *   *   *
12
13
14
15
16
17
18
19
20
21
22
23
```

1 (Pages 1 to 4)

5

1        I N D E X
2            Page
3    Examination by Mr. Lewis        6
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

7

1    sign your deposition.  You can waive the
2    right, or you can reserve the right to
3    read and sign.  You can consult with
4    Harry about it.
5            Do you want to read and sign
6    it or do you want to waive that right?
7            MR. LYLES:  Waive it.
8    A.  I'll waive it.
9    Q.  (By Mr. Lewis) What's your position with
10    ALDOT?
11    A.  I am a Transportation Technologist
12    Senior.
13    Q.  And what does that mean?
14    A.  I'm a Project Engineer.  I'm in charge of
15    construction projects.
16    Q.  And how long have you been doing that?
17    A.  About seven and a half years.  I haven't
18    been a Transportation Technologist for
19    seven and a half years.  I have been a
20    Project Engineer for seven and a half
21    years.
22    Q.  When did you join ALDOT?
23    A.  February 3rd, 1983.

6

1        P R O C E E D I N G S
2        THE COURT REPORTER:  Counsel, did
3        you want the usual
4        stipulations?
5    MR. LYLES:  That's fine.
6    MR. LEWIS:  That's fine.
7
8        (PATRICK TODD JACKSON,
9        of lawful age, having
10        been duly sworn,
11        testified as follows:)
12
13        EXAMINATION
14
15    BY MR. LEWIS:
16    Q.  (By Mr. Lewis) Tell us your name, please.
17    A.  Patrick Todd Jackson.
18    Q.  Okay.  Mr. Jackson, my name is Jay Lewis.
19        You heard what I chatted with Ms. Stacey
20        about with regard to depositions.  Have
21        you done a deposition before?
22    A.  Yes, sir.
23    Q.  Okay.  You have the right to read and

8

1    Q.  Okay.  You have been working continuously
2    since then?
3    A.  Yes, sir.
4    Q.  And when did you become a Project
5    Engineer?
6    A.  July of 1999.
7    Q.  And I know that these titles with the
8    State change periodically, but the job
9    kind of remains the same from time to
10    time but under a different job title.
11        Is a Transportation
12    Technologist essentially the same thing
13    as a Civil Engineer?
14    A.  I was a Civil Engineer when I was
15    promoted to a Project Engineer.  They had
16    several engineer classifications.  I
17    don't know where the Transportation
18    Technologist Senior would fall into that
19    now.
20    Q.  Okay.  At some point did you become
21    acquainted with Ms. Butler?
22    A.  Yes, sir.
23    Q.  And when did you first come to know

2 (Pages 5 to 8)

PATRICK TODD JACKSON - 1/4/2007

9

Ms. Butler?
2 A. When she -- well, I had seen her in the
3 District when I came up here and started
4 working. She was transferred to me at
5 one point. I don't remember when.
6 Q. From whom was she transferred?
7 A. I'm not sure.
8 Q. Do you know why she was transferred?
9 A. No, sir.
10 Q. Did you have any communications with Mr.
11 Waits at the time of her transfer?
12 A. Other than she was being sent to me. She
13 came with several other employees. I
14 don't remember how many.
15 Q. And he didn't tell you why she was being
16 transferred to you?
17 A. No, sir.
18 Q. And during the period of time that
19 Ms. Butler worked with you, you also
20 supervised Ms. Stacey; correct?
21 A. Yes, sir.
22 Q. All right. Did you ever tell Ms. Butler
23 that Mr. Waits was either out to get her

10

1 or she was on his list?
2 A. No, sir.
3 Q. Or anything like that?
4 A. No, sir.
5 Q. How was Ms. Butler an as an employee?
6 A. Average.
7 Q. No particular complaints about her work
8 performance?
9 A. Oh, yes, sir. I had some complaints
10 about her.
11 Q. What were they?
12 A. Unexcused absences. But I felt it was
13 too many absences, stuff like that.
14 Q. Anything else?
15 A. As a supervisor, you always have
16 complaints about all of your employees --
17 maybe not -- thinking maybe they are not
18 attending to their work properly or
19 something like that. In that situation,
20 it would probably be no more than most of
21 my employees.
