## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **ALVERENE BUTLER,,** | * | |
| | * | |
| **Plaintiff,** | * | |
| **v.** | * | |
| | * | **CASE NO. 2:06-cv-00278-MEF-CSC** |
| **ALABAMA DEPARTMENT OF** | * | |
| **TRANSPORTATION,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |

**STATE OF ALABAMA** )
**COUNTY OF MONTGOMERY** )

### AFFIDAVIT OF MARK T. WAITS

Before me, the undersigned Notary Public in and for the State of Alabama at large, this day personally appeared Mark T. Waits, who being known to me and being by me first duly sworn, deposes and says on oath as follows:

"1.    My name is Mark T. Waits. I am over the age of nineteen years and have personal knowledge of the facts set forth in this affidavit.

2.    I am employed by the Alabama Department of Transportation as a District Engineer.

3.    In April of 2005 I investigated a departmental grievance filed by Alverene Butler (Docket Number 954). Based upon my investigation I formulated the Department's "Initial



DEFENDANT'S
EXHIBIT

T

Response". A copy of the Initial Response is attached hereto as Attachment 1.The pages have been consecutively numbered "1" through "25".

      4.     In conducting my investigation I ascertained the individuals whom I would be interviewing. I then typed up a list of questions for each individual. I interviewed the individuals asking them the questions that I had previously prepared and noted their responses. I returned to my office and typed up each individual's responses to the prepared questions. I then met with the witnesses, asked them to review the responses I had typed up from my notes. Several of those interviewed signed and dated the responses. The questions and responses are contained in Attachment 1, pages 10-25.

      5.     I had to retype Ms. Stacey's responses due to a typo in the first draft, hence a date later than the other response sheets."

 

MARK T. WAITS

SWORN TO AND SUBSCRIBED before me on this the _19th_ day of
_January_ , 2007.

Notary Public, State at Large
My Commission Expires _3/7/10_



**ALABAMA DEPARTMENT OF TRANSPORTATION**

Initial Response Form

| Docket Number | Name of Complainant |
|---|---|
| 954 | Alverene Butler |

**Date of Initial Response**

April 26, 2005

| Name and Job Title of Responding Supervisor | Signature |
|---|---|
| Mark T. Waits, District Engineer | |

**Initial Response To The Above-Referenced Complaint:**

See Attachment

**Proposed Resolution:**

See Attachement

**Complainant's Response To Proposed Resolution (*You must check one*):**

Accept ___          Reject ___

Signature _____          Date _____

Please return to:    ALDOT Human Resources Bureau
Attention: Title 7 Coordinator
1409 Coliseum Blvd.
Montgomery, AL 36130

Revised 1/11/02



**In reply to the complaint representing the unfair grading by Mr. Jackson, I found the following:**

1). Ms. Butler's grade indicated a 17.5 responsibility score, meets standards, and a 10.5 performance score; partially meets standards. Ms. Butler's score was reduced by 7 points due to a reprimand she received on April 12, 2005 pertaining to disruptive conduct.

2). Ms. Butler's initial responsibility score was evaluated at 17.5 partially because she did not possess the proper certification (ACI) in order for her to meet the standards of some of her job responsibilities. Ms. Butler had an opportunity to retain her ACI training course she attended in December, 2005. I asked Ms. Butler if she was aware she needed this certification in order to properly perform her job. She indicated to me she knew an EA field inspector needed this certification in order to perform tests on the job. In addition, Ms. Butler indicated in her written statement "I really had no initiative to take the class.... so I didn't pass it". Ms. Butler stated to me that she also didn't pass it "because it was stressing me".

3). Ms. Butler made comments about her not having the opportunity to "compute cross-sections and the estimate". Ms. Butler stated to me she has been an EA with the Department approximately 11 years, of which 8 years she served as an project office EA. Ms. Butler's task/responsibilities statements, for that period, indicates that she was responsible for "drafting and computation of construction quantities so that the contractors monthly estimates and final pay quantities are correct and submitted on schedule". These tasks were performed by Ms. Butler under several previous supervisors. Ms. Butler's current supervisor and his office personnel informed me that Ms. Butler has had the opportunity to learn the monthly estimate procedure, but did not because she was involved with numerous personal phone calls when the estimate was being assembled.

