IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALVERENE BUTLER,                        )
                                        )
        Plaintiff,                      )
    v.                                  )
                                        )   CASE NO. 2:06-cv-278-MEF
ALABAMA DEPARTMENT OF                   )
TRANSPORTATION, *et al*.,               )
                                        )
        Defendants.                     )

**ORDER ON PRETRIAL HEARING**

A pre-trial hearing was held on this case on April 19, 2007, wherein the following

proceedings were held and actions taken:

1.      PARTIES AND TRIAL COUNSEL:

        A.      Plaintiff:      Alverene D. Butler

        B.       Plaintiff's Counsel:
                Jay Lewis
                Law Offices of Jay Lewis, LLC
                P.O. Box 5059
                Montgomery, AL  36103

        C.      Defendants: Alabama Department of Transportation, Joe McInnes, Mark
                T. Waits, Patrick T. Jackson

        D.      Defendants Counsel:
                Jim Ippolito, Jr.
                General Counsel
                Assistant Attorney General

                Harry A. Lyles
                R. Mitch Alton
                Robert Prescott
                Assistant Counsel

                Assistant Attorneys General
                Legal Bureau
                Alabama Department of Transportation
                1409 Coliseum Boulevard
                Montgomery, Alabama  36110

COUNSEL APPEARING AT PRETRIAL HEARING:  Same as trial counsel

2.      JURISDICTION AND VENUE: Plaintiff filed this Complaint invoking the

jurisdiction of this Court under and by virtue of the Fourteenth Amendment to the Constitution

of the United States, 42 U.S.C. §1981, 42 U.S.C. §1983, 28 U.S.C. § 1343. 28 U.S.C. § 2201, 28

U.S.C. § 2202, and the doctrine of supplemental jurisdiction.  The alleged violation of the

Plaintiff's rights occurred in Montgomery County, Alabama, and were allegedly committed

within the Northern Division of the Middle District of the State of Alabama.

3.      PLEADINGS: The following pleadings and amendments were allowed:

    a.  06-19-06-First Amended Complaint (Doc No. 16)
    b.  07-14-06-Answer to Amended Complaint (Doc No. 18)

4.      CONTENTIONS OF THE PARTIES:

The Plaintiff's Contentions:   In January, 1994, Plaintiff, a black female, began

work as a Clerical Aide for the Alabama Department of Transportation in Montgomery,

Alabama.  In June, 1994, Plaintiff began her provisional appointment as an Engineering

Assistant ("EA") with the ALDOT.  Plaintiff's employment status was changed to permanent in

March, 1999.  Plaintiff was promoted to an EA II/III and was an EA II/III at all times relevant to

this lawsuit.

Plaintiff worked under the immediate supervision of Patrick Todd Jackson,

Transportation Technologist Senior (Project Engineer).  Her next upstream supervisor was Mark

Waits, Transportation Manager (District Engineer), who also supervised Jackson.

Jackson was also the direct supervisor of Karen Stacey (white female).   Plaintiff

and Stacey, who both held the same position of EA II/III, worked together in the office and in

the field.

Plaintiff began complaining that her then supervisor, James Horace, was sexually harassing her in November, 2001.  She also filed an EEOC charge of discrimination (August 28, 2002), and a departmental grievance (February 26, 2003), against Horace.  Waits had been Horace's supervisor.  It was not until approximately March, 2003, that an investigation was conducted concerning Horace's alleged misconduct.  Horace was finally terminated on or about April 18, 2003.

In her complaints about Horace as well as Robert Smiley [in 1998], Plaintiff complained about Waits because he took no action regarding her complaints.

On January 31, 2005, Plaintiff and her co-worker Karen Stacey, while traveling together during work/lunch, were involved in an automobile accident with another vehicle in which Stacey (the driver) was determined to be at fault.  Plaintiff was taken to the hospital.

Plaintiff and Stacey both had different accounts of the auto accident.  Plaintiff stated that Stacey hit the other vehicle.  Stacey claimed that the other vehicle hit her.  Plaintiff also stated that after the accident Stacey said, "Did you see that stupid mother fucking nigger hit me?"  Stacey denied ever making that statement or other racial slurs.

While Plaintiff was at the hospital (because of the auto accident), Jackson arrived.  Plaintiff attempted to tell Jackson about the racial slurs that Stacey used, but Jackson did not want to hear it and would not let Plaintiff continue.  Jackson does not recall Plaintiff trying to talk to him about the accident or for that matter if he talked with her at all.

In early April, 2005, Stacey had heard from a co-worker that Plaintiff had told some employees about the accident being Stacey's fault and that Stacey used racial slurs.  Then some time after finding this out, Stacey told Jackson that Plaintiff was saying Stacey used racial

epithets.  Jackson then had a conversation with Plaintiff regarding the accident.  Jackson asked

Plaintiff if Stacey used the racial epithets.  Plaintiff said yes.  Jackson had no reason to

disbelieve Plaintiff was telling him the truth when he asked if Stacey had said the racial epithet.

Waits learned of the alleged racial slurs made by Stacey from Jackson on or about

April 8, 2005.

On April 11, 2005, Plaintiff and Stacey had a confrontation at a job-site.

According to Wynn and Johnson, who both witnessed the confrontation, Stacey was the

aggressor, confronting Plaintiff and yelling at her.  Stacey accused Plaintiff of lying about the

accident and saying that she used racial slurs when she did not.  Plaintiff did not initiate the

conflict.  Plaintiff maintained to Stacey that she did use racial slurs at the time of the accident.

After the confrontation, Stacey called for Jackson to come to the job site.  When

Jackson arrived on the scene, he and Stacey had a private conversation about the incident.

Plaintiff wanted to tell him her side of the story, but Jackson refused to listen to her and would

not permit her to speak.  Jackson told Plaintiff to "hush," and "just be quiet."