22 Q. Nothing in particular stands out?
23 A. No, sir.

11

1 Q. Okay. Well, tell me about these
2 unexcused absences that you referred to.
3 What are the procedures for getting
4 absences excused?
5 A. Annual leave is supposedly supposed to be
6 approved beforehand. Sick leave is
7 supposed to be approved beforehand. If
8 you have, like, a doctor appointment or
9 something like that. You can call in and
10 be excused if you call in sick.
11 Q. Did you ever institute a policy by which
12 employees were restricted to one call-in
13 per month?
14 A. Yes, sir. I believe it was one call-in a
15 month. I can't remember the exact. It
16 was one call-in a month, and I can't
17 remember all of it, no, sir. It's still
18 in effect.
19 Q. All right. And did -- in your opinion,
20 did Ms. Butler violate that one call-in a
21 month policy?
22 A. Yes, sir.
23 Q. All right. Do you know how many times

12

1 she called in during an average month?
2 A. No, sir.
3 Q. Did you ever write her up for excessive
4 call-ins?
5 A. I don't understand what you mean by
6 "write her up." Explain.
7 Q. Reprimand her, discipline her, put
8 anything in her file?
9 A. I think she may have gotten what I call a
10 letter of written counsel kind of
11 document in her time. I don't remember
12 if I ever reprimanded her for it or
13 not.
14 Q. Okay. Did you ever write up Ms. Stacey
15 or give her a letter of counsel?
16 A. Yes, sir.
17 Q. All right. About what?
18 A. Her time, her leave and stuff like
19 that.
20 Q. Okay. Were Ms. Stacey and Ms. Butler
21 allowed to come in late in the morning in
22 order to discharge their child care
23 responsibilities.

3 (Pages 9 to 12)

PATRICK TODD JACKSON - 1/4/2007

13

1  A.  I didn't allow them to come in late. I
2      allowed them to come in at 7:30 instead
3      of 7:00. I didn't consider it being
4      late. I mean, that was something we
5      worked out.
6  Q.  Then they worked over to make up for
7      that?
8  A.  They sometimes, maybe, they would take a
9      30-minute lunch, but usually I think they
10     stayed 30 minutes later than most
11     employees were.
12 Q.  At some point, did that policy change
13     where they were no longer permitted to do
14     that?
15 A.  Yes, sir.
16 Q.  And was Ms. Stacey required to come in at
17     7:00 at the same time as Butler was?
18 A.  Yes, sir.
19 Q.  And did she do that?
20 A.  Yes, sir.
21 Q.  Tell me about this accident on January
22     31st of 2005. How did you learn of that
23     accident?

14

1  A.  I believe Ms. Stacey called me on
2      SouthernLINC.
3  Q.  And SouthernLINC is the walk-talkie
4      phones?
5  A.  Yes.
6      MR. LYLES: Most of the DOT
7          employees do.
8  Q.  (By Mr. Lewis) Did you have a
9      conversation with Ms. Butler about that
10     accident?
11 A.  About the accident?
12 Q.  Yes.
13 A.  No, sir. Are you talking about the day
14     of the accident?
15 Q.  At any time.
16 A.  Yes, sir. I had a conversation
17     with her.
18 Q.  Tell me about that conversation. When
19     did it take place, first of all?
20 A.  I'm not sure of the date. Ms. Stacey had
21     come to me, I believe it was, about some
22     Blue Cross Insurance or something Blue
23     Cross was wanting for her -- and I

15

1      believe it was -- dealt with the
2      accident.
3          During that conversation she
4      had told me that Ms. Butler had stated to
5      some of the other employees that she had
6      used racial epithets during the accident
7      or after the accident or something like
8      that. She was wanting to try to get it
9      cleared up.
10         Ms. Butler, I believe, was
11     in a school that week, so I didn't have a
12     chance to talk to Ms. Butler about it
13     until a couple of days later. On Friday
14     afternoon. I think she got off the
15     school at about 1:00 o'clock, so I talked
16     to her that Friday. Basically asked her
17     had Karen used the racial epithets, and
18     Ms. Butler said she had.
19         And I believe I asked her
20     had she been harmed in any way -- I can't
21     remember the exact words -- and she told
22     me she had forgot it as soon as it
23     happened. I asked her to not talk to any

16

1      other employees about it until I had a
2      chance to talk to Mr. Waits.