4). Ms. Butler references the appointment of Karen Stacey as a chief inspector by Mr. Todd Jackson. Mr. Jackson has appointed three EA chief inspectors, Mr. Melvin Wynn, Mr. James Feagin and Ms. Stacey. Two of these three individuals are black employees. Mr. Jackson informed me he assigned these duties to each individual based on their ability to complete tasks in an accurate and efficient manner, ability to learn and comprehend plans and contracts, possess the self motivation and initiative to "do a good job" and the knowledge of construction operations.



**Summary and Proposed Resolution:**

Ms. Butler was aware that her job responsibility was to obtain and retain her ACI certification in order to meet the standards of her job. Ms. Butler admitted she had the opportunity to retain the certification in December, 2004 but she did not because she heard of some white employees had taken the test in the training coordinators office a few years ago. Her statement was "so, I didn't pass it". In addition, I have been informed by Mr. Thomas Golson, Materials and Tests, that Ms. Butler has failed the State portion of the ACI Training she took in April, 2005.

The reprimand she received appears to be of a valid nature. Ms. Butlers supervisor, Mr. Todd Jackson, informed me he issued the reprimand to Ms. Butler based on the information he received from his two chief inspectors that were present and "in charge" on the job site. In addition, Mr. Jackson informed me that when he arrived back onto the job site the other crew members were performing the tasks he left them to do, with the exception of Ms. Butler, Melvin Wynn and Reeser Knight. These three individuals were the only ones who left the job site and according to the information I received they did not inform chief inspectors they were leaving.

Therefore, based on the information I discovered during the initial response, my proposed resolution is that the grade Ms. Butler received , 10.5, remain "as is" and that Ms. Butler's actions justified the reprimand.



**Initial Response Attachment**

The following are my initial response pertaining to the complaint against Karen Stacey, Jesse Taylor and Todd Jackson:

1).     This complaint is essentially based around an alleged racial slur that Ms. Karen Stacey made during an accident that involved Ms. Butler. On January 31, 2005, Ms. Butler elected not to file a complaint at that time but admitted she did convey the slur to two other employees, Ms. Julia Freeman and Mr. Melvin Wynn. Ms. Butler stated to me that she only discussed this matter only one other time from the date of the accident until April 11, 2005, and with no other employees. During my interviews, for the initial response, all the other employees (black) informed me that Ms. Butler repeatedly brought up the issue to them of the alleged racial slur, as many as ten times in the two month period. One employee stated he had asked her not to continue because he didn't want to get involved, yet she continued. None of the other employees stated they have ever heard Ms. Stacey use a racial slur.

2).     Ms. Butler requests that a reprimand issued to her on April 13, 2005, for disruptive conduct, be removed because "personally feel that I am being treated this way because of retaliation of claim I've previously made against the Department" and lying for the Department about the accident". Ms. Butler has not previously filed any complaints while under the supervision of Mr. Jackson. In addition, Ms. Butler was not required to make any statements pertaining to the accident other than statements made in reference to her medical claim.

3).     Ms. Butler stated to me she was somewhat aware of the complaint procedure for racial harassment, knew it was posted in visible areas and that she attended classes for it. I asked Ms. Butler why she did not file a complaint then and she said she tried to verbally tell Mr. Jackson. I asked her if she knew the protocol or chain-of-command if she was not satisfied and that she could file a written complaint. She said she did know that she wanted to "leave it alone and keep it to herself".