Plaintiff did not file a formal grievance regarding the racial slur because, as she

told Jackson, "Waits was not going to do anything about it."  Plaintiff had complained to Waits

before about her then direct supervisor [Horace] sexually harassing her and Waits did nothing at

the time to stop it.  It was not until approximately one and a half years after filing her initial

complaint that an investigation was finally conducted, ending in Horace's termination.

Plaintiff was issued a reprimand from Jackson on April 13, 2005, regarding the

confrontation on April 11, 2005.  Plaintiff was charged with violating the following work rules:

"[i]nattention to job-doing anything distracting on the job" and "[d]isruptive conduct of any

sort." Jackson told Plaintiff that she was being issued the reprimand because she had asked co-workers that morning about the accident and because Plaintiff caused a commotion on the job-site. Jackson told Plaintiff that her co-workers said that she was the one responsible for work being stopped. Plaintiff maintains that she and her co-workers were all working until Stacey confronted Plaintiff.

Although Jackson had never told her not to discuss the incident both Jackson and Waits now claim that Plaintiff was issued a reprimand because she was told not to discuss the accident and racial slurs with other employees, yet she still did. To the contrary, the reprimand does not state that it was issued because Plaintiff disobeyed Jackson's order not to discuss the incident.

Stacey was never issued a reprimand for the confrontation. Stacey has had confrontations with other co-workers over the years that she was employed with ALDOT.

At some time following the confrontation, Waits called Kelvin Johnson, black male, in to ask his opinion about Plaintiff's treatment. Johnson told him that Plaintiff was generally being treated unfairly.

Plaintiff received her annual performance appraisal from Jackson on April 14, 2005. Plaintiff received a performance appraisal with a final score of 10.5; her previous annual appraisal had been above 25. Jackson told Plaintiff, "you know, a reprimand takes off a lot too."

On or about April 27, 2005, Plaintiff filed her third EEOC charge of discrimination, complaining of race discrimination and retaliation regarding the auto accident, the confrontation, the letter of reprimand, and the annual appraisal. Plaintiff was issued a second reprimand from Jackson on June 14, 2005. This reprimand claimed that Plaintiff did not follow

Jackson's instructions on a given instance. Plaintiff avers that he had never so instructed her. Melvin Wynn witnessed the incident and testified that the instructions Jackson gave them were carried out. Jackson then changed his mind about what he wanted done, then accused Plaintiff, Wynn and Reeser Knight, black female, of not following his instructions. Jackson proceeded to yell at Plaintiff and Knight.

On or about June 23, 2005, Plaintiff filed her fourth EEOC charge of discrimination.

Plaintiff had leave that had been previously approved taken from her by ALDOT. There is no evidence that Stacey ever had leave that was previously approved disapproved later. The memorandum regarding "approved and disapproved leave," written by Waits, states that "this office is reviewing all previous leave slips from April 8, 2005, in order to identify disapproved leave for possible payroll corrections."   That is the same date that Waits learned from Jackson that Plaintiff had accused Stacey of making racial slurs.

Prior to the confrontation that Stacey instigated, Plaintiff and Stacey had been permitted to come to work at 7:30am instead of the regular start time of 7:00am so that they could drop their children off at school. After the confrontation, the allowance was rescinded as to Plaintiff and she was required to be at work by 7:00 a.m.; Stacey was still permitted to report late.

On August 29, 2005, Jackson instituted a new policy restricting call-ins to one per month. Stacey was allowed to violate that policy regularly, calling in sick and for personal business on numerous occasions. Plaintiff was not allowed to do so and was written up when she called in.

In or about August, 2005, Plaintiff received counseling letters accusing her of using too much leave time and violating call-in procedures. Jackson admitted in his testimony that Plaintiff's leave time never got down to zero (Plaintiff never used up all her leave time).

On several occasions, after Plaintiff reported that Stacey had falsified a report on the January, 2005 automobile accident and used a racial slur, Jackson began scrutinizing Plaintiff's time sheets closely. Jackson pointed out that Stacey had reported to him that Plaintiff had not worked the hours logged. Jackson would change the hours Plaintiff put down as having worked the following day, claiming Stacey told him Plaintiff did not work the hours she claimed. Stacey could not have known what hours Plaintiff worked since Stacey was almost always gone when Plaintiff and her crew arrived back at the office from the field.

Plaintiff performed manual labor (including making concrete cylinders, and taking soil compactions) as part of her job as an EA II/III. Stacey, who was also an EA II/III, did not perform manual labor. Plaintiff worked with Stacey long enough to observe whether Stacey ever performed any manual labor. Plaintiff's observation was that Stacey did not do any manual labor. Stacey also told Plaintiff that she did not do soil compactions.

During the course of her employment, Plaintiff received training and certification and was qualified to be promoted from Engineering Assistant (EA) to Civil Engineer (CE). In or about October, 2004, a position for CE came open. Plaintiff was denied the promotion to CE, and the position was given to a white male of lesser qualifications whom Plaintiff had trained in his previous position. In or about November, 2005, another CE position came open. Plaintiff's application for promotion was again denied and the position was offered to Karen Stacey, white female.

Plaintiff was an excellent worker and well qualified for the position she held; several of her co-workers held her in high regard for her work ethic.

Plaintiff applied for disability retirement because the conditions at work were intolerable. Plaintiff was caused considerable mental and emotional anguish, loss of sleep and other physical symptoms. Plaintiff was approved for disability retirement from the ALDOT effective January 1, 2006.

Plaintiff is suing only the ALDOT for race discrimination under Title VII. Plaintiff does however, bring claims of race-based discrimination and retaliation against Waits and Jackson by way of 42 U.S.C. § 1983, as it subsumes 42 U.S.C. § 1981, for a deprivation of Plaintiff's civil rights under color of state law.

The individual defendants are not entitled to qualified immunity as they violated Plaintiff's constitutionally protected rights to equal protection, due process and freedom from discrimination and retaliation. Those rights were clearly established in the law at the time the violations took place, and any reasonable public official would have been aware of them.

Plaintiff has established that she was subjected to retaliation in that, (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between her protected activities and the adverse employment action.