3          Mr. Waits I don't believe
4      was -- at work that Friday but by that
5      time in the afternoon, and I was going to
6      try to get with him Monday morning and
7      talk to him about it, because I knew the
8      procedure if an employee come to me and
9      stated that racial epithets or something
10     like that had been used.
11         But I didn't know what the
12     procedure was if an employee had been --
13     would come to you and say somebody else
14     was saying -- in other words, the person
15     supposedly using the racial epithets came
16     to me and said it wasn't true, and she
17     wanted something done.
18         Well, I didn't know what to
19     do in that case is the reason I was
20     wanting to talk to Mr. Waits about it.
21 Q.  And did you talk to Mr. Waits about it?
22 A.  Yes, sir.
23 Q.  And describe the conversation between you

4 (Pages 13 to 16)

PATRICK TODD JACKSON - 1/4/2007

17

```
  1      and Mr. Waits about that.
  2   A.  Basically laying out both sides of the
  3      story.  I believe Mr. Phillips, our
  4      construction engineer at the time, was
  5      there too and just basically told him I
  6      didn't know how to proceed with it.
  7   Q.  What did Mr. Waits tell you?
  8   A.  I believe Mr. Phillips decided that
  9      we would let the EEO officer handle it.
 10   Q.  Who was the EEO officer?
 11   A.  Doug Furlow was.
 12   Q.  Did you refer to Doug Furlow?
 13   A.  Yes, sir.  Mr. Furlow took it from
 14      there.
 15   Q.  Do you know how it was resolved?
 16   A.  No, sir, I don't.  I may have known at
 17      the time.  I don't remember how they
 18      resolved it, no, sir.
 19   Q.  But you had already talked with
 20      Ms. Butler after her class about whether
 21      or not Ms. Stacey had said that?
 22   A.  Yes, sir.
 23   Q.  All right.  I may have asked you this,
```

18

```
  1      but I have some severe short-term memory
  2      loss.  Did you ever advise Ms. Butler to
  3      watch herself for any reason?
  4   A.  "To watch herself"?
  5   Q.  Yes.
  6   A.  I don't think I would have used them
  7      terms, no, sir.
  8   Q.  Well, in those words or words to that
  9      effect that she was in trouble or was
 10      going to get in trouble or that Mr. Waits
 11      was out to get her or anything like
 12      that?
 13   A.  No, I know I never said Mr. Waits was out
 14      to get her.
 15   Q.  Did Mr. Waits ever have a conversation
 16      with you about Ms. Butler in which he
 17      said, you know, We need to get rid of
 18      her; We need to watch her; We need to
 19      take care of her.  Anything like that?
 20   A.  No, sir.
 21   Q.  Did you ever tell Ms. Butler to take
 22      Reeser Knight aside after she was
  B      transferred into your project and advise
```

19

```
  1      her to watch herself?
  2   A.  I believe Mrs. Knight, Ms. Butler came to
  3      work for me at the same time.  I don't
  4      remember, but I believe they both came to
  5      work for me at the same time.
  6   Q.  Were you aware that Ms. Knight had
  7      previously filed a grievance against a
  8      previous supervisor?
  9   A.  No, sir.
 10   Q.  Were you aware of whether or not
 11      Ms. Butler had ever filed a grievance
 12      against a previous supervisor?
 13   A.  Have actually filed a grievance?  No,
 14      sir.
 15   Q.  Or made a complaint?
 16   A.  Yes, sir.
 17   Q.  How did you become aware of that?
 18   A.  I don't remember.
 19   Q.  Did you become aware of it before or
 20      after Ms. Butler came to work for you?
 21   A.  After.
 22   Q.  How many people -- during 2005, how many
 23      people worked under your supervision?
```

20

```
  1   A.  Probably -- I can't remember exactly.
  2      Anywhere from nine to 11, something like
  3      that.