4).     On April 6, 2005, Ms. Stacey came to my office informing me of a situation that had developed at the project office. She indicated she did not know how to handle it, I instructed her to go to her supervisor first. I later saw Mr. Jackson and told him he would be contacted by Ms. Stacey and to "look into it". Later that day, Mr. Jackson spoke to Ms. Stacey and explained he would try to resolve the problem. On Friday, April 8, 2005, Mr. Jackson discussed the issue with Ms. Butler and after hearing Ms. Butler's statements he decided to involve Mr. Furlow and myself. He told Ms. Butler what his plan was and he was <u>not going to discuss it with any other employees,</u> since he felt it might be a racial harassment issue.



5). On Monday, April 11, 2005, at 7:00 a.m., Ms. Butler admits she approached Mr. Jackson, Mr. Feagin and Mr. Taylor in an effort to discuss the racial slur incident. These employee's were unaware that Mr. Jackson was involved and was trying to resolve the complaint. Ms. Butler states that Mr. Taylor said "why don't you get her face to face in front of everybody and get it in the open". Mr. Taylor stated to me that he was tired of this going on, Ms. Butler continuing to bring it up, and wanted her to do whatever she needed to do in order to end it. Later that day he admitted to telling Karen that Rene had something to say. Some of the other employees I spoke with agreed they were tired of "hearing" of the same incident. I received conflicting stories during my interviews as to what actually was said or took place during Ms. Butler's and Ms. Stacey's discussion. However, it is apparent that this would not have taken place had Ms. Butler refrained from approaching the other EA's that morning.

**Summary and Proposed Resolution:**

Based on the information I received during my initial response interviews, I feel that Mr. Jackson acted properly issuing the reprimand. I did not find any discrimination based on race or retaliation. I do not feel any other employees should be disciplined. Mr. Jackson had discussed the complaint with Ms. Butler and informed her he was going to involve the appropriate personnel since he felt this may be a racial harassment complaint. Mr. Jackson told Ms. Butler that he had only spoken to Karen and herself about the complaint and was not going to talk with any other employees until he had involved Mr. Furlow and myself.

Ms. Butler had apparently continued to "bring the issue up" to the other employees throughout the two month period, even after some had asked her to stop. Ms. Butler was aware that Mr. Jackson was trying to resolve the complaint, on the morning of April 11, 2005, yet she brought the issue up to the other employees which in turn created the conflict on the jobsite.

In addition, I feel that Ms. Butler has created a possible hostile work environment with false statements when she admitted she approached Ms. Stacey about James Feagin stating "better talk to your home girl, every time I look around some mess is going on around here on the job, construction is a dangerous job". Mr. Feagin denied ever making that statement. Ms. Stacey said she finally went to Mr. Feagin and confronted him with it and that is when she discovered Ms. Butler was making statements to other black employee's about the racial slurs. I asked some of the other EA's about their working relationship with Ms. Butler and they indicated they were "uncomfortable" or intimidated in her presence, for they felt she would involve them a possible complaint or lawsuit.



### Initial Response Attachment

The following are my initial response pertaining to the complaint against Karen Stacey, Jesse Taylor and Todd Jackson:

1). This complaint is essentially based around an alleged racial slur that Ms. Karen Stacey made during an accident that involved Ms. Butler. On January 31, 2005, Ms. Butler elected not to file a complaint at that time but admitted she did convey the slur to two other employees, Ms. Julia Freeman and Mr. Melvin Wynn. Ms. Butler stated to me that she only discussed this matter only one other time from the date of the accident until April 11, 2005, and with no other employees. During my interviews, for the initial response, all the other employees (black) informed me that Ms. Butler repeatedly brought up the issue to them of the alleged racial slur, as many as ten times in the two month period. One employee stated he had asked her not to continue because he didn't want to get involved, yet she continued. None of the other employees stated they have ever heard Ms. Stacey use a racial slur.

2). Ms. Butler requests that a reprimand issued to her on April 13, 2005, for disruptive conduct, be removed because "personally feel that I am being treated this way because of retaliation of claim I've previously made against the Department" and lying for the Department about the accident". Ms. Butler has not previously filed any complaints while under the supervision of Mr. Jackson. In addition, Ms. Butler was not required to make any statements pertaining to the accident other than statements made in reference to her medical claim.