Plaintiff has established that she was subjected to discrimination in the terms, conditions, and privileges of employment in that, (1) she belongs to a protected racial group, (2) she was subjected to an adverse employment action or actions to which non-protected persons were not subjected, and (3) each adverse action was based on her race. More specifically with

8

regard to the failure to promote, Plaintiff has established that, (1) an adverse employment action was taken against her, (2) she was qualified for the job position in question, and (3) different treatment was given to someone who differs with regard to the relevant personal characteristic.

To establish a claim for constructive discharge, a plaintiff must show that, because of the employer's unlawful conduct, her working conditions were so unpleasant or difficult that a reasonable person in her position would be compelled to resign. Plaintiff sought disability retirement and resigned in an effort to avoid the stress caused by the discriminatory and retaliatory conduct of the defendants toward her. Were it not for the conduct of the defendants, Plaintiff would be capable of performing each and every essential function of the job she held. The resignation/disability retirement constituted a constructive termination.

Plaintiff has suffered a loss of employment and employment benefits, wages, and opportunities for further employment advances. She has suffered emotional distress and mental anguish as a consequence.

At this time Plaintiff expressly abandons any and all claims as against defendant McInnes.

Plaintiff is entitled to compensatory and punitive damages against individual defendants Waits and Jackson in their individual capacities and compensatory damages against ALDOT. Plaintiff is entitled to such equitable relief as would effectuate the purpose of the statutes invoked, including back pay, back benefits, accrued leave and, in lieu of reinstatement, a reasonable sum of money for front pay. In the alternative, Plaintiff is entitled to nominal damages. Plaintiff is also entitled to attorneys' fees and costs of this action. Plaintiff also claims such other legal, equitable, and declaratory relief as to which she may be entitled.

The Defendants' Contentions:

I.     Factual Contentions:

Defendants present their factual contentions in a chronological timeline below:

1.     January 1994--Butler was initially employed by the Alabama Department of Transportation (ALDOT) in January 1994 as a clerical aid and assigned to the Department's Sixth Division, District Three Office.  (See Exhibits E and G of Defendants' Motion for Summary Judgment.)

2.     April 23, 1997—Butler refused to sign evaluation given her by supervisor Richard Taylor.

3.     March 27, 1999—Butler was accorded permanent status as an Engineering Assistant.  (See Exhibit F-Defendants' Motion for Summary Judgment.)

4.     April 16, 1999—Butler refused to sign an evaluation given to her by her supervisor Richard Taylor.

5.     April 2000-February 2003— During this period, Butler was supervised by James Horace. (See Exhibit P to Defendant's Motion for Summary Judgment at 2.)

6.     December 7, 2001—Butler complained about James Horace to District Engineer Mark Waits.  (See Exhibit P to Defendant's Motion for Summary Judgment at 2.)

7.     February 25, 2003—Butler complained about Horace to both the Assistant District Engineer Chad Davis and Defendant Mark Waits. (See Exhibit P to Defendant's Motion for Summary Judgment at 2.)  Defendant Waits then met with employees supervised by Horace. Horace was immediately removed as supervisor of Butler and others and an investigation was initiated concerning Horace's alleged misconduct.

8.    February 26, 2003—Butler filed a departmental grievance alleging sexual harassment by Horace. (See Exhibits H and P to Defendants Motion for Summary Judgment.)

9.    March 27, 2003—Defendant Waits recommended that Horace be terminated and on April 18, 2003, Horace was terminated by ALDOT. (See Exhibit P to Defendant's Motion for Summary Judgment at 3.)

10.    On or about June 20, 2003, Butler submitted an application for Civil Engineer (now Transportation Technologist) Bridge Option.  On or about June 27, 2003, the State of Alabama Personnel Department (SPD) rejected Ms. Butler's application because she did not have the required experience for this position.  Thus, Butler was never placed on an SPD register for this position and ALDOT would not have been able to promote her.  Ms. Butler was notified by SPD of this rejection.  On or about July 2, 2003, Butler submitted an application for Civil Engineer – Analysis and Planning Option and on or about July 3, 2003, Butler submitted an application for Civil Engineer – Construction Option.  Ms. Butler did not appear on the register for the Civil Engineer – Analysis and Planning Option because she failed to schedule the exam and did not appear on the register for the Civil Engineer – Construction Option because she failed to appear for the scheduled exam.  SPD's job announcement for these positions stated that an open-competitive register would be established for the position and that all applicants would be required to take an examination.  Due to Butler's failure to complete the process, she was not placed on an SPD register and ALDOT could not have considered her for either of these positions.

11.    August 18, 2003—Butler was reassigned to work under the supervision of Defendant Todd Jackson.  Karen Stacey, an Engineering Assistant assigned to ALDOT's Sixth Division, District Three Office, was also supervised by Defendant Jackson.  Butler and Stacey

worked in the office together. From the time Stacey began her employment with ALDOT in 1998 until Defendant Jackson reassigned Butler and Stacey to the field, Stacey was allowed to drop off her child at school on the way to work. Butler was accorded equal treatment while assigned to the office. Stacey and Butler would come in by 7:30 and then take only 30 minutes lunch in order to make up their time.  On some occasions Stacey and Butler would work a half hour late to make up the half hour in the morning.  (See Exhibit D at 13 and Exhibit C at 29-30.)

        12.    <u>On or about September 22, 2003</u>—Butler and Stacey were reassigned to field inspection duties and began inspecting the U.S. Highway 82 repaving project.  Subsequent to the reassignment of Butler and Stacey to the field, leave slips signed by both Butler and Stacey reflect that their work hours were 7:00 a.m. to 4:00 p.m.  Butler and Stacey were not permitted to come to work at 7:30 a.m. after they were assigned to field work.