  4   Q.  Okay.
  5          MR. LYLES:  Jay, excuse me.  Just
  6            so I don't get confused.  You
  7            mean the total number of
  8            people that worked under him
  9            from January to December or
 10            number of people that would
 11            usually be on a crew?
 12          MR. LEWIS:  I hear what you're
 13            saying, Harry.  And that was
 14            a bad question.  I realized
 15            as soon as he answered.
 16   Q.  (By Mr. Lewis) At any given time, how
 17      many people would be under your?
 18   A.  Nine to 11.
 19   Q.  Okay.  All right.  During 2005, say
 20      2005-2006, how many people have left who
 21      were under your supervision?
 22      Obviously, Ms. Butler did.  I believe
 23      Ms. Knight did.
```

5 (Pages 17 to 20)

21

1    A.  Four to five.  I'm not exactly sure.
2    Q.  Okay.  Out of those four to five, how
3        many were Black?  How many were white?
4    A.  They were all black.
5    Q.  All black.  And of the nine to 11 people
6        who were working for you at any given
7        time, give me your best judgment as to
8        how many would be white, how many would
9        be black.
10   A.  Four were white and the rest were
11       black.
12   Q.  So there would be four whites and
13       somewhere between five and seven
14       Blacks?
15   A.  Yes, sir.
16   Q.  All right.  During September of 2005, was
17       there ever a time that you and Mr. Waits
18       and Ms. Stacey and Ron Estes were riding
19       together through the job site in the same
20       vehicle?
21   A.  I wouldn't remember that.  It wouldn't be
22       odd for the Division Engineer and the
23       District Engineer to come to a project,

22

1        major project, something like that.  But
2        I can't remember if in September they
3        came or not.
4    Q.  Do you recall whether or not there was
5        ever a conversation involving you and Mr.
6        Waits and Mr. Estes in which you were
7        encouraging Ms. Stacey to come up with
8        some charges against Ms. Butler?
9    A.  No, sir.
10   Q.  Appraisals.  And I don't have copies of
11       the appraisals here, and we have not
12       really exchanged those things, so I'm
13       really speaking from recollection of
14       Ms. Butler here.  But, did you give
15       Ms. Butler a yearly appraisal in 2005 in
16       which you scored her a 10.5?
17   A.  Did I give her one?
18   Q.  Yes.
19   A.  I wouldn't use them terms, no, sir.
20   Q.  Did you rate her as a 10.5?
21   A.  Yes, sir.
22   Q.  Okay.  And what -- on what scale?  In
23       other words, how many points if Jesus

23

1        came down and was working for you, how
2        many points could he get?
3    A.  I don't know.  I would have to look over
4        Him the whole year and see how He did on
5        his job.
6    Q.  Okay.  Your theoretical perfect employee.
7    A.  I just have never had one of them.
8    Q.  40 points?
9    A.  I don't know.  See, because you have a
10       formula where you take their number of
11       job duties and divide it.  So in other
12       words, somebody has more job duties than
13       somebody else.  I don't know if it all
14       ends up a 40.  I'm mean, I'm not sure.
15   Q.  Well, you're the one who does the
16       calculations.
17   A.  Yes, sir.  Well, it's printed out on the
18       thing.  You do a score up and you divide
19       by a certain number, that kind of
20       thing.
21   Q.  Did you ever deduct points from
22       Ms. Butler for having failed the ACI
23       test?

24

1    A.  Yes, sir.
2    Q.  Did she later take the test and pass
3        it?
4    A.  I don't know.  I don't remember.
5    Q.  Did you deduct seven points for
6        disciplinary reasons for Ms. Butler?
7    A.  I know there is a certain number of
8        points you deduct from a performance
9        appraisal.  I don't right off the top of
10       my head remember how many points it is.
11   Q.  All right.  Regarding that accident
12       earlier that year in January and the
13       confrontation that took place in April
14       that you heard Ms. Stacey describe, did
15       you give Ms. Butler any written notice of
16       counseling for that?