3). Ms. Butler stated to me she was somewhat aware of the complaint procedure for racial harassment, knew it was posted in visible areas and that she attended classes for it. I asked Ms. Butler why she did not file a complaint then and she said she tried to verbally tell Mr. Jackson. I asked her if she knew the protocol or chain-of-command if she was not satisfied and that she could file a written complaint. She said she did know that she wanted to "leave it alone and keep it to herself".

4). On April 6, 2005, Ms. Stacey came to my office informing me of a situation that had developed at the project office. She indicated she did not know how to handle it, I instructed her to go to her supervisor first. I later saw Mr. Jackson and told him he would be contacted by Ms. Stacey and to "look into it". Later that day, Mr. Jackson spoke to Ms. Stacey and explained he would try to resolve the problem. On Friday, April 8, 2005, Mr. Jackson discussed the issue with Ms. Butler and after hearing Ms. Butler's statements he decided to involve Mr. Furlow and myself. He told Ms. Butler what his plan was and he was <u>not going to discuss it with any other employees</u>, since he felt it might be a racial harassment issue.

5).    On Monday, April 11, 2005, at 7:00 a.m., Ms. Butler admits she approached Mr.
Johnson ~~Jackson~~, Mr. Feagin and Mr. Taylor in an effort to discuss the racial slur incident.
mw    These employee's were unaware that Mr. Jackson was involved and
was trying to resolve the complaint. Ms. Butler states that Mr. Taylor said "why
don't you get her face to face in front of everybody and get it in the open". Mr.
Taylor stated to me that he was tired of this going on, Ms. Butler continuing to
bring it up, and wanted her to do whatever she needed to do in order to end it.
Later that day he admitted to telling Karen that Rene had something to say. Some
of the other employees I spoke with agreed they were tired of "hearing" of the
same incident. I received conflicting stories during my interviews as to what
actually was said or took place during Ms. Butler's and Ms. Stacey's discussion.
However, it is apparent that this would not have taken place had Ms. Butler
refrained from approaching the other EA's that morning.

**Summary and Proposed Resolution:**

Based on the information I received during my initial response interviews, I feel that Mr. Jackson acted properly issuing the reprimand. I did not find any discrimination based on race or retaliation. I do not feel any other employees should be disciplined. Mr. Jackson had discussed the complaint with Ms. Butler and informed her he was going to involve the appropriate personnel since he felt this may be a racial harassment complaint. Mr. Jackson told Ms. Butler that he had only spoken to Karen and herself about the complaint and was not going to talk with any other employees until he had involved Mr. Furlow and myself.

Ms. Butler had apparently continued to "bring the issue up" to the other employees throughout the two month period, even after some had asked her to stop. Ms. Butler was aware that Mr. Jackson was trying to resolve the complaint, on the morning of April 11, 2005, yet she brought the issue up to the other employees which in turn created the conflict on the jobsite.

In addition, I feel that Ms. Butler has created a possible hostile work environment with false statements when she admitted she approached Ms. Stacey about James Feagin stating "better talk to your home girl, every time I look around some mess is going on around here on the job, construction is a dangerous job". Mr. Feagin denied ever making that statement. Ms. Stacey said she finally went to Mr. Feagin and confronted him with it and that is when she discovered Ms. Butler was making statements to other black employee's about the racial slurs. I asked some of the other EA's about their working relationship with Ms. Butler and they indicated they were "uncomfortable" or intimidated in her presence, for they felt she would involve them a possible complaint or lawsuit.

**Karen Stacey Questions and Reply**

**Questions:**

1).      Ask Karen about "string someone up" comment.

2).      Ask her when she found out about racial slur.

3).      Ask her if she ever discussed the slur issue with other employees.

4).      What about any other employees?

5).      Ask if Melvin, Reeser and Rene asked or informed her they were going to the store?

6).      Ask Karen if she ever showed Rene how to do estimates.


**Answers:**

1).      Karen said she said, "where's your f-----g road dog. If you care about her you better watch her back or you'll find her strung up out here". Karen said it was no laughing matter now or before March 16, 2005.