        13.    <u>August 6, 2004</u>—Butler's February 26, 2003 grievance alleging that Horace had sexually harassed her was heard by a Hearing Officer who found that Butler was not subjected to sexual harassment and that ALDOT's response (once an actual claim of harassment was articulated by Butler), "was effective and it was quick." (Exhibit P to Defendant's Motion for Summary Judgment at page 3.)   The Hearing Officer further noted that ALDOT "dropped the ball" by allowing Horace to perform the Annual Employee Performance Appraisal for Ms. Butler after he had become aware of Ms. Butler's sexual harassment claim against him.

        14.    <u>October 8, 2004 –</u>  ALDOT Assistant Director L. Daniel Morris, Jr., requested that the State of Alabama Personnel Department (SPD) raise Ms. Butler's evaluations for calendar years 2002 and 2003 and that the revised scores be reflected in Butler's personnel file. Morris further requested that, if the revised scores entitled Butler to a pay raise, that such pay raise be granted retroactive to the date that it would have been paid but for the improper

evaluations. (See Exhibit H to the Defendant's Motion for Summary Judgment at 2.) Assistant Personnel Director Jackie Graham (now Personnel Director) approved Morris' request on October 25, 2004.

15.     November 11, 2004—Karen Stacey's PreAppraisal for the period May 1, 2004 through May 1, 2005, listed some of her responsibilities as performing field tests such as concrete slump test, concrete air test, temperature test, tests for compaction, and preparation of concrete cylinders for testing.

16.     January 31, 2005--Butler was a passenger in a state vehicle that was involved in a traffic accident. (See Defendant's Motion for Summary Judgment, Exhibit I and Exhibit C at 13-16). The state vehicle was driven by Stacey and was determined to be the "prime contributing unit" (See Exhibit I at 1; Exhibit C at 37-39). Stacey acknowledged that the accident was her fault. (See Defendants' Motion for Summary Judgment, Exhibit C at 37.) Butler later claimed that Stacey had falsified a report of the accident. She (Butler) admitted, however, that she had no knowledge of what Stacey told the police or her supervisor. Butler admitted that her assertion that Stacey falsified a report was not based upon personal knowledge. Instead, Butler contends that Stacey told her that she (Stacey) intended to lie to Project Engineer Todd Jackson about who was at fault. (See Defendant's Motion for Summary Judgment, Exhibit A at 54-55).

17.     Subsequently, Butler told co-workers that Stacey had uttered a racial slur at the time of the accident. Stacey had denied using such language.[1] During this same time period, Butler advised Stacey that certain black employees wanted to harm Stacey. (See Exhibit

---

[1] On page 18 of the Plaintiff's brief (Doc. 29) she claims that the retaliation was based upon her report of Stacey's racial epithets. At the April 19, 2007 pre-trial conference, however, the Court and learned counsel for the Plaintiff discussed the problematic nature of a claim based upon these purported utterances. (See Attachment 1 to this pleading, Transcript of Pre-Trial Hearing, at page 34). Plaintiff now apparently claims that the retaliation claim is based upon her report of Stacey's filing of a false report of the accident and her third and fourth EEOC charge...

T, Attachment 1, at 10; Exhibit C at 25-26; Exhibit W.)  Stacey was concerned enough to file a

"Report of Workplace Violence."  (See Exhibit W.)[2]  After the January 31, 2005, incident, Butler

stopped riding to work with Stacey.  (See Defendant's Motion for Summary Judgment, Exhibit

A, at 28.)

18.    March 16, 2005--Stacey discussed Butler's claim with a black employee.

During this discussion, Stacey became aware of what Butler was telling black employees about

her (Stacey).  (See Exhibit T, Attachment 1, at 10; Exhibit C, at 26.)

19.    April 4, 2005— Todd Jackson sent a letter to Division Engineer Randy

Estes noting the high level of Stacey's performance, the change in work assignments to an

inspector on construction projects, and the dedication which Stacey shows to her new

assignments. Jackson also advised Estes that Stacey "has no problem working whatever hours

are required."

20.    April 6, 2005 – Stacey reported Butler's purported comments to her

supervisor, Project Engineer Todd Jackson.  (See Exhibit D, at 14.)  Jackson approached Butler

and asked about the racial epithets.  Butler said that Stacey had used the language but that she

"forgot it as soon as it happened."  (See Exhibit D, at 15.)  Jackson instructed Butler not to

discuss the matter with anyone else.  (See Exhibit D, at 16.)  Butler then discussed the matter

with several co-workers.  (See Exhibit U; Exhibit B, at 15-16; Exhibit T, Attachment 1, at 8.)

Butler admitted approaching at least three employees contrary to Jackson's instructions.  (See

Exhibit T, Attachment 1, at 8.)  Two co-workers acknowledged that Butler discussed the matter

with them on the morning of April 11, 2005.

---

[2] It is interesting to note that Exhibit W, the Report of Workplace Violence, includes a leave slip submitted and signed by Karen Stacey. The leave slip indicates that Stacey's work hours are 7:00 a.m. to 4:00 p.m.

21.     April 11, 2005--Stacey, Butler, and other co-workers were on a job site. There was a confrontation between Butler and Stacey regarding the statements.  Several other employees were involved in the discussion and work at the job site ceased.  (See Exhibit C, at 20, 23-25.)  Jackson was called to the job site by Stacey.  (See Exhibit D, at 25-28.)  Jackson later interviewed the employees present at the job site, other than Stacey and Butler, and, on April 13, 2005, issued Butler a reprimand.  (See Exhibit D, at 25-28; Exhibit Q.)[3]  Jackson issued the reprimand based on information that he obtained to the effect that Butler had hindered work, caused a disruption, and acted contrary to his instructions to not discuss the matter.

22.     On or about April 14, 2005, Butler received her yearly performance appraisal.  This was the last appraisal of Butler's performance.

23.     On or about April 15, 2005, Butler filed a departmental grievance alleging that Stacey made racial slurs at the time of the January traffic accident, that there had been a confrontation, that she received a reprimand, and that she received an unfair performance appraisal score.  (See Exhibit U.)  This grievance constituted the first time that Butler reported Stacey's alleged racial slur.