17   A.  For the accident?
18   Q.  No.  For the confrontation.
19   A.  I think I gave her a reprimand for it.
20   Q.  Did you give Ms. Stacey a reprimand?
21   A.  No, sir.
22   Q.  Having heard that Ms. Stacey actually
23       started that conversation by saying the

6 (Pages 21 to 24)

PATRICK TODD JACKSON - 1/4/2007

|  | 25 |
|---|---|
| 1 | first words to Ms. Butler, can you |
| 2 | explain why you gave Ms. Butler a |
| 3 | reprimand and not Ms. Stacey? |
| 4 | A. I didn't -- when I talked to my employees |
| 5 | about it, I didn't talk to Ms. Butler or |
| 6 | Ms. Stacey. I talked to the other |
| 7 | employees and asked them what happened. |
| 8 | That's how I came up with what I thought |
| 9 | was appropriate. |
| 10 | Q. Did the other employees tell you that |
| 11 | Ms. Butler had started the |
| 12 | conversation? |
| 13 | A. Yes, sir. |
| 14 | Q. Now today is this the first time you |
| 15 | found out that's not true? |
| 16 | A. I don't know if I found that out today. |
| 17 | Q. Well, you were under the impression from |
| 18 | having talked to, quote, "the other |
| 19 | employees" that Ms. Butler had basically |
| 20 | instigated the confrontation; correct? |
| 21 | A. Yes, sir. |
| 22 | Q. All right. And you heard Ms. Stacey in |
| 23 | here just a few minutes ago saying that |

|  | 26 |
|---|---|
| 1 | she was the one who said to Ms. Butler, |
| 2 | "If you got something to say, say it." |
| 3 | Have you heard that? |
| 4 | A. I don't remember her exact words, no, |
| 5 | sir. |
| 6 | Q. But does that give you some clue as to |
| 7 | who instigated the confrontation? |
| 8 | A. No, sir. |
| 9 | Q. It doesn't. Okay. Did you talk to |
| 10 | Mr. Johnson about who instigated it? |
| 11 | A. If I remember right, I spoke to James |
| 12 | Feagin and Jesse Taylor. I believe I |
| 13 | spoke to Mr. Robbins, Harry Robbins. And |
| 14 | Frank Hollifield. |
| 15 | Q. Frank Hollifield? |
| 16 | A. Yes, sir. |
| 17 | Q. And Robbins? |
| 18 | A. Yes, sir. Taylor. |
| 19 | MR. LEWIS: For the court |
| 20 | reporter, spell those names |
| 21 | out the best you know. |
| 22 | THE WITNESS: Jesse Taylor, |
| 23 | J-E-S-S-E, T-A-Y-L-O-R. |

|  | 27 |
|---|---|
| 1 | James Feagin, J-A-M-E-S, |
| 2 | F-E-A-G-I-N. Frank |
| 3 | Hollifield, F-R-A-N-K, |
| 4 | H-O-L-L-I-F-I-E-L-D. And |
| 5 | Eric Robbins, E-R-I-C, |
| 6 | R-O-B-B-I-N-S. |
| 7 | Q. (By Mr. Lewis) What race is Mr. |
| 8 | Hollifield? |
| 9 | A. He is white. |
| 10 | Q. How about Mr. Robbins? |
| 11 | A. He is white. |
| 12 | Q. How about Mr. Taylor? |
| 13 | A. He is black. |
| 14 | Q. And how about Mr. Feagin? |
| 15 | A. He was black. |
| 16 | Q. Okay. But you didn't talk to Ms. Stacey |
| 17 | or Ms. Butler? |
| 18 | A. No, sir. Now, I talked to Ms. Butler |
| 19 | about it when I gave her her reprimand, |
| 20 | yes, sir. But I didn't talk to her about |
| 21 | it at the time, no, sir. I didn't |
| 22 | actually talk to any of them at the time |
| 23 | of the incident. I talked to them later |

|  | 28 |
|---|---|
| 1 | on after they had got the work that I |
| 2 | gave them to do done. |
| 3 | Q. Did Ms. Stacey run compactions? |
| 4 | A. Has she ever run? I'm sure she has, yes, |
| 5 | sir. |
| 6 | Q. During 2005? |
| 7 | A. I can't remember, no, sir. I don't |
| 8 | remember that. I don't know if she did |
| 9 | or not. |
| 10 | Q. Did you perform -- did she perform slump |
| 11 | tests? |
| 12 | A. During 2005? I'm sure at some point she |
| 13 | did, yes, sir. |
| 14 | Q. You don't have any recollection? |
| 15 | A. No, sir. |
| 16 | Q. Have you ever had confrontations with Ms. |
| 17 | Stacey? |
| 18 | A. Confrontations? |
| 19 | Q. Yes. |
| 20 | A. No, sir. |
| 21 | Q. Y'all ever yell at each other? |
| 22 | A. Oh, I'm sure we have. I wouldn't |
| 23 | consider that a confrontation. |

7 (Pages 25 to 28)

PATRICK TODD JACKSON - 1/4/2007

29