2).      Said she was unaware of any slur until March 16, 2005. Talked to James Feagin to confront him about what Rene said he said. Then James told you about her and the slurs Karen used.

3).      March 16, 2005, told Jesse, James and Kelvin that Karen found out and told them she wouldn't say it. Kelvin said, "it didn't sound like you (Karen)".

4).      Next day she told Melvin and Reeser she wouldn't say anything like that. Reeser said she had heard Rene tell Melvin that.

5).      April 11, 2005, X section, said after discussion, Rene, Melvin, and Reeser did not tell Karen or James they were going to the store.

6).      Karen said she showed Rene with David how to do estimates. Spoke with David Jones today -- yes. With David and Rene in the office, Karen taught both how to do estimates with Chris Thomas. Said she would not stay seated long enough because of receiving personal calls.

Karen Stacey
5/5/05
(10)

**Karen Stacey Questions and Reply**

**Questions:**

1).      Ask Karen about "string someone up" comment.

2).      Ask her when she found out about racial slur.

3).      Ask her if she ever discussed the slur issue with other employees.

4).      What about any other employees?

5).      Ask if Melvin, Reeser and Rene asked or informed her they were going to the store?

6).      Ask Karen if she ever showed Rene how to do estimates.

**Answers:**

1).      4 ~~dog~~ Road ~~day~~ string up statement, (Karen said it was no laughing matter before March 16, 2005.

2).      Said she was unaware of any slur until March 16, 2005. Talked to James Feagin to confront him about what Rene said he said. Then James told you about her and the slurs Karen used.

3).      March 16, 2005, told Jesse, James and ~~Kevin~~ Kelvin that Karen found out and told them she wouldn't say it. Kelvin said, "it didn't sound like you (Karen)":

4).      Next day she told Melvin and Reeser she wouldn't say anything like that. Reeser said she had heard Rene tell Melvin that.

5).      April 11, 2005, X section, said after discussion, Rene, Melvin, and Reeser did not tell Karen or James they were going to the store.

6).      Karen said she showed Rene with David how to do estimates. Spoke with David Jones today – yes. With David and Rene in the office, Karen taught both how to do estimates with Chris Thomas. Said she would not stay seated enough for personal calls.



**Alverene Butler Questions and Reply**

**Questions:**

1). Explain statements to Rene that Doug Furlow has.

2). Ask Rene about task statements – were they correct and reflect her job duties. Who/when did she get them assigned.

3). Ask Rene when (2) whites re-took ACI – who were they? Any blacks ever re-take ACI/State Section?

4). Ask Rene if she passed ACI/State hands on in November, 2004?

5). Ask Rene if her ACI certification expired because she failed, did she know that?

6). Ask Rene if she knows that EA's (field inspector) are required to have ACI certification in order to perform their job.

7). Ask Rene if she is aware of performance appraisal procedure, she can apply comments to by initial and letter.

8). Ask Rene if she has ever served as an office EA before, when and how long.

9). Ask Rene her duties as an office EA.

10). Ask Rene of her form 40 about estimates preparation and grades.

11). Ask Rene if she has ever prepared an estimate.

12). Do you know the procedure for filing complaint/racial slur policy?

12a). Have you ever heard Karen Stacey make a racial slur? When/where/what.

13). When did you file a complaint? Why/not?

14). Do you know the protocol for filing a complaint/District policy for chain of command.

15). Did you go to personnel on Friday, April 8, 2005, in Central Office? Why?

16). Did you tell anyone else about Karen Stacey saying a racial slur? How many times, why?

17). See note "how did other employee's know? Maybe Karen found out the way they did?

18). On the morning of April 11, 2005, at the office at 7:00 a.m., why did you confront other employee's about this issue after you talked to Todd on Friday.

19). On April 11, 2005, what was your duty that day?

20). When Todd left, who did he leave in charge? Did work need to get done?

21). You left the worksite to go to the store, was work complete? What store?