24.     April 2005--Defendant Waits investigated Butler's grievance.  Defendant Waits interviewed a number of employees, including Butler and Stacey, reduced their responses to writing, allowed the employees to review the responses, and had a number of those interviewed sign the written rendition of their responses.  (See Exhibit T.)  Based upon information received in his investigation, Waits found that Butler's actions justified her reprimand.  (See Exhibit T, Attachment 1, at 3.)  After reviewing Waits investigation, ALDOT's

_____

[3] At the Pre-Trial Hearing it was represented to the court, in all likelihood inadvertently, that  the problem with these interviews were that they included Stacey but not Butler (See attachment 1, at pages 32-33). The undisputed evidence is, however, that Jackson spoke to neither Stacey nor Butler before issuing the reprimand (See Exhibit D, at pages 25-28).

Human Resources Bureau issued an Investigative Determination upholding the reprimand.  (See Exhibit U.)  Butler appealed the finding, but failed to appear at a grievance hearing held thereon. Accordingly, her departmental grievance was dismissed.  (See Exhibit V.)

25.    April 27, 2005--Butler filed her third EEOC charge against ALDOT.  (See Exhibit AA.)  Defendants Waits and Jackson were not aware of this EEOC charge.

26.    June 14, 2005 – Defendant Jackson issued Butler a written reprimand due to her failure to follow his instructions to fill out EDP (Employee Development Program Training) forms.  This written reprimand did not adversely affect Butler as it occurred after her last performance appraisal with ALDOT.

27.    June 23, 2005--Butler filed her fourth EEOC charge against ALDOT. (See Exhibit CC.)  Defendants Waits and Jackson were not aware of this EEOC charge.

28.    August 24, 2005--Waits issued a memorandum to "All District Three Supervisors" regarding "Approved and Disapproved Leave."  (See Exhibit X.)  The memo was an attempt to clarify confusion as to how to treat situations where a leave request is denied and the employee takes the leave anyway.  (See Exhibit B, at 23-28.)  ALDOT's Finance Bureau, per Lamar McDavid, determined that disallowed or disapproved leave would be treated as leave without pay (LWOP).  (See Exhibit B, at 23-28.)  Accordingly, an audit was conducted to ensure that records were corrected.  (See Exhibit B, at 25, 26.)  As a result of the audit, some employees' leave balances were adjusted.  (See Exhibit Z.)  According to the Leave Accrual Correction Form (Exhibit Z), the balances were adjusted by first reducing the employees pay by an amount equal to the hourly rate for the number of hours in Leave Without Pay status.  A corresponding increase would be made in the employees leave balance.  In other words, if an

employee was docked for one hours pay, his total number of hours of accrued leave would be increased by one hour.

In the Sixth Division four employees had their leave balance adjusted in amounts ranging from one hours leave to eight hours leave. (See Exhibit Z.)

Among the four employees in the Sixth Division to whom this occurred was Alverene Butler. (See Exhibit Z.) As with the other three employees, the reduction in her hours paid was offset by an equal number of hours her total hours of accrued leave was increased. (Exhibit Z.)

29.    August 29, 2005--Todd Jackson instituted new leave policies for those under his supervision. (See Exhibit Y.) This policy required, in part, that all employees under his supervision obtain prior approval for annual leave, "call-ins" for sick leave be followed up with written documentation if the employee had less than 40 hours of leave, "call-ins" be made to his cell phone, and one unscheduled call-in and two unscheduled leave requests would be allowed per month.

30.    August 30, 2005--Jackson issued a letter of written counseling to Butler for excessive absences. (See Exhibit Y, at 2.) This letter did not constitute formal disciplinary action and would not have affected Butler's performance appraisal score. (In any event, Butler did not receive a performance appraisal after April 2005 as she retired before her annual performance appraisal for 2006 was due.) Jackson also issued Stacey letters of written counseling for her use of leave. (Exhibit D, at 12.)

31.    August 30, 2005--Jackson issued a letter of written counsel to Butler for her failure to follow call-in procedures. (Exhibit Y, at 3.) Again, this letter did not constitute formal disciplinary action and would not have affected Butler's performance appraisal score. (In

any event, Butler did not receive a performance appraisal after April 2005 as she retired before her annual performance appraisal for 2006 was due.)

32.    <u>August 31, 2005</u>--A representative from Retirement Systems of Alabama (RSA) responded to a request for information from Butler.  (See "Exhibit K.")  The Representative advised Butler that disability benefits would only be paid, "…after our Medical Board certifies that such member is mentally or physically incapacitated for the further performance of duty and that such incapacity is likely to be permanent…."

33.    <u>September 23, 2005</u> – Butler's physician, Albert Lester, M.D., submitted a report of disability to the RSA in which he indicated that hat he had treated Butler from April 20, 1985, to September 12, 2005, reported the following diagnoses as the cause of her disability: "Chronic back pain, neck pain, abnormal MRI Lumbar Spine, chronic shoulder pain, HTN, and Fibromyalgia."  On the second page of the report, when asked about records that clarify or support diagnosis, Lester noted, "Abnormal MRI of shoulder, Abnormal MRI of Lumbar Spine." (See "Exhibit N.")

34.    <u>November 2, 2005</u>--Butler submitted an Application for Retirement to the RSA Alabama.  ("Exhibit L.")  On the second page of her application Butler indicated that she was seeking "disability benefits from the Retirement Systems of Alabama."  (See "Exhibit M.")

35.    <u>November 8, 2005</u> -- Retirement Systems representative Lucy H. Holcombe advised Butler that her application for disability was approved.  Holcombe further advised Butler that her retirement would be effective January 1, 2006.  (See "Exhibit J.")