1  Q.  Has she ever thrown anything?
2  A.  At me?
3  Q.  At you or in your presence?
4  A.  No, sir.
5  Q.  Did you ever reduce -- well, first of
6      all, let me ask you this: How did the
7      employees under your supervision keep
8      track of their hours they worked?
9  A.  We have a sheet up on a board at the
10     office that they are responsible for
11     putting their hours down. It's been done
12     a different way since I've been a Project
13     Engineer, but usually I try to make each
14     employee responsible for their time.
15     That way they can't – like I say, if a
16     Chief Inspector is filling out the daily
17     report, if he forgets to put somebody
18     down or something like that, it keeps
19     that from happening. They are supposed
20     to keep their own time on the sheet when
21     they came in. That way they can't say,
22     Well, James forgot to put me down, or
23     something like that.

30

1  Q.  Did Ms. Butler and people she rode with
2      during 2005 generally arrive back at the
3      project office after everybody else
4      did?
5  A.  I wouldn't know. I mean, I usually
6      wasn't there when they got back in the
7      afternoon.
8  Q.  Okay. So how would you know whether or
9      not the hours they claimed were
10     accurate?
11 A.  They write their hours down.
12 Q.  Okay. Did you ever deduct hours from Ms.
13     Butler's time sheet?
14 A.  I don't know. I don't remember.
15 Q.  Did Ms. Stacey ever tell you that
16     Ms. Butler had not worked the hours she
17     claimed?
18 A.  I don't remember.
19 Q.  Did you ever go back anytime during 2005,
20     beginning on April 8th, 2005, and
21     disallow previously allowed leave time
22     for Ms. Butler?
23 A.  Disallow previously? I don't remember.

31

1      I'm not understanding the question.
2  Q.  All right. In other words, did you ever
3      go back into Ms. Butler's file and
4      disallow any leave slips that had been
5      approved prior to that?
6  A.  Back into her file?
7  Q.  Yes. Or wherever leave slips are kept.
8  A.  No. Because when we turn in a time
9      sheet, the leave slips go. The leave
10     slips go over to the District Office on
11     them. In other words, it wasn't a matter
12     whether I went back and changed something
13     in her file, because the leave slip that
14     went to the payroll clerk would be on
15     file.
16 Q.  Well, did you ever change it before it
17     went to the payroll clerk and disallow
18     leave that had previously been
19     approved?
20 A.  I may have. I don't remember. Before
21     the pay period was up?
22 Q.  Yes.
23 A.  I may have. I don't remember.

32

1  Q.  Okay. Did you ever go back to previous
2      pay periods and deduct hours from
3      current?
4  A.  Did I do it?
5  Q.  Yes.
6  A.  No, sir, I don't have that power to do
7      that.
8  Q.  Did anybody do it, to the best of your
9      knowledge?
10 A.  I don't remember.
11 Q.  Did anybody do it at your direction?
12 A.  The person that would do it wouldn't be
13     under my supervision. That would have to
14     come from, I guess, the payroll clerk. I
15     don't know how that would work.
16 Q.  Let me ask you one more time, because I
17     don't remember the answer. Was there
18     ever a time that Ms. Butler was required
19     to be at work at 7:00 o'clock and Ms.
20     Stacey was allowed to come in at 7:30?
21 A.  No, sir.
22 Q.  Did Ms. Stacey -- or did Ms. Butler ever
23     tell you what racial slurs Ms. Stacey was

8 (Pages 29 to 32)

33

1    supposed to have used?