22). Did you ever tell Karen Stacey that someone said "tell your road dog to be careful or someone was going to string her up"? Did you ever tell anyone that or of that nature? See note (what did she tell Julia and Melvin?

**Answers: Alverene Butler**

1).  Note: I had to ask Ms. Butler to remove her cell phone ear piece before we started the interview. She received a personal call during the interview and I asked her to turn the phone off.

2).  Yes.

3).  David Jones and Brandie Williams, couple of years ago, no blacks have had opportunity. No initiative because it was stressing her.

4).  Only passed hands on – only received notice until April 5, 2005. Rene called Barbara's office after class notice and if passed or failed.

5).  Knew expiration date prior to November.

6).  Yes, told that cannot perform test unless certified – then recanted and said she didn't recall ever being told that.

7).  Said she was familiar with performance Appraisal Procedure but did not know she could initiate appraisal for additional comment. I showed her an appraisal she had initiated before.

8).  Eleven years as EA, 8 years as office EA.

9).  Type cover letter for estimate – transpose filed information into diary, also filed payroll and labor reports.

10). Explained past form 40/tasks she disputed even through grades indicate good.

11). No.

12). Racial policy – somewhat, filing a compliant – no more than reporting to supervisor. Know that it is posted in many places, went to class.

13a). Yes, in truck, late of accident – yes prior to accident.

13b). No, not at time, he did not want to hear it, left it alone and kept to yourself. Best to leave it alone.

14). Said she knew protocol. Chain of command.

15). She called to Vivian Handy at personnel, asked about tasks, certification and training. Concerning grade sheet, knew protocol to District.



16).  Julia and Melvin Wynn from date of accident to April 11, 2005. James, Jesse and Kelvin/why did you tell them, wanted it known so if it came up, someone else would know it. Only one time discussed with anybody before April 11, 2005.

17).  She told them (Karen did). Rene denies telling any one else.

18).  She wanted to know if any of them had went to Karen and said anything. She acknowledged Todd was aware and was in the process of working on it.

19).  Assignment "X" sections, Todd wanted them rechecked then, Todd wanted them done. Helping Kelvin with rod (calladita pole).

20).  Todd was at work site that morning, said she didn't have anything else to say to him about slur issue. Left Karen in charge.

21).  Work was not complete yet. After her discussion with Karen, she went and got in the truck than went to bathroom. She stated Melvin, Told and Karen, they were leaving the jobsite with Reeser, receiving and Rene.

22).  Started on job about overtime, James came to Rene on job and said "better talk to home girl every time I look around some mess is going around here on the job, construction is a dangerous job". Told James she was going to discuss this with Karen. She said she told Karen "she's going to have to leave these guys alone and the next somebody is going to hook her up to the back of their bumper and drag her down the road". Rene said Karen laughed and took it as a joke.
      guys alone

*(15)*

**Questions for Melvin Wynn, Reeser Knight, Jesse Taylor, Eric Robbins and Kelvin Johnson.**

1).    Have you ever heard Karen Stacey use a racial slur?

2).    Have you ever heard Alverene Butler accuse Karen Stacey of using a racial slur? When?

3).    Have you ever heard James Feagin threaten Karen Stacey about "stringing someone up" or anyone else make that statement?

4).    Did Alverene Butler mention the racial slur issue to you on the morning of April 11, 2005?

5).    Were you in the survey crew on the morning of April 11 2005? Who was in charge?

6).    Was Alverene Butler helping of hindering the survey crew that morning? Was she insubordinate to the chief inspector?

7).    How is your working relationship with Alverene Butler? With Karen Stacey?