II.    Legal Contentions

1.    <u>Retaliation</u>--Since the filing of ALDOT's Reply on March 6, 2007, the Eleventh Circuit and two U. S. District Courts in Alabama  have addressed Title VII's anti-

retaliation provision. *Baldwin v. Blue Cross/Blue Shield*, 2007 WL 805528 (11th Cir. 2007); *Carter v University of South Alabama Children's &* *Women's Hospital*, 2007 WL 951739 (S.D. Ala. 2007); *Byrd v. Auburn University at Montgomery*, 2007 WL 1140424 (M.D. Ala. 2007).

In order to prevail on her retaliation claim Butler must show that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her protected activity and the adverse action. *Baldwin v Blue Cross*, *supra*; *Carter v. University of South  Alabama*, supra; *.Byrd v AUM*, supra.  Accord, *Crawford v. City of Fairburn, Ga.* __ F.3d __, 2007 WL 519061 (11th Cir. Feb 21, 2007); *Stavropoulus v. Firestone*, 361 F.3d. 610 (11th Cir 2004).

Butler does not specify, in her pretrial contentions, the protected activity for which she was retaliated against.  However, in her response to Defendants' Motion for Summary Judgment, Butler contends that she was retaliated against for engaging in the "protected activity" of complaining about Karen Stacey's racial slur and for filing an EEOC charge on April 27, 2005 and June 23, 2005.  At the April 19, 2007, pre-trial conference hearing, Butler's counsel suggested that Butler was retaliated against for reporting that Stacey had told her that she (Stacey) was going to lie about the January 2005 traffic accident.

Defendants contend that Stacey's comment did not constitute action by the employer. *Little v. United Technologies* 103 F.3d 956 (11th Cir. 1997).  Thus, Defendants contend that Butler's reporting of Stacey's comment did not constitute a protected activity *Little, supra*. Defendants further contend that Butler's alleged reporting of Stacey's "lie" regarding the January 2005 traffic accident did not constitute a protected activity . See, *Little*, supra.

With respect to the April and June 2005 EEOC charges upon which Butler bases her retaliation claim, Defendants contend that Plaintiff has not demonstrated that the decision-makers with respect to her alleged adverse employment actions (Waits and Jackson) were aware of the EEOC charges, and thus, Plaintiff's retaliation claim fails. *Gupta v Florida Board of Regents* 212 F3d 571(11th Cir. 2000).

Assuming Butler contends that she was retaliated against for complaining about her prior supervisor, James Horace, Defendants contend that these complaints (EEOC charge filed on August 28, 2002 and a departmental grievance filed on February 26, 2003) are too remote in time and are not causally connected to the adverse employments she contends that she was subjected to in 2005.

Of the 8 (eight) alleged adverse employment actions listed by Butler in her response to Defendants' Motion for Summary Judgment, 5 (five) do not, in fact, constitute an adverse employment action, and one is not attributable to ALDOT.

The five actions that miss the mark are as follows:

1. The revoked leave-It is undisputed that the leave that Butler contends was revoked was, in fact, disapproved leave for which Butler had already been paid. ALDOT auditors required that an accounting code adjustment be made to restore the leave to Butler and subtract the incorrect payment from her check. This did not amount to an adverse employment action since the hours subtracted from Butler's check were restored to her accumulated leave and were available for her subsequent use.
2. The contention, by Butler, has not been demonstrated to have resulted in any type of adverse action.
3. Letter of written counsel dated August 30, 2005, for excessive absences did not constitute formal disciplinary proceedings and would not have affected Butler's performance appraisal.
4. Letter of written counsel dated August 30, 2005, for failure to follow call in procedures did not constitute formal disciplinary proceedings and would not have affected Butler's performance appraisal.
5. The June 14. 2005, was not demonstrated to have affected Butler adversely since it was not captured in a performance appraisal due to her voluntary resignation in December of 2005.

Of the remaining three of the purportedly adverse actions one is not even attributable to the Defendants. The alleged failure to promote Butler was based upon decisions, actions, and procedures of the Alabama State Personnel Department not the Defendants. (See Defendants contentions regarding the failure to promote claim).

The remaining two actions cannot be deemed "adverse actions". The April 13, 2005 reprimand and April 14, 2005 performance appraisal does not establish a retaliation claim, because these events occurred before Butler filed her grievance (dated April 15, 2005) in which she reported Stacey's alleged racial slur and lie in connection with the January 2005 traffic accident.

Defendants contend that Butler's "witness testimony" (as contained in the affidavits of Kelvin Johnson and Melvin Wynn in Butler's response to Defendants' Motion for Summary Judgment) does not corroborate her claim that she was treated differently after she filed her EEOC charges in April and June of 2005, and after she complained about Karen Stacey's racial slur. Butler's witnesses do not provide any testimony regarding Defendants' knowledge of the EEOC charges and do not connect any Defendants' actions to the filing of Plaintiff's EEOC charges. To the extent that Butler's witnesses address Butler's treatment after she complained about Ms. Stacey's racial slur, Defendants contend that affiant Wynn's and Johnson's statements that Butler was "generally being treated unfairly" and that she was treated with "a general air of disdain and hostility" are too vague and conclusory to constitute evidence of retaliatory motive. *See Gore v. GTG South Inc.*, 917 F. Supp. 1564 (M.D.Ala. 1996); *Hawthorne v. Sears Termite Pest Control, Inc.*, 309 F. Supp. 1318 (M.D. Ala. 2003). Defendants contend that Butler's witnesses' testimony that Butler was not allowed to violate ALDOT policy regarding the call-in

procedure and time for arrival at work is not be based on their personal knowledge and, therefore, does not constitute evidence in support of her retaliation claim.

If Butler somehow succeeds in asserting a *prima facie* case, she merely shifts the burden back to ALDOT to "articulate a legitimate reason for the adverse action." *Byrd,* at 13. This burden has been characterized as "exceedingly light." *Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004); *Bicknell v. City of St. Petersburg*, 2006 WL 560167 (M.D. Fla. 2006).

Once the Defendant meets this burden of articulation, Butler must produce sufficient evidence to convince the fact-finder that each and every one of the employer's proffered reasons is pretextual. *Arnold v. Tuskegee University*, 2006 WL 3724152 (11th Cir. 2006). See also *Byrd*, supra.