2    A.   Yes, sir.
3    Q.   Okay.  What did she say?
4    A.   I mean, I know it was the "N" word, but I
5         mean, I believe it was supposed to be
6         several other curse words along with
7         that.  I don't remember exactly.
8    Q.   Would it have been something in the
9         nature of, "Did you see that stupid ass
10        motherfucking nigger hit me?"
11   A.   Something like that, yes, sir.
12   Q.   And did she also report to you that when
13        Ms. Stacey saw the driver of the other
14        car in the street directing traffic, she
15        said, "Now that stupid ass nigger is out
16        there trying to direct traffic"?
17   A.   I think it was something like that.  I
18        don't remember the exact words.  She
19        didn't report it to me now.  I asked
20        her.
21   Q.   And do you have any reason to believe
22        that she was not telling you the truth
23        about what she heard or thought she

34

1         heard?
2    A.   Do I have any reason to believe?
3    Q.   Yes.
4    A.   No, sir.
5    Q.   Okay.  During or immediately after the
6         confrontation on April 8th -- I represent
7         to you it was April 8th -- the following
8         Monday, did you come to the job site and
9         have a meeting with the employees who
10        were there about that incident?
11   A.   Are you talking about the day of the
12        incident?
13   Q.   The day of or afterwards.
14   A.   I remember coming back to the job site.
15        I was called by Ms. Stacey.  She was
16        telling me worked wasn't being performed.
17        I remember coming back to the job site
18        and gathering all the employees up on the
19        job site together and pretty much reading
20        the riot act to them and basically
21        letting them know that I was expecting
22        the work that I had given them to be
23        performed and be performed at that time.

35

1         I didn't take any questions or comments
2         from anybody.  I pretty much told them I
3         expected them to get that done and get it
4         done then.
5    Q.   Well, did Ms. Butler attempt to tell you
6         her side of the story at that time?
7    A.   Yes, sir.
8    Q.   You didn't --
9    A.   I didn't want to hear it.
10   Q.   You didn't want to hear it.
11   A.   I mean, what you have to understand, the
12        work I had given them to do was right in
13        front of a contractor.  In other words,
14        we didn't have time.  It had to be done
15        at that point.  I mean, it was not wait
16        until tomorrow or let's all have a
17        meeting.  It was, we've got to get this
18        done at this point, and that was all that
19        I was interested in having done at that
20        time was getting all of that done.
21   Q.   I hate to go back to the sick-leave thing
22        again, excused absences.  But let me ask
23        you if you recall a time that Ms. Butler

36

1         called in and told you that her son was
2         sick and that she would not be in?
3    A.   Do I?
4    Q.   Yes.
5    A.   I don't recall a particular instance, no,
6         sir.
7    Q.   All right.  Well, do you recall on any
8         instance that you approved her leave and
9         then, before anything went to payroll,
10        you went back in and disapproved it?
11   A.   I don't recall that, no, sir.
12   Q.   Okay.
13   A.   I'm not saying that I didn't.  I just
14        don't recall.
15   Q.   I understand.  During the period of time
16        that Ms. Butler was under your
17        supervision, did any openings exist or
18        did they become open for Civil Engineer
19        or what is now, I guess, Transportation
20        Technologist?
21   A.   I'm sure they did.
22   Q.   In your area?
23   A.   I'm just sure that they were hiring

9 (Pages 33 to 36)

PATRICK TODD JACKSON - 1/4/2007

37

1    civil -- I mean, I'm a pretty good guess
2    they were hiring them across the state.
3    I don't know any particular position or
4    anything like that.
5    Q.  Did you do any of the interviewing?
6    A.  No, sir.
7    Q.  That would have been at Mr. Waits' level
8    or somewhere up there?
9    A.  Just whoever.  I have never interviewed
10    anybody.
11    Q.  All right.  Can you recall who received
12    Civil Engineer jobs during the time that
13    Ms. Butler worked for you?
14    A.  No, sir.
15    Q.  Was Ms. Stacey offered a civil
16    engineering job?
17    A.  I heard her say today she was.
18    Q.  Prior to her, do you recall a white male
19    receiving a Civil Engineer job?
20    A.  No, sir.
21    Q.  To the best of your knowledge, did
22    Ms. Butler ever apply for that
23    position?