*16*

**James Feagin Questions and Reply**

1).     James Feagin

a).     Has Rene Butler ever mentioned to your Karen Stacey made a racial slur?
Did you hear her tell anyone else? Yes, several: Kelvin Johnson and Jesse Taylor
in the truck one month before April 11.

b).     Have you ever heard Karen Stacey make a racial slur? No.

c).     Did you ever threaten Karen Stacey to Rene Butler? "where is your road dog
tell her to be careful or she might get strung up"? No.

d).     Were you on the jobsite on April 11, 2005 with Rene and Karen for x sections?
Yes.

e).     Did Rene ask or tell you anything about Karen make a racial slur that
morning? Did she say anything, slurs, to anyone else that you heard?
Insubordinate?

f).     Was Rene helping or hindering work with her actions? What took place?
Yes, she was hindering.

g).     How is your working relationship with Rene/Karen? Rene, not well because
she manipulates work force – now have to handle differently around Rene,
worry about every move because notes, lawsuit, intimidated.

What happened, at 7:00 a.m., Jesse, James and Kelvin was stopped by Rene
at the truck at office and was asked did anybody tell Karen that she said Karen
used slurs. Everyone said no but James said "Karen came to me asking "had
Rene said she used slur". Jesse said "if problem is with Karen she needs to
confront Karen". Jesse told her he was going to tell Karen that "Rene had
something to tell her about". Rene said don't do it. On jobsite, Jesse told Karen
"Rene had something to say" within ear shot.

4-29-05

(17)

**Jesse Taylor Reply**

1).     No.

2).     Yes – morning of April, 11, 2005 – but other employees have told him 3 or 4 times about it.

3).     No.

4).     Yes – came to truck at office asking which one had told Karen about her using a racial slur.  Told Rene she needed to talk with Karen because of this "on going thing".  He said he was tired of hearing about it and it was never going to get over until she did.  He said he knew nothing about Todd Jackson being involved.

5).     Yes, instrument man, Karen and James in charge.

6).     Yes, she was hindering work, possible insubordination.

7).     Not good relationship – she is messy and keeps things going on.
        Rene is looking for something to "get some dirt on you".  She writes down things.  Karen is okay to work with.

8).     I ask him why he said something to Karen that morning.  Jesse said Rene made it his business when she approached him that morning and he was tired of hearing about it.

*Jesse Taylor   4-29-05*

(18)

**Kelvin Johnson Reply**

1).     No.

2).     Yes, a while back – over a month ago, January or February, he didn't why Rene told him but she brought it up over ten times.  He told her he didn't want to be involved more than once yet she would do it again.

3).     No, Karen asked the group (Jesse and James) if any of them said that to Rene about three weeks ago.

4).     Yes, ask him if he talked to Karen about the racial slur he told her no.  She then Approached three of them in the truck and asked again.  Jesse said "maybe you and Karen need to talk about it:.

5).     Yes, on crew as rodman, Karen in charge.

6).     Hinderence, held up crew work.

7).     With Rene; have to change because you have to be careful around her what you say because of a situation like this.  Maybe intimidated because of her "mess".  With Karen, she is not a "messy" person.  Hostile work environment with Rene, not with Karen.


*Kelvin Johnson*    4/29/05

(19)

**Alverene Butler          Complaint# 954**

**Initial Response**

      Attached are the questions and comments from the interviews taken on April 21, 22, and 26, 2005.

1).     Barbara Simms informed me that Ms. Butler failed the ACI and State portion after she attended the training in December,2004.  Ms. Simms forwarded me Ms. Butler's EDP Training Records.

2).     Thomas Golson, Material and Test Bureau, informed me that Ms. Butler failed the State portion of the ACI Training Ms. Butler attended in April, 2005.  The ACI results would not be available for another three weeks.  In addition, she could not re-take the test for another 90 days.

3).     Mr. David Jones, EA, informed me that Ms. Butler had the opportunity to learn the estimate procedure when Ms. Stacey was teaching him.  He stated "Rene would not sit down in the chair long enough due to receiving personal phone calls".



**Melvin Wynn Reply**

1).      No

2).      Yes, 4 or 5 times. Stated she told him even before the accident date, all he did was "lent an ear only listened".

3).      No, he did state he heard James Feagin say Karen needed to mind her own business referencing a issue on time.