In paragraph 31 of Butler's First Amended Complaint (Doc. No. 14 at 6), she claims she was the subject of retaliation for "having reported the misconduct of a white individual."

As noted in the *Statement of Facts* section of this memorandum, Butler was a passenger in a state vehicle that was involved in a traffic accident on January 31, 2005. (See Exhibit I; Exhibit C" at 13-16.) The state vehicle was driven by Karen B. Stacey, an employee of ALDOT.

Defendants contend that, as a matter of law, none of these actions is protected by Title VII. *Little v. United Technologies*, 103 F.3d 956(11th Cir. 1997); *Beckham v. Early Bankshares*, 2006 WL 826710 (M.D. Ga. 2006).

As noted above, even if Butler somehow succeeds in asserting a *prima facie* case, she merely shifts the burden back to ALDOT to "articulate a legitimate reason for the adverse action". This burden is one of production not persuasion. The Defendants have testified that the

reprimand was issued as a matter of employee discipline.  Butler has done nothing to show that this representation is pretextual.

To create a genuine issue of material fact with regard to pretext, Butler must demonstrate that the proffered reason was not the true reason for the employment decision. *Jackson v. State of Alabama State Tenure Comm*, 405 F.3d 1276(11th Cir. 2005).  The Plaintiff satisfies this requirement by either showing that a discriminatory reason more likely motivated the employer or by showing that the employer's explanation is unworthy of credence.  Such lack of credibility is shown by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's in the proffered reason that a reasonable fact finder finds them unworthy of belief. *Jackson*, *supra*.  *Vessels v. Atlanta Independent School System*, 408 F.3d 763 (11th Cir. 2005).

While Butler's two EEOC charges are clearly protected activity, the Defendants contend that they have more than satisfied their burden of articulating a legitimate reason for any adverse action. There is no evidence of pretext.

   2.    McInnes, Waits and Jackson Are Not Proper Defendants under Title VII --In addition to the Alabama Department of Transportation (ALDOT), Butler has named Joe McInnes, Mark Waits, and Patrick Todd Jackson as Defendants in  this action.  McInnes is named in his official capacity.  Waits and Jackson are named in both their individual and official capacities.

Only ALDOT may be sued under Title VII.  *Busby v. City of Orlando*, 931 F.2d. 764, 772 (11th Cir. 1991); *Smith v. Auburn University*, 201 F. Supp. 2d 1216 (M.D. Ala. 2002).  McInnes, Waits, and Jackson are not proper defendants under Title VII.

The Eleventh Amendment Bars Butler's 1983 Action against the Alabama Department of Transportation--In order to succeed on a 1983 claim, "a plaintiff must show that he or she was deprived of a federal right *by a person* acting under color of state law." *Griffin v. City of Opa Locka*, 261 F3d 1295, 1303 (11th Cir.2001) (emphasis added). According to *Will v. Mich. Department of State Police,* 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989), the State is not a "person" within the meaning of § 1983.

3.    Qualified Immunity--Defendants Waits and Jackson are sued both  in their official and their individual capacities.  These Defendants claim the defense of qualified immunity.

In order to overcome the qualified immunity defense, the Plaintiff must come forward with a factually analogous case from the United States Supreme Court or from the Eleventh Circuit which establishes that a reasonable person in Waits or Jackson's position would have known that the conduct complained of violated clearly established law.  *White v. Board of Trustees of the University of Alabama*, 31 F. Supp. 2d 953(N.D. Ala. 1999).

The burden is on the Butler to cite to this Court *binding* case law of the above-mentioned specificity.  *Hughes v. Alabama Dept. of Public Safety*, 994 F. Supp. 1395 (N.D. Ala. 1998); *Jordan v. Doe*, 38 F.3d. 1559 (11th Cir. 1994).

Butler's counsel has failed to cite any case law to the Court to overcome these Defendants' assertion of the qualified immunity defense.

Accordingly, Waits and Jackson are entitled to the defense of qualified immunity with regard to the Plaintiff's claims under 42 U.S.C. § 1983.

4    Plaintiff's Disparate Treatment Claims

Butler's Complaint alleges that she was subjected to disparate treatment by Defendants Jackson and Waits. In deposition, Butler identified Karen Stacey, a white ALDOT employee, as her cooperator. (Exhibit A, Deposition of Alverene Butler, at 14 and16). She could not identify anyone else from whom she was treated differently.

Defendants would first contend that this Court should follow the rationale of the Northern District in agreeing with the Fifth Circuit that allegations of disparate treatment in connection with Title VII cannot form the basis of a separate claim under Section 1983. *Montgomery v. City of Birmingham*, 200WL 1608620 (N.D. Ala. 2000), citing *Jackson v. City of Atlanta, Texas*, 73 F.3d 60,63 (5th Cir. 1996).

Butler's claim must fail due to the lack of a proper cooperator for purposes of showing disparate treatment. In determining appropriate cooperators, the legal standard for such relevant evidence is routinely addressed in Title VII actions through well settled case law. For instance, in *Holifield v. Reno,* 115 F.3d 1555, 1562(11th Cir. 1997), the Court held employees are "similarly situated" only when the cooperator is "nearly identical" to the employee. Similarly situated employees are the only appropriate legal comparison because the law does not vest the Court with the authority to second-guess a reasonable employer's decisions. *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).

In the case at bar, it is undisputed that Karen Stacey held the title of Chief Inspector as opposed to Butler's working title of Inspector. (Exhibit C, at 30-32.) Stacey held the title of Chief Inspector from the time Jackson put Stacey and Butler back in the field until Stacey retired. (Exhibit C, at 30-32.) Jackson appointed Stacey to the Chief Inspector position because she showed initiative and an ability to get things done. He noted that when he gave Stacey something to do that it got done. (Exhibit T, Attachment 1, at 25.) Butler acknowledged that the

duties of a Chief Inspector were largely "to delegate" and to supervise.  (Exhibit A, 122-3.)  A comparison, therefore, of duties, tasks performed, or work not done, is clearly improper.