38

1    A.  No, sir, I don't know.
2    Q.  None of that would have been your
3    responsibility?
4    A.  No, sir, no.
5    Q.  Let me just go through some notes.  I
6    think we are just about through.
7        MR. LYLES:  Do you want us to step
8        out for a minute?
9        MR. LEWIS:  Yes, if you don't
10        mind.  That would be great.
11        Thank you.
12        (Short recess)
13    Q.  (By Mr. Lewis) Did you ever observe Ms.
14    Stacey having altercations in the office
15    with David Jones?
16    A.  Altercations?
17    Q.  Yes.
18    A.  What do you mean by "altercations"?
19    Q.  I'm talking shouting matches and things
20    like that.
21    A.  I've heard them yell at each other, yes,
22    sir.
23    Q.  Was she ever reprimanded for that?

39

1    A.  No, sir.
2    Q.  Can you recall whether you ever
3    reprimanded her for anything?
4    A.  Ms. Stacey?
5    Q.  Yeah.
6    A.  No, sir.
7    Q.  That was a bad question.
8        Did you ever reprimand her
9    for anything?
10    A.  Reprimand her?  No, sir.
11    Q.  Or give her a letter of counseling?
12    A.  Yes, sir.
13    Q.  You did?
14    A.  Yes, sir, I have given her a letter of
15    counseling.
16    Q.  Do you recall on how many occasions?
17    A.  I know of one.  I don't know other than
18    that, but I know of one.
19    Q.  Did you ever write Ms. Butler a letter
20    and tell her that her leave time was
21    low?
22    A.  Did I write her a letter?  I don't know
23    if I wrote her a letter.  I had several

40

1    discussions with her about her time, but
2    I don't know if I wrote her a letter.  I
3    know I wrote her a letter of written
4    counsel about her leave time.
5    Q.  Well, I've got a leave record here, and
6    I'm not going to make it an exhibit.  We
7    will do that later sometime.  And it
8    shows that through August 19th of 2005
9    she always maintained a positive balance
10    of leave time.  Could you confirm whether
11    that's true or not?
12    A.  For 2005?
13    Q.  Well, I think it starts 2003.
14    A.  Yes, sir, it looks like she did.  Yes,
15    sir.
16    Q.  Okay.  At what point would you warn her
17    about leave time?
18    A.  I usually try to say something to my
19    employees if they get under about 40
20    hours.
21    Q.  But she never got down to zero.  She
22    never used up all of her leave time?
23    A.  I don't recall.  I just glanced over it.

10 (Pages 37 to 40)

PATRICK TODD JACKSON - 1/4/2007

41

```
 1        I don't think she did, no, sir.
 2   Q.   Did you go to the hospital to see
 3        Ms. Butler after that accident in January
 4        of 2005?
 5   A.   Yes, sir.
 6   Q.   During that period of time did she try to
 7        talk to you about the circumstances of
 8        the accident?
 9   A.   Not that I recall, no, sir.
10   Q.   Do you recall anything she said to you?
11   A.   I don't even recall if I talked to
12        Ms. Butler.  I don't know if Ms. Butler
13        was already back in the waiting room or
14        not when I got there.  I just went by
15        there and checked.  I don't remember.
16             MR. LEWIS:  I think that's all I
17             have.
18             MR. LYLES:  We don't have
19             anything.
20             (Whereupon, the deposition was
21             adjourned at 12:05 o'clock
22             p.m.)
23
```

42

```
 1        CERTIFICATE OF COURT REPORTER
 2    I, DAWN A. GOODMAN, do hereby certify;
 3    That I am a Certified Shorthand Reporter
 4  of the State of Alabama;
 5    That the foregoing pages are a true and
 6  correct transcript of the Deposition of Patrick
 7  Todd Jackson;
 8    I further certify that I am not interested
 9  in the outcome of said matter nor connected
10  with or related to any of the parties of said
11  matter or to their respective counsel.
12    Dated this 9th day of January, 2007, at
13  Prattville, Alabama.
14
15
16        DAWN A  GOODMAN, CSR
          State of Alabama
17
18
19
20
21
22
23
```

11 (Pages 41 to 42)