4).      N/A

5).      Yes, not sure who was in charge but Karen and James were the chief inspectors on that job.

6).      Yes, she hindered crew work but Jesse Taylor started it.

7).      Good relationship with both - no difference.

8).      Ask Melvin who told Melvin of the racial slur – he said Rene did and he never went to Karen about it.

21

**Resser Knight Reply**

1).   No.

2).   Rene told her several times over the past 2 months.

3).   Rene told Reeser "if Karen keep on talking about her its best to stay our of other people business or you are going to find yourself strung up out here". Did not hear James Feagin say it.

4).   No.

5).   Yes, Karen and James in charge.  She stated Jesse said "Rene have something to tell her" to Karen, then Melvin said to Rene "Do you have anything to say to Karen".  Rene said she didn't and that's when the two started talking, no yelling.

6).   Not insubordinate, not a hindering no delay in work getting done, said they did not the jobsite then said they went to Dollar General to get a drink.

7).   Good relationship with both employees, no hostile environment.

22

**Eric Robbins Reply**

1).    No.

2).    No.

3).    No.

4).    No.

5).    Yes, Karen and James in charge.

6).    Do not know.

7).    With Rene he stated "try not to get into her politics, do not hang around if she starts to talk about others".   Ask about hostile work environment he said "not with him…… some what with Rene".  He has a good relationship with Karen and no hostile environment.

**Todd Jackson Questions and Reply**

1).     Have you ever heard Karen Stacey use a racial slur? No.

2).     When did you find out about this incident? Wednesday, April 6, 2005.
        Talked with Karen Stacey.

3).     Who have you spoken to about this? Mark Waits, Karen Stacey, Alverene Butler
        and Ed Phillips.

4).     On April 8, 2005, you spoke to Rene about the complaint, what did you tell/ask
        her? Did you ask her not to take any actions with Karen or other co-workers until
        it was resolved? Explain what Karen told you on April 6, 2005, that other
        employees had came to Karen about Rene telling other employees about a slur>
        Did Karen use a racial slur? Rene said "yes". He asked what other employees
        Rene had told – Melvin Wynn – Maybe Reeser Knight over heard Melvin and
        Rene talking. Asked why she did not tell his supervisor – she stated she tried to
        but she didn't think he wanted to hear it. He said he told her (Alverene) he spoke
        to no one else and give him time to investigate it.

5).     Did you talk with Karen about this? When? What was said/discussed. April 6,
        2005, Karen told him other co-workers were coming to her telling her Rene was
        telling she used slur (James Feagin).

6).     On April 11, 2005, survey crew, tell me what happened, who you spoke to and
        what actions you represent, took. Why? Who was in charge? Why no one else
        was reprimanded? Todd helped crew get started and left Karen/Jesse in charge.
        Got call from Karen on radio to come back "trouble starting on job", got back and
        spoke to group as a whole – explained work and expectations.

7).     Do you allow cell phone use on the jobsite? Yes.

8).     Should employees get permission to leave (bathroom breaks) from one in charge
        when doing work (x sections)? Suppose to inform others they were/or leaving.

9).     Has Rene ever done work on estimates under your supervision? Explained
        estimate process, worked on finales, checked quantity calculations, put Rene
        inside with David Jones because of office experience, David there first in office.

10).     Why did Rene get a low score on her appraisal 17.5 – 7=10.5? ACI certification
        missing and reprimand, also, communication between Rene and himself.



11).  Why did you make Karen chief inspector? Why not Rene? Three chief inspectors
      are; Karen, James and Melvin. Karen showed initiative, ability to get job done.
      KSA's, initiative were with Karen shown by hands on work. Give Karen
      Something it gets done, with Rene, he isn't confident it will not get done.

12).  Reprimand for the April 11, 2005, incident. Why? Talked with her on April 8,
      2005, about slur complaint and you were doing investigation. You had not spoke
      to any one else but Karen. Talked with James, Jesse and Kelvin on April 12,
      2005, to find out what happened. James – Karen in charge. Rene's fault per
      James.