Butler also compares herself to Stacey in alleging that the Defendants failed to promote her (Butler) to the position of Civil Engineer.  Once again, Stacey is not a proper cooperator. Stacey testified that she took the test for the Civil Engineer position and "got on the register". Unlike Stacey, Butler was not "on the register."  Butler was once determined not to meet minimum qualifications and, on two other occasions, simply failed to appear for the test (Exhibit S, Affidavit of Steve Dukes) so that she could be placed on a register.  Stacey was available for interviews.  Butler was not available for consideration.  As Dukes noted, it was "impossible" for the Department to even consider her (Butler) for a position.  (Exhibit S, Affidavit of Steve Dukes.)

Even if, however, Butler could make out a *prima face* case of disparate treatment, her claim would still fail.  The Defendants have set forth legitimate, non-discriminatory reasons for their actions.  These reasons have been set forth in previous sections of this memorandum.

Defendants contend that Butler's identification of instances in which she claims she was treated differently based on her race are not supported by the evidence. Butler's "witness testimony" (as presented in her response to Defendant's Motion for Summary Judgment) do not demonstrate that Butler's alleged differential treatment was based on race. In fact, Butler's witnesses state that she was treated fairly prior to her report of Stacey's alleged racial slur and purported falsehood concerning the January 2005 traffic accident. Stated another way, the crux of Butler's "testimony" and evidence is that her differential treatment occurred after she complained about Karen Stacey's racial slur, and, thus, is geared toward the Plaintiff's retaliation claim, not to her racial discrimination claim. Defendants also contend that affiant

Wynn's and Johnson's statements that Butler was "generally being treated unfairly" and that she was treated with "a general air of disdain and hostility" are too vague and conclusory to constitute evidence of racial discriminatory intent. Thus, Butler's claim of disparate treatment based on race is not supported by any evidence and must fail.

Butler cannot establish a *prima facie* of discrimination in promotion.  In *Hawthorne v. Sears Termite and Pest Control,* 309 F. Supp. 2d 1318 (M.D. Ala), the Middle District recognized the elements for a *prima facie* case as requiring that plaintiff show (1) he is a member of the protected class; (2) he applied for and was qualified for the promotion; (3) he was rejected in spite of his qualifications; and, (4) the position went to a person who was not a member of the protected class or the employer continued to attempt to fill the position after rejecting the employee's application.

In Butler's case she fails to meet elements two and three.  In all three of her attempts to apply, she was either adjudged not qualified or she failed to complete the application process by taking the examination.  The one time Butler's application was rejected it was rejected due to her lack of minimum qualifications and not in spite of her qualifications.  (Exhibit S, Affidavit of Steve Dukes.)

5    Constructive Discharge

A constructive discharge occurs when a discriminatory employer imposes working conditions that are "so intolerable that a reasonable person in the employee's position would have been compelled to resign." *Fitz v. Pugmire Lincoln Mercury Inc.,* 348 F.3d 974, 977 (11th Cir. 2003), *Poole v. Country Club of Columbus, Inc.,* 129 F.3d. 551,553 (11th Cir. 1997).

The undisputed evidence reflects that Butler applied for and accepted disability retirement after being certified by Retirement Systems of Alabama as being permanently physically incapacitated for the performance of duty.  (Exhibits K-O.)  None of Butler's allegations arise to the level of being so intolerable as to compel her resignation.

6    Due Process -- The Supreme Court's interpretation of the 14th Amendment provides that it contemplates two different kinds of constitutional protection: procedural due process and substantive due process. *Zimmerman v. Burch*, 494 U.S. 113, 110 S. Ct. 975, 108 L. Ed.2d 100(1990); *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994). A finding that a right merits substantive due process protection means that the right is protected against certain government actions regardless of the fairness of those actions. *McKinney, supra*.

   a)    Substantive Due Process—Areas of law to which substantive due process protection has not been extended are tort and public employment law. *McKinney*, at 1556. *Artistic Entertainment, Inc. v City of Warner Robbins* 134 F. App'x 306 (11th Cir. 2005)
   b)    Procedural Due Process---The plaintiff did not state what rights she has been denied. Defendants would contend that the plaintiff cannot make a procedural due process claim because her voluntary retirement did not trigger any process contemplated by state statute or constitution.

   In the case at bar, the evidence is clear that the Defendants did not request that the Butler resign.  Instead, Butler, like the plaintiff in *Hughes*, chose to retire.  Because there is no constructive discharge, there is nothing to trigger the procedural due process component of the due process clause.

28

3.    <u>STIPULATIONS BETWEEN THE PARTIES:</u>
      At this time the facts material to this action remain disputed.

      It is **ORDERED** that:

      (1)    The jury selection and trial of this cause, which is to last three (3) days, are set for June 4, 2007, at 10:00 a.m. at the United States Courthouse in Montgomery, Alabama;

      (2)    A trial docket will be mailed to counsel for each party approximately three weeks prior to the start of the trial term;

      (3)    The parties are to file their pre-trial briefs, if any, May 29, 2007;

      (4)    Each party shall have available at the time of trial, for use by the court (the judge, the courtroom deputy clerk, and the law clerk), three copies of the exhibit list and a sufficient number of copies of each photostatically reproducible exhibit for opposing counsel, the courtroom deputy clerk, the law clerk, and the judge to each have a set of the exhibits;

      (5)    All deadlines not otherwise effected by this order will remain as set forth in the Uniform Scheduling Order (Doc. #21) entered by the court on August 4, 2006;

      (6)    All understandings, agreements, deadlines, and stipulations contained in this Pretrial Order shall be binding on all parties unless this Order be hereafter modified by Order of the Court.

      DONE this the 1st day of May, 2007.


                        _____
                             /s/ Mark E. Fuller
                        CHIEF UNITED STATES DISTRICT JUDGE